# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * * * *
                                  *  CIVIL ACTION NO.
JOHN HUGHES                       *  3:02CV1917(SRU)
         PLAINTIFF                *
                                  *
VS.                               *
                                  *
MILFORD HOUSING AUTHORITY,        *
ET AL.                            *
         DEFENDANTS               *
                                  *
* * * * * * * * * * * * * * * *

COPY

-----------------------------------------------------
                DEPOSITION OF:   JOHN HUGHES
-----------------------------------------------------

    Taken before Irene A. Janazzo, Registered
Professional Reporter, Lic./Reg. No. 00085, and
Notary Public in and for the State of Connecticut,
pursuant to the Federal Rules of Civil Procedure,
at the offices of Robinson & Cole, LLP, 280 Trumbull
Street, Hartford, Connecticut, on September 12, 2003,
commencing at 10:46 a.m.

BRANDON SMITH REPORTING SERVICE, LLC
          44 Capitol Avenue
          Hartford, CT  06106
          Tel:  (860) 549-1850
          Fax:  (860) 549-1537

Page 52

1  Q    Without what your lawyer told you, was your --
2  A    I refer this to my counsel.
3              MR. CHIMES:  Don't answer the
4        question.
5              I'm going to instruct him not to
6        answer because it would be impossible for
7        him to answer because he has no independent
8        ability to answer other than communications
9        with me.
10             MS. WALKER:  That's fine.  That's
11       fine.  If that's the answer, that's -- I'm
12       not going to probe you on that.
13 BY MS. WALKER:
14 Q    If you can look at paragraph 39, it says,
15      "Milford Housing Authority's personnel policies
16      govern the terms and conditions of the
17      employment relationship."  What does "personnel
18      policy" refer to there?  You can answer the
19      question, Mr. Hughes.
20 A    What's stated in the personnel policies.
21 Q    What personnel policies are you referring to?
22 A    I'm referring to the '99 personnel policies.
23 Q    Paragraph 40 says, "MHA's personnel policies
24      were mutually binding upon MHA and Hughes and
25      constituted an enforceable contract."

Page 53

| | | |
|---|---|---|
| 1 | A | When I began employment. |
| 2 | Q | Okay. Why were you told that your employment was being terminated? Strike that. |
| 4 | | Who told you that you would no longer be employed by the Milford Housing Authority? |
| 6 | A | The director and Mr. David Dunn. I was home in bed sick with the flu, a telephone conversation. |
| 9 | Q | And both Mr. Dunn and Mr. Vasiliou were on the telephone with you? |
| 11 | A | That's correct. |
| 12 | Q | And what did Mr. Vasiliou say? |
| 13 | A | That you are terminated. You are no longer employed as of today, 4 o'clock today. |
| 15 | Q | What else did he say? |
| 16 | A | He went on with his usual rhetoric. |
| 17 | Q | What was that? |
| 18 | A | I said, "Is this from you or is this the board? Has this been brought?" |
| 20 | | "Yes, it has been," and that's it. "Come in and pick up your personal effects." |
| 22 | Q | Did he give you a reason for the separation of your employment? |
| 24 | A | Not on the telephone conversation. |
| 25 | Q | He didn't say anything to you about why you |

Page 54

1           were being separated?
2    A      No, not till I received the paperwork that I
3           was being laid off.
4    Q      So you had no idea why your employment was
5           being separated as a result of that phone call?
6    A      None whatsoever.
7    Q      Did you think it was because of theft?
8    A      No, God, no.
9    Q      So it's fair to say you had no clue why your
10          employment was being severed?
11   A      No.
12   Q      Did Mr. Dunn tell you why your employment was
13          being severed during that telephone
14          conversation?
15   A      No. I would be advised, come in and I would be
16          given the paperwork.
17   Q      And did you eventually go in?
18   A      Yes, I did.
19   Q      And when was that?
20   A      The following week.
21   Q      So from the time of the phone conversation
22          until the following week, you had no idea why
23          your employment was being severed?
24   A      No, I didn't.
25   Q      Did you call anybody and ask anyone?

Hughes vs Milford Housing

9/12/2003                                                          John Hughes

Page 55

| | | |
|---|---|---|
| 1 | A | I don't recall. |
| 2 | Q | Who did you speak with during that week with regard to the separation of your employment? |
| 4 | A | People in the office, Kathryn Bozzi. She had the paperwork. |
| 6 | Q | What did say to Ms. Bozzi, and what did she say to you? |
| 8 | A | "This is the paperwork I'm told to give you. Here it is" and the presentation, "It's been a pleasure working with you," and we shook hands. |
| 11 | Q | And was that before or after you met with Mr. Vasiliou? |
| 13 | | MR. CHIMES: Objection. He testified he got a phone call. |
| 15 | | MS. WALKER: He also testified that he went in and met with Mr. Vasiliou. |
| 17 | BY MS. WALKER: | |
| 18 | Q | So before you met with Mr. Vasiliou -- |
| 19 | A | Whoa, whoa, whoa, met with Mr. Vasiliou? I was home sick on Friday with the flu in bed when the phone call arrived. |
| 22 | Q | And they didn't tell you why you were being separated. They just told you that your employment was being severed? |
| 25 | A | Yeah. "You're being severed from the MHA." |

