```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3

 4

 5
         ----------------------------------X
 6       JOHN HUGHES,                      :
                   Plaintiff,              :  CIVIL ACTION NO.
 7       V.                                :  302CV1917(MRK)
         MILFORD HOUSING AUTHORITY,        :
 8       ANTHONY VASILIOU, RICHARD         :
         ANDERSEN, HILARY HOLOWINK, JOHN   :
 9       AMENTA, EDWARD CANELLI AND JACK   :
         TUCCIARONE,                       :
10                 Defendants.             :
         ----------------------------------X
11

12

13

14

15            DEPOSITION OF:  DION SMITH,
         taken before Kelly E. Yarasavych, Court Reporter
16       and Notary Public in and for the State of
         Connecticut, at the law offices of Robinson &
17       Cole, LLP, 280 Trumbull Street, Hartford,
         Connecticut, on February 26, 2004.
18

19

20

21

22
                    Reporter:  KELLY E. YARASAVYCH
23             License Registration Number:  00058
                 BRANDON SMITH REPORTING SERVICE
24                    44 Capitol Avenue
                  Hartford, Connecticut 06106
25                      (860) 549-1850
```

Hughes vs Milford Housing

2/26/2004                                                              Dion Smith

Page 2

```
         APPEARANCES
1
2
3  REPRESENTING JOHN HUGHES AND DION SMITH:
   GARRISON, LEVIN-EPSTEIN,
4  CHIMES & RICHARDSON, P.C.
   405 Orange Street
5  New Haven, CT 06511
   By: Lewis H. Chimes, Esq.
6
7
   REPRESENTING THE DEFENDANTS:
8  ROBINSON & COLE, LLP
   280 Trumbull Street
9  Hartford, CT 06103-3597
   By: Anne Noble Walker, Esq.
10
11
   ALSO PRESENT:
12 Anthony J. Vasiliou
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
         STIPULATIONS
1
2
3
4      It is stipulated by the attorneys for the
5  Plaintiff and the Defendant that each party reserves the
6  right to make specific objections in open court to each and
7  every question asked and the answers given thereto by the
8  witness, reserving the right to move to strike out where
9  applicable, except as to such objections as are directed to
10 the form of the question.
11
12     It is stipulated and agreed between counsel for
13 the parties that the proof of the authority of the
14 Commissioner before whom this deposition is taken is
15 waived.
16
17     It is further stipulated that any defects in the
18 notice are waived.
19
20     It is further stipulated that the reading and
21 signing of the deposition transcript by the witness is not
22 waived.
23
24
25
```

Page 3

```
            INDEX
1
2
   WITNESS:      DIRECT  CROSS  REDIRECT  RECROSS
3
4  Dion Smith       6
5
6
7
8  Exhibits:            Page:
9
10 Exhibit 1, Subpoena Duces Tecum -------------------- 7
   Exhibit 2, Folder of Documents -------------------- 8
11 Exhibit 3, Resume -------------------------------- 10
   Exhibit 4, Five-page Job Description -------------- 13
12
13
   (The exhibits were retained by Attorney Walker.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1      (The deposition commenced at 2:06 p.m.)
2      DION SMITH, Deponent, having
3  been duly sworn by the Court Reporter, deposes
4  and states as follows:
5      MS. WALKER: We are under an order from the
6  court with respect to this deposition. And that court
7  order indicates that any questions pertaining -- and if I
8  get this wrong, Lew, step in.
9      Any questions pertaining to the deponent's
10 communications with the Department of Justice, with HUD,
11 and with OIJ {sic} will be under a protective order.
12     Under that protective order, the communications
13 will not be disclosed to any of the defendants in this
14 lawsuit, until the court has had an opportunity to review
15 the contents of the deposition.
16     In addition, the court has requested that
17 Mr. Vasiliou not be present at the deposition for questions
18 pertaining to the deponent's communications with OIJ {sic},
19 HUD, and the department of -- OIG, HUD, and the Department
20 of Justice.
21     And therefore, we will save that portion of the
22 deposition until the end, and Mr. Vasiliou will excuse
23 himself.
24     MR. CHIMES: That's fine.
25
```

Page 6

1      DIRECT EXAMINATION
2   BY MS. WALKER:
3       Q   Mr. Smith, my name is Anne Walker. I'm an
4   attorney. I represent all of the defendants in the matter
5   brought by Mr. Hughes against the Milford Housing
6   Authority, Mr. Vasiliou, and the commissioners.
7           Have you ever been deposed before?
8       A   Uh-huh.
9           THE COURT REPORTER: You have to answer in
10  words.
11          THE WITNESS: Yes.
12      Q   (By Ms. Walker) Is it fair to say that you
13  understand that in the course of this deposition, I'll ask
14  you a series of questions, and you need to provide answers
15  to those questions?
16      A   Yes.
17      Q   You understand that?
18      A   Yes.
19      Q   It would be helpful for the court reporter if
20  you respond affirmatively with a response, as opposed to
21  nodding; do you understand that?
22      A   Yes.
23      Q   And I am going to assume that if you answer my
24  question, then you understood the question; is that clear?
25      A   Yes.

Page 7

1       Q   Do you agree to that?
2       A   Yes.
3       Q   Therefore, if you don't understand a question,
4   you agree to tell me that?
5       A   That's correct, yes.
6       Q   If you need a break, can you agree to tell me
7   that you need a break?
8       A   Yes.
9       Q   Are you under any -- are you taking any
10  medications, or are there any factors which would preclude
11  you from giving honest and accurate testimony here today?
12      A   Not that I'm aware of.
13      Q   And you will tell me if at any point during the
14  deposition you become unable for some reason to give honest
15  and accurate testimony?
16      A   Sure.
17          MS. WALKER: Can you mark that?
18          (Exhibit 1, Subpoena Duces Tecum, marked for
19          identification.)
20      Q   (By Ms. Walker) Mr. Smith, I'm showing you
21  what has been marked as Defendants' Exhibit 1. Is that a
22  copy of a subpoena that you were issued to come here today?
23      A   Yes.
24      Q   And could you turn to Schedule A, which is on
25  the third page?