Hughes vs Milford Housing

9/12/2003                                              John Hughes

Page 56

| | | |
|---|---|---|
| 1 | Q | That's all they said? |
| 2 | A | Um-hum. |
| 3 | Q | How long was the phone conversation? |
| 4 | A | Minutes, not very long at all. |
| 5 | Q | And what did you do when you got off the |
| 6 | | telephone? |
| 7 | A | Well, I was in bed at the time, and I was very |
| 8 | | sick with the flu, went to the toilet, I think. |
| 9 | Q | And what did you do after that? |
| 10 | A | Got a glass of water and sat down. |
| 11 | Q | Do you have a spouse or a significant other? |
| 12 | A | No, I don't. |
| 13 | Q | Did you call anyone and tell them that your |
| 14 | | employment had been severed? |
| 15 | A | No, I didn't. |
| 16 | Q | Who was the first person that you told that |
| 17 | | your employment had been severed? |
| 18 | A | I don't remember. |
| 19 | Q | Did you tell anyone that your employment had |
| 20 | | been severed before you eventually came in and |
| 21 | | met with Mr. Vasiliou? |
| 22 | | MR. CHIMES: Objection. There's no |
| 23 | | testimony he met with Mr. Vasiliou. |
| 24 | A | I don't recall. |
| 25 | BY MS. WALKER: | |

Page 57

1  Q   After you got this phone call from Mr. Dunn and
2      Mr. Vasiliou, did you eventually learn of the
3      reasons of the separation of your employment?
4  A   Through the paperwork that I was given.
5  Q   So you never had another conversation with
6      Mr. Dunn or Mr. Vasiliou?
7  A   I don't recall, no, not to my knowledge.
8  Q   During your phone conversation with them, did
9      you ask them why your employment was being
10     severed?
11 A   I believe I did.
12 Q   And what did they tell you?
13 A   I don't recall.
14 Q   Did they not answer the question?
15 A   I don't remember. I was sick to begin with.
16     I'm not that sick that often. This was very
17     unusual, especially for me to be in bed, and I
18     wasn't clear. It was a shock. It was a
19     lightning bolt out of the blue to say the
20     least, and then not only being sick and this
21     occurring, I was -- I was in disbelief of it.
22 Q   So you don't recall -- when you asked them the
23     question why you were being severed, you don't
24     recall the answer that they gave you?
25 A   No.

Page 108

```
 1                          letter, 3/8/02, marked for
 2                          identification.)
 3
 4    BY MS. WALKER:
 5    Q    Do you recognize this letter, Mr. Hughes?
 6    A    Yes.
 7    Q    When did you receive that?
 8    A    After the 8th, I received this, that next week,
 9         Tuesday perhaps, Monday, Tuesday.
10    Q    And did you receive it in the mail?
11    A    Yes -- no.  It was delivered to me.
12    Q    Hand delivered?
13    A    I think so.
14    Q    By whom?
15    A    I don't recall.
16    Q    Okay.  Did you have an exit interview with
17         Mr. Dunn?
18    A    No, I didn't.
19    Q    Did Mr. Dunn call you about an exit interview?
20    A    No, he didn't.
21    Q    Did you speak to anyone about having an exit
22         interview with Mr. Dunn?
23    A    No.
24    Q    Did you ever ask anybody about it?
25    A    No.
```

```
 1              MR. CHIMES:  Objection.  I don't think
 2          that's a fair characterization of it but --
 3   BY MS. WALKER:
 4   Q    Which one is accurate, Mr. Hughes?
 5   A    This is my statement that I wrote.  I wouldn't
 6        have written it if that's not what happened.
 7   Q    So they did tell you the reason for the
 8        separation of your employment during the phone
 9        conversation?
10   A    It's been 18 months since that occurred.
11   Q    You told me a lie before, didn't you?
12   A    No, I didn't tell you a lie.  I told you I
13        didn't recall --
14   Q    No, you didn't.
15   A    -- and my vague remembrances, but right here it
16        is.
17              MS. WALKER:  Can you mark this.
18
19                    (Defendant's Exhibit No. 17,
20                    notes, 3/1/02, marked for
21                    identification.)
22
23   BY MS. WALKER:
24   Q    Could you read what's been marked as
25        Defendant's Exhibit 17.
```