Page 8

1       A   Okay.
2       Q   Have you read that schedule?
3       A   Yes, I have.
4       Q   And you brought a folder, or your attorney
5   brought a folder of documents here today; is that correct?
6       A   That's correct.
7           MS. WALKER: And can you mark those?
8           (Exhibit 2, Folder of Documents, marked for
9           identification.)
10      Q   (By Ms. Walker) That folder that I'm placing
11  in front of you, that's been marked as Defendants' Exhibit
12  2; is that correct?
13      A   That's correct.
14      Q   Are those documents responsive to what was
15  requested in schedule A?
16      A   The way I understood it, yes.
17      Q   Is there something about the Schedule A that
18  you don't understand?
19      A   Nope.
20      Q   You would tell me if there was?
21      A   Yes.
22      Q   Do you have any other documents that are
23  responsive to the Schedule A?
24          MR. CHIMES: Objection to the form.
25          You can answer.

Page 9

1           THE WITNESS: Can you repeat the question,
2   please?
3       Q   (By Ms. Walker) Do you have any other
4   documents in your possession, at your home, wherever,
5   within your custody or control, that are responsive to this
6   schedule?
7       A   No.
8           MR. CHIMES: I'll state for the record that in
9   the initial subpoena I did object, obviously. I have not
10  withheld any documents on the basis of objections.
11      Q   (By Ms. Walker) Do you have any documents in
12  your possession at home relating to Milford Housing
13  Authority?
14      A   At home? Yes.
15      Q   What are those?
16      A   Letters from Anthony, my hire letter, Board of
17  Commissioners' grievances.
18      Q   What else? Do you have an employee handbook at
19  home?
20      A   Not at home.
21      Q   Okay. Do you have anything relating to
22  Mr. Hughes' employment at home?
23      A   No.
24      Q   Do you have anything relating to -- do you have
25  any correspondence between you and Mr. Hughes at home?

### Page 10

1   A   No.
2   Q   What about at your office?
3   A   No.
4   Q   Where do you presently reside, Mr. Smith?
5   A   63-B Briarwood Lane.
6   Q   And your phone number?
7   A   (203)488-4405.
8   Q   How long have you lived there?
9   A   Three and a half years, roughly.
10      MS. WALKER: Can you mark that?
11      (Exhibit 3, Resume, marked for
12      identification.)
13  Q   (By Ms. Walker) I'm going to show you what has
14  been marked as Defendants' Exhibit 3. Can you tell me what
15  that document is?
16  A   It looks like my resume.
17  Q   Is it a copy of a resume that you submitted to
18  the Milford Housing Authority?
19  A   I assume so.
20  Q   Do you have any reason to believe it's not?
21  A   It's been several years.
22  Q   Other than the fact that time has passed and
23  your memory may be marred, do you have any reason to
24  believe that this is not the resume that you submitted to
25  the Milford Housing Authority?

### Page 11

1   A   No.
2       MR. CHIMES: What relevance does that have to
3   Mr. Hughes' termination?
4       MS. WALKER: I'm going to ask him one more
5   question, then we can move on.
6   Q   (By Ms. Walker) If you can take a minute to
7   review it, I'd just like you to tell me whether or not the
8   information contained in that resume is accurate.
9       MR. CHIMES: You don't have to answer that.
10      MS. WALKER: We did not waive --
11      MR. CHIMES: I understand. I don't think it's
12  appropriate. He's identified it as what appear to be his
13  resume. I don't see that as a basis of inquiry in this
14  case. It might be if --
15      MS. WALKER: Have we not waived objections as
16  to relevance?
17      MR. CHIMES: I don't think it's reasonably
18  discovered, relevant to the discovery of --
19      MS. WALKER: That's not the question. The
20  question is, we have the usual stipulations entered, and
21  we've waived all objections, except as to relevance.
22      All I'm asking him is whether what is on his
23  resume is accurate. Are you directing him not to answer?
24      MR. CHIMES: Tell me how that is reasonably
25  related to the discovery of admissible evidence.

### Page 12

1       MS. WALKER: It is general background
2   information for any witness. It is not overly or unduly
3   burdensome. All I'm doing is asking him to point out if
4   there are any known inaccuracies on his resume. I'm saving
5   a lot of time not going through --
6       MR. CHIMES: I wouldn't let you go through it.
7       You can answer it, if you know.
8   Q   (By Ms. Walker) Take your time, Mr. Smith.
9       MR. CHIMES: For the record, this was produced
10  to my office today.
11      MS. WALKER: You're free to request your
12  client's personnel file at any time.
13      MR. CHIMES: Why would I do that in a case
14  where he's not the plaintiff?
15      MS. WALKER: It doesn't have to be in
16  connection with this case.
17      THE WITNESS: Can you repeat the question,
18  please?
19  Q   (By Ms. Walker) Sure. Mr. Smith, is there
20  anything on this CV or resume, on this document that is in
21  front of you, that to your knowledge, as you sit here
22  today, is inaccurate?
23  A   Not that I'm aware of.
24  Q   Exclusive of the writing that I assume is not
25  yours at the top.

### Page 13

1   A   I don't see anything here that might be
2   inaccurate. The dates may be off a little bit. But as far
3   as the descriptions, it seems to be accurate.
4   Q   Why do you say the dates may be off a little
5   bit?
6       MR. CHIMES: You don't have to go through that.
7   That's good enough.
8       Ask questions about Mr. Hughes.
9       MS. WALKER: You're directing him not to
10  answer?
11      MR. CHIMES: Yes, I am.
12      MS. WALKER: Can you mark that?
13      (Exhibit 4, Five-page Job Description, marked
14      for identification.)
15  Q   (By Ms. Walker) I'm going to show you what has
16  been marked as Defendants' Exhibit 4. If you can, take a
17  minute to look at it, Mr. Smith, and can you tell me if you
18  recognize those documents? And take your time, please.
19  A   Okay. They look familiar to me.
20  Q   Okay. And is the first one, as far as you
21  know, a copy of your offer letter?
22  A   As far as I know, yes.
23  Q   And is the second document, in what has been
24  marked as Defendants' Exhibit 4, a copy of your job
25  description as work center supervisor?