Page 153

```
 1         lawyer.  Have you told anyone that Mr. Vasiliou
 2         told you that he didn't intend to comply with
 3         the settlement agreement?
 4              MR. CHIMES:  This is asked and
 5         answered.
 6    A    Other than what I've told you?
 7  BY MS. WALKER:
 8    Q    Have you told -- have you said that to anyone,
 9         that Mr. Vasiliou did not intend -- told you --
10         strike that.  Let me start again.
11    A    But you've asked me that before.
12              MR. CHIMES:  This is asked and
13         answered.
14              MS. WALKER:  I want to make sure I
15         understand.
16              MR. CHIMES:  You know what --
17  BY MS. WALKER:
18    Q    Did you tell --
19    A    The people I told you before earlier.
20    Q    I want to make sure I understand what you told
21         them.  You told Ms. Devito -- if I do it in two
22         parts, it will be easier.  Have you told anyone
23         that Mr. Vasiliou told you that he did not
24         intend to comply with the terms of the
25         settlement agreement?
```

Hughes vs Milford Housing

9/12/2003                                                                John Hughes

Page 154

```
 1                    MR. CHIMES:  Objection.
 2    A    Other than what I told you before?
 3                    MR. CHIMES:  That's an appropriate
 4           answer.
 5    BY MS. WALKER:
 6    Q    That's a yes or no.  Have you told people that?
 7    A    The people I told you already.
 8    Q    So the answer is yes?
 9    A    Yes.  You asked me who they were, and I told
10         you.
11    Q    And those people were Karen DeVito, Margaret
12         Mandell, Department of Justice?
13    A    Um-hum.
14    Q    Who am I missing?
15    A    My attorney.
16    Q    I don't want to know about your attorney.
17         CCLU, Dion Smith?
18    A    Dion Smith.
19    Q    Okay.  Did you tell those same people that you
20         thought Mr. Vasiliou was doing something
21         unlawful?
22    A    What do you mean "unlawful"?
23    Q    Illegal.
24                    MR. CHIMES:  Objection to the form.
25                    You can answer.
```

# EXHIBIT C

Hughes vs Milford Housing

12/4/2003 Shelley White

Page 1

```
                  UNITED STATES DISTRICT COURT

                     DISTRICT OF CONNECTICUT

      - - - - - - - - - - - - - - - - - - -x
      JOHN HUGHES,
                          Plaintiff,        |   Civil Action No.
                                                 302CV1917 (MRK)
                          vs.                |

      MILFORD HOUSING AUTHORITY,             |
      ANTHONY VISILIOUI, RICHARD ANDERSEN,
      HILARY HOLOWINK, JOHN AMENTA,          |
      EDWARD CANELLI AND JACK TUCCIARONE,
                                             |
                          Defendants.
      - - - - - - - - - - - - - - - - - - -x




              DEPOSITION OF:  SHELLEY A. WHITE
              DATE:  DECEMBER 4, 2003
              HELD AT:  ROBINSON & COLE, LLP
              280 TRUMBULL STREET
              HARTFORD, CT




                 Tiffany V. Pratt, LSR #00128
              BRANDON SMITH REPORTING SERVICE, LLC
                       44 Capitol Avenue
                  Hartford, Connecticut  06106
                         (860) 549-1850
```

COPY

Page 36

```
 1   conversation?
 2        A    That conversation that I had had initially with
 3   him.
 4        Q    So she was following up on your memorandum?
 5        A    Yes.
 6        Q    Did you take any notes at that meeting?
 7        A    No.
 8        Q    Do you know if the other parties took any notes?
 9        A    At this point, I have no memory whatsoever.
10        Q    Were any decisions made at that meeting with
11   respect to a course of action?
12        A    I think the course of action was that Je Yon -- I
13   can't remember whether it was at the same trip or if she
14   came down a second time, but we were going to look at the
15   Housing Authority's files more in-depth and take a closer
16   look again at the files in light of what he was saying about
17   the spending of money and the 28 units, that we would take
18   another look at the files.
19        Q    And did you do that?
20        A    Yes.
21        Q    How was that accomplished?  What process was
22   followed?
23        A    That Je Yon and I went down to the Milford Housing
24   Authority, and they had files that -- Anthony had files, and
25   I believe they had brought in the files from John D'Amelia.
```

Page 37

1   John D'Amelia kept his files in Waterbury, and I'm fairly
2   sure John had had his files delivered over to the housing
3   authority so that we didn't have to make two trips to two
4   different places.
5       Q    What did you find in those files?
6       A    We were looking to see if there was a reason for
7   us to go back in to court.  Actually, under this process,
8   what happens is we send a 30-day notice to the housing
9   authority of an intent to -- of a potential violation of the
10  consent decree.  That's what we were trying to determine if
11  we wanted to do or not.  And my recollection from the review
12  of the files was that we simply didn't feel we had the
13  evidence to send such a notice.
14      Q    So there wasn't evidence that money was being
15  spent excessively on soft costs?
16      A    We could not determine that.  My recollection was
17  that we discussed with the Justice Department having a
18  file -- having had the files audited, decided that it
19  probably wasn't cost effective; that it -- that we didn't
20  think that we would uncover anything that would do anything
21  more than, you know, maybe, maybe get another unit or
22  something like that.  So we weren't -- we just thought all
23  things being equal, that we weren't going to -- we didn't
24  see the evidence there to be able to follow-up on it.
25      Q    So you weren't able to find evidence to support