Hughes vs Milford Housing

2/26/2004                                                                                               Dion Smith

Page 14

1    A   As far as I can tell, yes.
2    Q   Did you receive this job description at the
3    time that you were hired?
4    A   Yes. But I cannot attest that this is the
5    exact same one that I have, that was given to me.
6    Q   That's okay. Were you told, at the time that
7    you were hired, what your principal responsibilities would
8    be?
9    A   Yeah. I believe Jack Hughes told me that I
10   would be responsible for the maintenance department, taking
11   care of work orders, and training the staff, when needed,
12   along with Mr. Hughes.
13       It's been a while. I don't recall everything
14   that was said. I know that I received a document that
15   looked like this. And as far as what was said between
16   Anthony and myself, or Jack Hughes and myself, I don't
17   recall the conversations.
18   Q   What are your present responsibilities at the
19   Milford Housing Authority?
20   A   I take care of the maintenance department. I
21   plan maintenance activities. I take care of insurance
22   claims. I take care of turning units. Anything that has
23   to do with maintenance, repair, snowplowing, lawn cutting.
24   I answer the phones. I do just about everything.
25   Q   How many people do you supervise?

Page 15

1    A   I work with three maintenance men.
2    Q   And do they report to you?
3    A   Yes.
4    Q   Okay. Are your responsibilities today
5    different than they were when you were working for Jack
6    Hughes?
7    A   Yes.
8    Q   How are they different today?
9    A   Well, now I'm having to do RFPs, which is a
10   request for proposal. I'm doing insurance claims, taking
11   statements from tenants on insurance claims. I am doing
12   the monthly reports to the Board of Commissioners.
13       I am also looking over and approving the
14   invoices that come in, which Jack Hughes used to do. And
15   I'm sure there's several other things that I can't think of
16   off the top of my head.
17   Q   Did you take over some of the responsibilities
18   of Jack Hughes, when Jack Hughes left the Housing
19   Authority?
20   A   Yes.
21   Q   And the list that you just gave me, is that a
22   list of responsibilities that were previously Mr. Hughes's
23   responsibilities?
24   A   As far as I know, yes.
25   Q   And in your opinion, did you take on more

Page 16

1    significant authority after Mr. Hughes left?
2        MR. CHIMES: Objection to the form.
3        You can answer.
4        THE WITNESS: I have no authority --
5    Q   (By Ms. Walker) I'm sorry?
6    A   I have no authority at the Housing Authority.
7    Q   That wasn't my question. And if it was, I'll
8    rephrase it.
9        Did you take on additional responsibilities
10   after Mr. Hughes left?
11   A   Yes.
12   Q   And were those responsibilities more managerial
13   in nature?
14   A   That would depend on your definition of
15   managerial.
16   Q   What is your definition of managerial?
17   A   Managerial would be someone who comes in in a
18   suit and tie and takes care of business documents, works
19   and takes care of modernization. That particular field,
20   which I have nothing to do with modernization.
21   Q   You're not performing any modernization duties?
22   A   Not that I'm aware of.
23   Q   Well, you would be aware of them, if you were
24   performing them, wouldn't you?
25   A   Yes. The only thing that I have to do with

Page 17

1    modernization is stuff that the construction companies --
2    there's two construction companies, Haze Construction and
3    All Phase, that they were not required to do, that Anthony
4    has asked me to do, as far as repairs, contacting vendors,
5    things of that nature.
6    Q   Do you have any other -- can you think of
7    anything else, any additional responsibilities that you
8    took on when Mr. Hughes left?
9    A   I did do the clerk of the works for a couple of
10   months. I took over inspection of floor and towers for the
11   brick work that Jack Hughes was doing. The inspection that
12   he was doing. Not the work itself.
13       Like I said, I'm sure there's other things, I
14   just can't think of them off the top of my head right now.
15   Q   When you say you performed clerk of the works
16   responsibilities, in what time period did you perform those
17   responsibilities?
18   A   From sometime in March.
19   Q   Of 2002?
20   A   Of 2002. Until June or July. I'm not sure of
21   the exact dates.
22   Q   And who told you those were clerk of the works
23   responsibilities?
24   A   Anthony and Mark Bakstis from John D'Emilia &
25   Associates.

5 (Pages 14 to 17)

Hughes vs Milford Housing

2/26/2004                                                                 Dion Smith

**Page 18**

1   Q   And what kind of things were you doing in this
2   capacity as clerk of the works?
3   A   I was inspecting the construction work that was
4   going on, talking to vendors hired by the general
5   contractor, attending construction meetings, giving input
6   on devices and controls. That's about it, as far as I can
7   remember.
8   Q   And at some point in the summer of 2003, those
9   clerk of the works responsibilities stopped?
10  A   2002.
11      MR. CHIMES: Objection to the form.
12  Q   (By Ms. Walker) 2002; is that true?
13  A   That's correct.
14  Q   And do you know who, if anyone, performed those
15  responsibilities once you stopped performing them?
16  A   John Schukoske.
17  Q   And what do you know about Mr. Schukoske?
18  A   I know that he used to work with or for -- with
19  or for Anthony's wife.
20  Q   What else?
21  A   He calls Anthony, Donny. That's about it. I
22  don't know John Schukoske that well.
23  Q   Are you familiar with how Mr. Schukoske was
24  hired?
25  A   I know that I was not asked to put in an RFP.

**Page 19**

1   Other, than that, no.
2   Q   Was it your responsibility at that point in
3   time to put in an RFP?
4   A   Yes. I put in an RFP for a van at that time.
5   I did not put in the RFP for two trucks. But for the van,
6   I put in an RFP.
7   Q   Had you put in RFPs for personnel? Have you
8   put in RFPs for personnel in the past?
9   A   To hire personnel? Not that I'm aware of. I
10  haven't hired anyone since I've been at the Housing
11  Authority. I don't have the authority to hire anyone.
12  Q   Do you have the authority to put together a
13  request for proposals that involve the hiring or the use of
14  personnel to perform Milford Housing Authority tasks and
15  responsibilities?
16  A   I don't understand the question.
17  Q   I'm not surprised. That's meant at the way I
18  asked the question, not what you said.
19      If the Milford Housing Authority is issuing a
20  request for proposal for the services of a contractor, as
21  opposed to purchasing equipment, or something like that, is
22  that your responsibility?
23  A   It is now.
24  Q   And when did it become your responsibility?
25  A   Evidently when they fired Jack.

**Page 20**

1   Q   Why do you say "evidently"?
2   A   Because that's stuff that Jack used to do, and
3   I've done several RFPs that I -- I did the van. Anthony
4   just asked me yesterday, I believe it was, in an e-mail, to
5   do an RFP for painting contractors. I would have to go
6   back in my records and look to see what other RFPs I have
7   done.
8   Q   And whose decision is it, once the proposals
9   are submitted and evaluated, as to who to retain?
10  A   Anthony's.
11  Q   Do you play any role in that process?
12  A   I make a recommendation. If Anthony asks for a
13  recommendation, I will make a recommendation on who I think
14  would be --
15  Q   And does he ask you for recommendations?
16  A   Yes.
17  Q   And are your recommendations followed?
18  A   I don't think Anthony's not followed them, but
19  I can't recall off the top of my head if he's said no, or
20  anything of that nature.
21  Q   But it's your general impression that he
22  follows your recommendations?
23  A   Most of the time, yes.
24      Do you mind if I get a drink of water?
25  Q   Not at all. If you could look at the job

**Page 21**

1   description in front of you and take a minute to read the
2   major duties and responsibilities, could you do that for
3   me, please?
4   A   Out loud?
5   Q   No. Take your time, read it. I just want to
6   ask you some questions on it when you're done reading.
7   A   Okay.
8   Q   Looking at the list of major duties and
9   responsibilities numbered 1 through 18 on page 1 and 2, is
10  there anything in there, any duties in there that you don't
11  perform? Are there any duties in there that you don't
12  perform?
13      MR. CHIMES: Objection to the form. Are we
14  talking currently or at the --
15      MS. WALKER: Presently.
16      THE WITNESS: Well, there's no daily work
17  reports.
18  Q   (By Ms. Walker) Okay.
19  A   Everything in there that says assist the
20  director of facilities is no longer in use, because there
21  is no director of facilities.
22  Q   So how should that be worded, if you still
23  continue to perform the responsibilities -- strike that.
24      Are you responsible for recognizing when staff
25  training is necessary?

6 (Pages 18 to 21)

Hughes vs Milford Housing

2/26/2004                                                              Dion Smith

Page 22

1   A   Yes.
2   Q   And --
3   A   Along with the director of facilities.
4   Q   The director of facilities is no longer
5   employed, correct?
6   A   That's correct.
7   Q   So with whom, if anyone, do you work closely to
8   conduct the training?
9   A   If training is required, Anthony would let me
10  know.
11  Q   On number 4 it indicates that you assist the
12  director of facilities in preparing the departmental
13  budget, correct?
14  A   Correct.
15  Q   Do you prepare the departmental budget on your
16  own?
17  A   I do now. I make recommendations for budgets.
18  I don't prepare the budget. I make recommendations.
19  Q   Sir, number 6 says you assist the director of
20  facilities in the hiring of new maintenance employees. Do
21  you hire new maintenance employees now?
22  A   No.
23  Q   Do you assist someone in hiring new maintenance
24  employees?
25  A   We've never had the opportunity.

Page 23

1   Q   Do you expect that it would be your
2   responsibility to hire them, if you had the opportunity?
3       MR. CHIMES: Objection to the form.
4       You can answer.
5       THE WITNESS: I don't have the authority to
6   hire anyone. I can make recommendations.
7   Q   (By Ms. Walker) You've never had the
8   opportunity to do that?
9   A   That's correct. I've asked to do it. I've
10  asked to add staff to the maintenance department, but I've
11  been denied.
12  Q   When did you ask to add staff?
13  A   On several occasions. After the death of
14  Richard Verespie, and several months after that.
15  Q   And why did you ask to add staff?
16  A   Pardon?
17  Q   And why did you ask to add staff?
18  A   Because we need more staff.
19  Q   To do what?
20  A   Maintenance work.
21  Q   To do the actual maintenance itself?
22  A   Yes.
23  Q   Okay. Because you're in a supervisory
24  capacity, as opposed to doing the actual maintenance work
25  itself?

Page 24

1   A   No. I do maintenance work myself as well.
2   Q   What percentage of your job is spent doing
3   maintenance work yourself?
4       MR. CHIMES: Objection to the form.
5       If you can quantify it, you can answer it.
6       THE WITNESS: I couldn't tell you what the
7   percentage is.
8   Q   (By Ms. Walker) You have no idea?
9   A   I've done several documented work orders. I've
10  probably done around 200, or so, in the past year and a
11  half, since Jack has been fired. I do a lot of, today,
12  hands-on stuff.
13  Q   Would you say that more than 50 percent of your
14  job is hands-on stuff, or less than 50 percent of your job?
15      MR. CHIMES: Objection.
16      You can answer.
17      THE WITNESS: I would say more.
18  Q   (By Ms. Walker) And the basis for your belief
19  that more than 50 percent of your job is hands-on is what?
20  A   Well, the documented work orders, and there's a
21  lot of things that aren't documented. I help the
22  maintenance men with expansion tanks, water heaters, moving
23  furniture, weed whacking, lawn cutting, like I said.
24  Anything they need help with, I help them with.
25  Q   If you look at paragraph 11 -- start with

Page 25

1   paragraph 10, it says you monitor all HUD performance
2   indicators related to the maintenance and reviews with the
3   director of facilities weekly and monthly.
4       Do you perform that function?
5   A   No. There's no director of facilities.
6   Q   I understand that. But do you monitor all HUD
7   performance indicators related to maintenance?
8   A   I think you probably need to explain to me what
9   indicator you are talking about. I don't know all of the
10  HUD indicators.
11  Q   Do you know some?
12  A   I know the REAC inspections. Then we do take
13  care of what they find.
14  Q   Do you monitor those?
15  A   Yes.
16  Q   Okay. What other ones do you monitor?
17  A   Work order completion times. From what I
18  understand, HUD requires that work orders are completed
19  within 25 days, and I do my best to make sure that they are
20  completed within 25 days, with the exception of emergency
21  work orders, which would need to be taken care of within 24
22  hours.
23  Q   Any other indicators for HUD that you monitor?
24  A   I don't recall.
25  Q   Do you review those with Mr. Vasiliou on a

7 (Pages 22 to 25)

Brandon Smith Reporting

016d1f1c-1187-4048-aa77-da35e6daa27e

Page 26

1  weekly or monthly basis?
2  A  No. We used to, Anthony and I, but we haven't
3  done that in a year or more.
4  Q  Do you know why?
5  A  No.
6  Q  Do you suspect why?
7     MR. CHIMES: Objection to the form.
8  Q  (By Ms. Walker) Has anyone ever told you why?
9  A  No. I would assume that it's because Anthony
10 is aware that we get the work done.
11 Q  Okay. Returning to the list from 1 to 18, are
12 there any other -- are there any duties in there, again,
13 that you don't perform that you haven't already pointed
14 out?
15    MR. CHIMES: Objection to the form.
16    You can answer that.
17    THE WITNESS: It seems that I do perform most
18 of these.
19 Q  (By Ms. Walker) How often do you perform the
20 functions of maintenance mechanic?
21 A  All the time.
22 Q  What is all the time?
23 A  It's my job. I'm a maintenance man.
24 Q  What are the functions of a maintenance
25 mechanic?

Page 27

1  A  To make sure that our tenants have safe, decent
2  housing.
3  Q  Do you have anyone working for you who is
4  called a maintenance mechanic?
5  A  I don't know that anyone works for me. I
6  haven't hired anyone. I haven't fired anyone. We all work
7  for the Housing Authority, for Anthony Vasiliou. I have
8  people that I work with that do maintenance mechanic
9  duties.
10 Q  And what are those duties?
11 A  The same thing as mine, with the exception of
12 the paperwork, as far as I know.
13 Q  And again, those duties are? Other than the
14 paperwork, those duties are?
15 A  Repairs, lawn cutting, snowplowing.
16 Q  And is it still your testimony that more than
17 50 percent of your time is spent on those sort of hands-on
18 tasks?
19 A  It's my testimony that as far as I know, yes.
20 I don't go out and check and see if I'm expending this much
21 time or that much time doing one particular thing or not.
22 Q  Did Jack Hughes, to your knowledge, do hands-on
23 maintenance work?
24 A  He planted some trees, and stuff like that, but
25 that was with the entire staff. Hands on, no.

Page 28

1  Q  When was the last time you spoke to or saw
2  Mr. Hughes? Spoke with or saw Mr. Hughes?
3  A  I haven't seen Jack since December of 2002.
4  Q  Okay.
5  A  I talked to him.
6  Q  When is the last time you spoke with
7  Mr. Hughes?
8  A  I've talked to him a couple of times, but I
9  couldn't tell you dates. Once was, I believe, a couple of
10 weeks ago.
11 Q  Let's start with that. Did he call you or did
12 you call him?
13 A  He called me.
14 Q  And what did he say to you?
15 A  He wanted to know how my wife was doing.
16 Q  What else did he say to you?
17 A  I don't recall.
18 Q  Did he talk to you about his lawsuit?
19 A  No.
20 Q  Did he mention Mr. Vasiliou?
21 A  I don't recall. I know we talked about my
22 wife, and then he talked to my wife. But you have to
23 understand I'm -- my wife has been injured.
24 Q  I'm sorry to hear that.
25 A  I'm taking care of my house, my kids, my wife,

Page 29

1  going to school.
2  Q  It's hard. I understand that, Mr. Smith. And
3  I don't want to keep you here any longer than necessary.
4  And while I empathize with having small children at home
5  and a spouse that's ill, and all of that, I'm not really
6  interested in any of those things. That's your personal
7  business.
8     What I am interested in is conversations you
9  may have had with Mr. Hughes about the Milford Housing
10 Authority, about Mr. Vasiliou, the commissions, or the
11 lawsuit.
12    And again, I don't mean to be rude, but can you
13 tell me, when you spoke with him two weeks ago, did you
14 have any conversations about the Milford Housing Authority?
15 A  About the staff, I believe. How is Jimmy
16 doing? How is John doing? How are people doing?
17 Q  What else?
18 A  I don't recall.
19 Q  Okay. And did you have any conversations about
20 the lawsuit?
21 A  No. No.
22 Q  Did you tell him that you believed you were
23 going to be deposed in this matter?
24 A  Yes. He knows I'm going to be deposed.
25 Q  Did you tell him that?

Page 30

1   A  Yes.
2   Q  Did you talk about your deposition?
3   A  No.
4   Q  What did you say exactly?
5   A  I just said that I have to go and do a
6   deposition.
7   Q  And what did he say?
8   A  I think he said something to mention, yeah I
9   know that you have to do a deposition.
10  Q  Is that it?
11  A  As far as I can recall.
12  Q  And did you have any further discussions about
13  this lawsuit?
14  A  Not that I'm aware of.
15  Q  Did he know you were being deposed today?
16  A  Yes.
17  Q  How did he know you were being deposed today?
18  A  I told him.
19  Q  Two weeks ago you told him you were being
20  deposed today?
21  A  I told him when I got the subpoena. I guess it
22  was a couple of days after that that he called my wife, or
23  to ask about my wife, and that's when I told him.
24  Q  Prior to the conversation a couple of weeks
25  ago, when was the last time you had spoken to him?

Page 31

1   A  I don't recall. If I had to guess, I would say
2   a couple of months. But right after my wife's accident.
3   Q  When was your wife's accident?
4   A  December 20th.
5   Q  So you spoke to Mr. Hughes on the telephone
6   sometime in December of 2003?
7   A  It was either --
8      MR. CHIMES: Objection to the form. He said a
9   couple of weeks ago.
10     THE WITNESS: Pardon me?
11  Q  (By Ms. Walker) Prior to your conversation a
12  couple of weeks ago, did you speak with Mr. Hughes on the
13  telephone?
14  A  Yes.
15  Q  And --
16  A  I believe.
17  Q  When was the next point, closest to the time
18  two weeks ago, that you spoke to Mr. Hughes?
19  A  It was late December or early January.
20  Q  Okay. Did he call you, or did you call him?
21  A  He called me to ask about how my wife was. I
22  heard that she had an accident. And I gave him all of the
23  details of the accident, and then he talked to my wife.
24  Q  Did you tell him that you had been subpoenaed
25  to testify in this case?

Page 32

1   A  I didn't know then.
2   Q  Did you talk about his lawsuit?
3   A  Not that I'm aware of.
4   Q  Did you talk about his employment with the
5   Milford Housing Authority?
6   A  Yeah. He told me -- he said, Can you believe
7   it's been almost two years since I've worked there? I do
8   remember that I said, Yeah. It's been almost two years.
9   Q  What else did he say about the Milford Housing
10  Authority?
11     MR. CHIMES: And just in the spirit of full
12  disclosure, Mr. Smith, you should be aware that yesterday
13  Mr. Vasiliou served Mr. Hughes with a defamation complaint,
14  and in the allegations are various people that have been
15  deposed where it's alleged that Mr. Hughes made defamatory
16  statements to them.
17     And I'm sure that Ms. Walker is not using this
18  deposition as a discovery tool for Mr. Vasiliou in his
19  other deposition.
20     But obviously, in the spirit of fairness, you
21  should be aware that there's the potential for that, sir.
22     THE WITNESS: Now I lost my train of thought.
23  What was the question?
24  Q  (By Ms. Walker) Did Mr. Hughes say anything
25  else to you with respect to the Milford Housing Authority

Page 33

1   or any of the commissioners or the executive director, in
2   that conversation with you in late December, early January?
3   A  Not that I recall.
4   Q  Prior to that conversation in late December,
5   early January, when was the time previous that you had
6   spoken to him?
7   A  I don't know.
8   Q  Sometime in the fall?
9   A  I don't know. It could have been. It could
10  have been the summer.
11  Q  How frequently did you talk to Mr. Hughes in
12  2003?
13  A  I probably talked to him two or three times.
14  I've called him on a number of occasions, and he never
15  returned my calls.
16  Q  Why did you call him?
17  A  He's my friend.
18  Q  And what did you wish to discuss with him?
19     MR. CHIMES: Objection to the form.
20     THE WITNESS: To see how he was doing.
21  Q  (By Ms. Walker) Anything else?
22  A  No.
23  Q  I just want to make sure I have it. You talked
24  to Mr. Hughes two or three times in the course of 2003?
25  A  Yes.

Page 34

1   Q   And in addition, you made several --
2   A   To the best of my recollection.
3   Q   And is there some reason why you would forget?
4       MR. CHIMES: Objection to the form.
5       You don't have to answer that.
6       Go ahead.
7   Q   (By Ms. Walker) Do you have a problem with
8   your memory?
9       MR. CHIMES: Objection to the form.
10  Q   (By Ms. Walker) You can answer that. Do you
11  have a problem with your memory?
12  A   No.
13  Q   Okay. And in addition to those two or three
14  phone calls that you can recall where you actually spoke
15  with Mr. Hughes, you also called him several times, but he
16  didn't return your phone calls; is that accurate?
17  A   That's correct.
18  Q   Did you ever ask him why he didn't return your
19  phone calls?
20  A   He said he didn't think it would be appropriate
21  to talk to people who still worked for the Housing
22  Authority, while his lawsuit was going on.
23  Q   Did you ask him why he thought that?
24  A   No. I just said, Okay. I understand.
25  Q   What prompted him, if you know, to tell you

Page 35

1   that?
2       MR. CHIMES: Objection to the form.
3       If you know what prompted Mr. Hughes to tell
4   you that, you can answer.
5   Q   (By Ms. Walker) If you know, did you say
6   something to Mr. Hughes that prompted that statement?
7   A   Yeah. I asked him, How come you haven't
8   returned my calls?
9   Q   And he said, I don't think --
10  A   Actually, as a matter of fact, now that I think
11  about it, it wasn't me who asked. My wife asked him. He
12  returned a call to my wife.
13  Q   And she asked him why he hadn't returned your
14  phone calls?
15  A   Yes.
16  Q   And she related to you that he said that he
17  didn't return your phone calls because --
18  A   It wasn't appropriate. He thought it wasn't
19  appropriate to talk to anyone who worked for the Housing
20  Authority.
21  Q   Did you stop calling him after that?
22  A   No. I tried to call him several times after
23  that, and he didn't return my calls, and I think even at
24  the Housing Authority almost everyone at the Housing
25  Authority tried to contact Jack.

Page 36

1   Q   Did he explain to you in December of 2002 why
2   it was suddenly appropriate to contact you?
3       MR. CHIMES: Objection to the form. It's
4   December of 2003.
5   Q   (By Ms. Walker) In December of 2003. Did he
6   explain to you in December of 2003 why he suddenly felt it
7   was appropriate to contact you?
8       MR. CHIMES: Other than his wife had a broken
9   leg?
10      MS. WALKER: Objection. There's no reason to
11  coach the witness.
12      THE WITNESS: No.
13  Q   (By Ms. Walker) You saw Mr. Hughes in December
14  of 2002; is that correct?
15  A   That's correct.
16  Q   Where did you see him?
17  A   At the Elks Club.
18  Q   And what was going on at the Elks Club?
19  A   A few staff members got together and had a
20  little Christmas get-together.
21  Q   Was this a Milford Housing Authority sanctioned
22  or organized event?
23  A   No.
24  Q   Who organized the event?
25  A   The staff did. Some of the staff.

Page 37

1   Q   Who on the staff?
2   A   Jimmy, because he's an Elks member. I'm trying
3   to think of who else was there. It wasn't really like an
4   organized thing. It was, Hey, let's get together and
5   celebrate Christmas. Okay. And that's what we did.
6   Q   And did you have any conversations with anyone,
7   to the best of your recollection, at that party about
8   Mr. Vasiliou, or about the Milford Housing Authority, or
9   about Mr. Hughes's lawsuit, or about the commissioners?
10      MR. CHIMES: What is the relevance of that to
11  Mr. Hughes's case, as far as Mr. Smith goes? I understand
12  why, if you're seeking to do discovery for Mr. Vasiliou's
13  case, or the case against --
14      MS. WALKER: I don't represent Mr. Vasiliou.
15      MR. CHIMES: You've already been doing
16  discovery for Mr. Vasiliou in this litigation. So I'd
17  like --
18      MS. WALKER: I'm inquiring as to what
19  Mr. Hughes may have said about the Milford Housing
20  Authority because those are potential admissions in this
21  lawsuit.
22  Q   (By Ms. Walker) And if you remember, I'll move
23  on, if you can share with me anything that Mr. Hughes may
24  have said about the Milford Housing Authority?
25      MR. CHIMES: Relative to his claims or relative

Page 38

1  to -- do you want to limit it to that? Because I would
2  agree to that.
3      Q   (By Ms. Walker) What did Mr. Hughes say, if
4  anything, about the Milford Housing Authority or his
5  lawsuit or of Mr. Vasiliou at that party, if you recall?
6      A   Nothing that I'm aware of. He only stayed for
7  like 30, 45 minutes, and then he left.
8      Q   Do you recall the day that Mr. Hughes was
9  terminated?
10     A   Yes.
11     Q   What happened, to the best of your
12 recollection?
13     A   To the best of my recollection, I was at the
14 post office and I received a phone call from Anthony.
15     Q   What time of day was this, Mr. Smith?
16     A   It was in the morning. I want to say sometime
17 between 9:00 and 10:00. I'm not sure, but it was in the
18 morning.
19         Anthony told me that he and David Dunn needed
20 to see me in his office. I said okay. I went over there,
21 after I was done at the post office.
22         I went into Anthony's office and he informed me
23 that Jack Hughes was no longer employed at the Housing
24 Authority, and that he and David talked to Jack Hughes on
25 the phone because Jack was out sick that day, and informed

Page 39

1  him of it.
2      Q   At that point in time, did Mr. Vasiliou or
3  Mr. Dunn tell you why Mr. Hughes was no longer an employee
4  of the Milford Housing Authority?
5      A   They told me that it was for budgetary reasons.
6      Q   Did they tell you anything else?
7      A   About why Jack was fired?
8      Q   Let's start with that, correct.
9      A   No. They told me it was for budgetary reasons.
10     Q   What else did they say in that conversation?
11     A   They told me that they were going to ask me to
12 take on some of Jack's responsibilities. Not all of it,
13 because they were going to contract out the modernization
14 work.
15         Anthony also told me that he was going to give
16 me an 8-percent pay raise, which he didn't do, for taking
17 on these additional duties. And then they asked me to
18 deliver an envelope to Jack.
19     Q   Did you read what was in the envelope?
20     A   No.
21     Q   Did you have any knowledge of what --
22     A   Nope. The envelope was taped up and sealed.
23     Q   So then what did you do?
24     A   I delivered the envelope to his house.
25     Q   And did you see Mr. Hughes when you arrived at

Page 40

1  his house?
2      A   No.
3      Q   You had no conversation with Mr. Hughes when
4  you arrived at his house?
5      A   He wasn't there.
6      Q   What did you do with the envelope?
7      A   If I remember correctly, I put it in his screen
8  door, which is what I believe Anthony said, that Jack said
9  that he wouldn't be home, and you can leave it in his
10 screen door or in his mailbox. But it's not legal to put
11 it in his mailbox. So I believe I left it in the screen
12 door.
13     Q   He wasn't home?
14     A   He didn't answer the door.
15     Q   Do you know if he was home?
16     A   No. He didn't answer the door, and I didn't
17 see his car.
18     Q   Did you have an expectation when he went there
19 that Mr. Hughes would be home?
20     A   When who went there?
21     Q   When you went to Mr. Hughes's home to deliver
22 this letter, did you have an expectation that he would be
23 home and you would see him?
24     A   I was hoping he would be.
25     Q   Did you discuss with Mr. Dunn and Mr. Vasiliou

Page 41

1  whether or not Mr. Hughes would be present at his home when
2  you delivered the letter?
3      A   I was told by Anthony to deliver the letter or
4  this package, manila envelope, to Jack Hughes, and if he
5  wasn't home, to leave it in the screen door or his mailbox.
6  I believe Anthony said his mailbox. I'm not sure. And I
7  said, okay.
8      Q   Thank you. When you went out to deliver the
9  letter, did you have an expectation that Mr. Hughes would
10 be home?
11         MR. CHIMES: Objection to the form.
12         THE WITNESS: I was hoping he would be home.
13     Q   (By Ms. Walker) But you really didn't know
14 whether he would be home or not?
15     A   That's correct. I didn't know.
16     Q   Thanks. That's all I needed.
17         What is your understanding as we sit here today
18 -- strike that.
19         When is the next time that you saw Mr. Hughes?
20 Strike that.
21         After March 8th, 2002, did you see Mr. Hughes
22 again within a two-month period?
23     A   I don't think so.
24     Q   Did you talk to him?
25     A   Yes.

Page 42

1  Q  When did you talk to him?
2  A  I believe it was that night that he got fired,
3  March the 8th. I believe it was that night.
4  Q  And did you call him, or did he call you?
5  A  I left a couple of messages for him. I don't
6  remember if I called him again, or he called me back. I
7  don't remember.
8  Q  Okay. And what did he say to you when you
9  spoke on the telephone?
10 A  He told me that he thought that he got fired
11 for budgetary reasons, or that he did not believe that he
12 got fired for budgetary reasons.
13    He told me that he thought that he got fired
14 because of what he had said to Al Kuncas in his office a
15 week or so before that.
16 Q  And what did he tell you he had said to
17 Mr. Kuncas?
18 A  All I can recall is, and I can't remember
19 exactly what he said, but it was something about him having
20 to -- that he might have to go to the federal authorities
21 or the Department of Justice, or something like that.
22    And then he said Anthony stormed into his
23 office and said that he should not be talking to vendors
24 like that. You should not be telling vendors things like
25 that, and then a week later he was fired.

Page 43

1  Q  Did you know anything about that incident prior
2  to this conversation on the evening of his separation?
3  A  Yes. He told me about the incident the day or
4  the day after it happened. He had mentioned it to me.
5  Q  And what was your reaction to Mr. Hughes, when
6  he said he thought he had been fired because of this
7  confrontation with Anthony over the architect?
8  A  I was -- I'm trying to think exactly. I mean,
9  I was upset, visibly upset, and wasn't surprised.
10 Q  Why weren't you surprised? First of all, what
11 were you not surprised about?
12 A  On Jack's reasoning of why he got fired.
13 Q  So you agreed with Mr. Hughes that he may have
14 been fired because of his confrontation with Mr. Vasiliou
15 over Mr. Kuncas?
16    MR. CHIMES: Objection to the form.
17    THE WITNESS: I don't know that I agreed. I
18 just wouldn't have been surprised.
19 Q  (By Ms. Walker) Why wouldn't you have been
20 surprised, if that was the reason?
21 A  Because I don't put anything past Anthony.
22 Q  Why do you say that?
23    MR. CHIMES: Objection to the form.
24    You can --
25    THE WITNESS: I don't think that Anthony is a

Page 44

1  good manager. I don't think he should be in charge of
2  people.
3  Q  (By Ms. Walker) Other than those two things,
4  do you have any other reason to believe that Mr. Hughes's
5  conclusions about why he was fired, in that conversation
6  with you, would be accurate?
7  A  Nothing more than, I trust Jack. I trust what
8  he tells me. From what I understand, he used to be a state
9  cop. And I know there's bad cops out there, but I don't
10 think Jack was one of them. I trust Jack Hughes.
11 Q  Did he tell you that he thought he had been
12 discriminated against because of his age?
13 A  I don't recall if he did. I don't think -- I
14 might have brought that up. I said, Do you think it's
15 because you're 65, or going to be 65? But I don't recall
16 if he said that or not, to be perfectly honest with you.
17 Q  Whose idea was it that it may have been this
18 conversation with Anthony that sparked his separation of
19 employment?
20    MR. CHIMES: Objection to the form. He's
21 already answered that.
22    THE WITNESS: Jack.
23 Q  (By Ms. Walker) As we sit here today, do you
24 have an opinion as to the reason why Mr. Hughes's
25 employment was separated?

Page 45

1     MR. CHIMES: Objection to the form.
2     THE WITNESS: Can you repeat that, please? I'm
3  sorry.
4  Q  (By Ms. Walker) As we sit here today, do you
5  have a belief as to why Mr. Hughes's employment was
6  terminated or separated?
7     MR. CHIMES: How would that be reasonably
8  related to discovery of admissible evidence? How could he
9  know all of the facts relating to it?
10    THE WITNESS: I don't know the facts of why.
11 Q  (By Ms. Walker) Let me ask you this: Do you
12 believe what Mr. Vasiliou and Mr. Dunn told you about the
13 reasons for his termination?
14 A  I don't know what to believe.
15 Q  So you have no opinion whatsoever on whether or
16 not what Mr. Vasiliou and Mr. Dunn told you was truthful?
17    MR. CHIMES: Objection to the form.
18    THE WITNESS: I have no idea what to believe.
19 Q  (By Ms. Walker) Did you think Mr. Vasiliou and
20 Mr. Dunn were telling you the truth, when they told you
21 that Mr. Hughes's position or his job was being eliminated
22 for budgetary reasons?
23    MR. CHIMES: I don't think that we established
24 that they told him.
25 Q  (By Ms. Walker) Did they tell you that?

Page 46

1  A  They told me it was budgetary reasons.
2  Q  And did you believe them?
3  A  I had no other choice. That's what they told
4  me.
5  Q  Did you think they were telling you the truth?
6     MR. CHIMES: Objection. How is that reasonably
7  related to the discovery of admissable evidence?
8     MS. WALKER: It goes to pretext.
9  Q  (By Ms. Walker) Did you think they were
10 telling you the truth?
11    MR. CHIMES: No. His opinion is not admissible
12 by you or by me.
13    MS. WALKER: He can say yes, no, or I don't
14 know.
15 Q  (By Ms. Walker) Did you think they were
16 telling you the truth?
17    MR. CHIMES: Now or at the time?
18 Q  (By Ms. Walker) At the time.
19 A  At the time? No. I mean, I'm sorry. Yes.
20 That's what I thought the case was.
21 Q  And is your opinion different today?
22    MR. CHIMES: Objection to the form. How is
23 that reasonably related to the discovery of admissable
24 evidence?
25    THE WITNESS: My opinion now is, I don't know

Page 47

1  what to believe.
2  Q  (By Ms. Walker) So you're not sure whether the
3  reasons that Mr. Hughes gave you are in fact the truth?
4  A  No. I trust Jack Hughes. He's never lied to
5  me, that I'm aware of. Anthony has lied to me.
6  Q  When has Mr. Vasiliou lied to you?
7  A  He told me he was going to give me an 8-percent
8  pay raise. He didn't do it.
9  Q  Any other circumstance that Mr. Vasiliou has
10 lied to you, in your opinion?
11 A  I don't know.
12    (A break was taken from 3:02 p.m. until
13    3:06 p.m.)
14 Q  (By Ms. Walker) In that conversation you had
15 with Mr. Hughes on the evening of the separation of his
16 employment, that Friday night, do you recall that
17 conversation?
18 A  Vaguely. I think I just went over that
19 conversation, what I can recall.
20 Q  That's right. Did Mr. Hughes say to you that
21 he didn't think budgetary reasons were the real reason he
22 had been separated?
23 A  Yes.
24 Q  Did you have -- did he tell you what was in the
25 letter that Mr. --

Page 48

1  A  No. He's never told me what was in that, and
2  I've never asked.
3  Q  Did he tell you why he thought that the
4  conversation in front of Mr. Kuncas had anything to do with
5  the separation of his employment?
6  A  That Anthony was very upset, screaming at him,
7  and that the threat of him going to -- this is my words.
8  The threat of him going to the federal authorities upset
9  Anthony, made him angry.
10 Q  That's what you think, or is that what
11 Mr. Hughes said to you?
12 A  That's what I gathered from what he said to me.
13 I don't recall the exact conversation.
14 Q  So when you spoke with Mr. Hughes, Mr. Hughes
15 knew the reason that Mr. Dunn and Mr. Vasiliou had given
16 him were budgetary reasons?
17    MR. CHIMES: Objection to the form. I think
18 he's already testified that --
19 Q  (By Ms. Walker) Is that true?
20    MR. CHIMES: Can you repeat the question? He's
21 already testified that Mr. Hughes didn't share the contents
22 of the letter with him.
23 Q  (By Ms. Walker) Yes. But he also testified
24 that Mr. Hughes told you that it was budgetary reasons that
25 Mr. Vasiliou and Mr. Dunn had given him, correct?

Page 49

1  A  No. I didn't say that. I said that that's
2  what I was told by Anthony and David Dunn.
3  Q  Did Mr. Hughes know that you had -- strike
4  that.
5     What did Mr. Hughes tell you that he had been
6  told by the Milford Housing Authority about the reasons for
7  the separation of his employment?
8     MR. CHIMES: Objection to the form.
9  Q  (By Ms. Walker) If anything?
10    MR. CHIMES: Thank you.
11    THE WITNESS: I believe he said that Anthony
12 and David Dunn told him it was for budgetary reasons, but I
13 can't honestly say that 100 percent.
14 Q  (By Ms. Walker) Okay. Are you aware of the
15 settlement agreement pertaining to the scattered site
16 housing?
17 A  Vaguely. I know that we were supposed to build
18 or buy up to 28 units because of a lawsuit filed by the
19 Department of Justice, and I want to say the NAACP, but I
20 don't remember who the other party was.
21    I know that Shelly White was the attorney, or
22 something like that. I don't know. I know the Department
23 of Justice and someone else. I don't remember off the top
24 of my head who it was, who the other party was.
25 Q  Have you ever met any of the other parties in