UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN HUGHES,<br>Plaintiff, | CIVIL NO.  302CV1917 (MRK) |
| v. | |
| MILFORD HOUSING AUTHORITY,<br>ANTHONY VASILIOU, RICHARD<br>ANDERSEN, HILARY HOLOWINK, JOHN<br>AMENTA, EDWARD CANELLI AND JACK<br>TUCCIARONE,<br>Defendants. | JUNE 14, 2004 |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7(a) and 56 of the

Local Rules of Civil Procedure for the District of Connecticut, Defendants, Milford Housing

Authority, Anthony Vasiliou, Richard Andersen, Hilary Holowink, John Amenta, Edward Canelli

and Jack Tucciarone ("Defendants"), move for Summary Judgment in favor of Defendants on all

counts contained in Plaintiff's Second Amended Complaint.  Defendants submit this Memorandum

of Law, along with authenticated deposition transcripts, affidavits and exhibits, in support of their

Motion for Summary Judgment.

HART1-1168883-7

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

I.    STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................... 2

    A.    The Milford Housing Authority .............................................................2

    B.    1998 Settlement Agreement Between The DOJ And MHA...........................................4

    C.    Plaintiff's Responsibilities As The Director Of Facilities Maintenance
        And Operations.........................................................................6

    D.    Plaintiff's Position Was Eliminated Due To A Reorganization Of The
        Maintenance Department And As Part Of An Overall Effort To
        Improve  MHA's Long-Term Fiscal Outlook .............................................8

    E.    Plaintiff's Conversation With Alphonse Kuncas On February 28, 2002 ....................11

    F.    Plaintiff Received At-Will And Contract Disclaimers In His
        Employment Application And The Personnel Policies Manual...................................12

    G.    Plaintiff's Post-Termination Contact With The DOJ And HUD.................................13

II.   PROCEDURAL HISTORY................................................................................... 15

III.  LEGAL ANALYSIS............................................................................................ 16

    A.    Standard for Granting Summary Judgment. .............................................16

    B.    The First And Seventh Counts Alleging Retaliation Under The Federal
        Fair Housing Act Fail As A Matter Of Law .............................................17

        1.    The First Count Fails Because The Decision To Eliminate
            Plaintiff's Position Was Made *Before* Any Of His Alleged
            Protected Activity. .............................................................19

        2.    The Seventh Count Fails Because Defendants Were Wholly
            Unaware Of Plaintiff's February 2004 Meeting With HUD ..............................20

        3.    The Retaliation Claims In The First And Seventh Counts
            Fail Because Plaintiff Did Not "Aid Or Encourage" Other
            Persons In The Exercise Or Enjoyment Of Their Fair
            Housing Rights .................................................................21

a.  To "Aid" Or "Encourage" Requires More Than Friendship Or Sympathy To Rights Protected Under The FHA................................................................................21

b.  Plaintiff's Statements To Kuncas Were Not Made To Aid Or Encourage Others In The Exercise Of Their Fair Housing Rights.....................................................................24

c.  Plaintiff Did Not Aid Or Encourage The Fair Housing Rights Of Others By Attending A Meeting With HUD In February 2004 ..........................................................25

4.  The Retaliation Claim In The First Count Also Fails Because The Undisputed Facts Establish Plaintiff's Position Was Eliminated For Budgetary And Operational Reasons ................................26

C.  Plaintiff's Claim Under 42 U.S.C. § 1983 Fails As A Matter Of Law........................27

1.  Plaintiff's § 1983 Claim Fails Because Defendants Were Not Aware Of Plaintiff's Meeting With HUD, The Alleged Protected Activity ................................................................28

2.  Plaintiff's § 1983 Claim Must Be Dismissed Because Vasiliou's Private Lawsuit Does Not Constitute An Official Action Under Color Of Law .............................................28

3.  Plaintiff Did Not Make Statements To HUD On Matters Of Public Concern.................................................................30

4.  Vasiliou And The Commissioners Are Shielded From Personal Liability By Qualified Immunity And Should Be Dismissed From The Lawsuit. ........................................32

D.  Plaintiff's Common-Law Claim For Wrongful Discharge Is Precluded Because Plaintiff Has A Statutory Remedy Available ................................35

E.  Plaintiff's Breach Of Contract Claim Must Be Dismissed Because Plaintiff Was An At-Will Employee, And There Was No Contract Or Agreement To The Contrary.................................................................36

F.  Plaintiff's Breach Of The Implied Covenant Claim Fails As A Matter Of Law .........................................................................................39

IV.  CONCLUSION................................................................................................. 40

ii

# TABLE OF AUTHORITIES

## CASES[1]

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)..............................................16

Armstead v. Stop & Shop Cos.,
    2003 U.S. Dist. LEXIS 4107 (D. Conn. 2003) (Tab A) .......................................35, 36

BE&K Constr. Co. v. NLRB,
    536 U.S. 516, 122 S. Ct. 2390, 153 L. Ed. 2d 499 (2002)....................................33, 34

Bickerstaff v. Vassar Coll.,
    196 F.3d 435 (2d Cir. 1999)........................................................................................16

Bill Johnson's Rests. v. NLRB,
    461 U.S. 731, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983)....................................33, 34

Bunger v. University of Oklahoma Bd. of Regents,
    95 F.3d 987 (10th Cir. 1996) ......................................................................................32

Burnham v. Karl & Gelb, P.C.,
    252 Conn. 153, 745 A.2d 178 (2000) ..................................................................35, 36

Burnham v. Karl & Gelb, P.C.,
    50 Conn. App. 385, 388, 717 A.2d 811 (Conn. App. 1998)..................................36, 37

Celotex Corp. v. Catrett,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)..............................................17

Chappell v. GTE Products Corp.,
    803 F.2d 261 (2d Cir. 1986)........................................................................................27

Clark Cty. Sch. Dist. v. Breeden,
    532 U.S. 268, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)..........................................25

Connick v. Myers,
    461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983).................................30, 31, 32

Cowen v. Federal Express Corp.,
    25 F. Supp. 2d 33 (D. Conn. 1998)..............................................................................39

---

[1]/ Copies of unreported decisions are included in the Appendix of Unreported Authorities.

iii

Dallaire v. Litchfield Cty. Ass'n. for Retarded Citizen, Inc.,
    2001 U.S. Dist. LEXIS 2389 (D. Conn. 2001) (Tab B).........................................35, 39

Danahy v. Buscaglia,
    134 F.3d 1185 (2d Cir. 1998).......................................................................................32

Dang Vang v. Vang Xiong Toyed,
    944 F.2d 476 (9th Cir. 1991) .......................................................................................29

Delcambre v. Delcambre,
    635 F.2d 407 (5th Cir. 1981) .......................................................................................29

Doherty v. Sullivan,
    29 Conn. App. 736, 618 A.2d 56 (1992) ......................................................................40

D'Ulisse-Cupo v. Board of Directors of Notre Dame High School,
    202 Conn. 206, 520 A.2d 217 (1987) .....................................................................36, 37

Finley v. Aetna Life & Casualty Co.,
    202 Conn. 190, 520 A.2d 208 (1987) .....................................................................37, 39

Frazier v. Rominger,
    27 F.3d 828 (2d Cir. 1994)....................................................................................18, 20

Garcia v. State Univ. of N.Y. Health Scis. Ctr.,
    280 F.3d 98 (2d Cir. 2001)...........................................................................................30

Gardetto v. Mason,
    100 F.3d 803 (10th Cir. 1996) .....................................................................................32

Grieco v. Hartford Courant Co.,
    1993 Conn. Super. LEXIS 298 (Conn. Super. Ct. 1993) (Tab C) .................................39

Hall v. Lowder Realty Co. Inc.,
    160 F. Supp. 2d 1299 (M.D. Ala. 2001) ......................................................................22

Harlow v. Fitzgerald,
    457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)..............................................33

Hill v. Citibank Corp.,
    2004 U.S. Dist. LEXIS 5069 (S.D.N.Y. 2004) (Tab D) ..............................................19

James v. Newsweek, Inc.,
    2000 U.S. App. LEXIS 8805 (2d Cir. 2000) (Tab E) ......................................20, 21, 28

iv

Kern v. City of Rochester,
  93 F.3d 38 (2d Cir. 1996)...........................................................29

Knight v. U.S. Fire Ins. Co.,
  804 F.2d 9 (2d Cir. 1986)...........................................................17

Krause v. Bennett,
  887 F.2d 362, 368 (2d Cir. 1989)...........................................33, 34

Lombardi v. Marketing Corp. of America,
  1994 Conn. Super. LEXIS 1383 (Conn. Super. Ct. 1994) (Tab F)..............39

Markgraf v. Hospitality Equity Investors, Inc.,
  1993 Conn. Super. LEXIS 426 (Conn. Super. Ct. 1993) (Tab G)...............39

Martin-Glave v. Aventis Pharms.,
  2003 U.S. Dist. LEXIS 23956 (D. Conn. 2003) (Tab H)......................35

Mayo v. Columbia Univ.,
  2003 U.S. Dist. LEXIS 5639 (S.D.N.Y. April 7, 2003) (Tab I)...............26

McCloskey v. Union Carbide Corp.,
  815 F. Supp. 78 (D. Conn. 1993)...................................................27

McEvoy v. Spencer,
  124 F.3d 92 (2d Cir. 1997)...........................................................33

McLee v. Chrysler Corp.,
  38 F.3d 67 (2d Cir. 1994)............................................................17

Meadows v. Edgewood Mgmt. Co.,
  432 F. Supp. 334 (W.D. Va. 1977)...............................17, 18, 21, 23, 24, 25

Meiri v. Dacon,
  759 F.2d 989 (2d Cir. 1985).........................................................17

Monsky v. Moraghan,
  947 F. Supp. 53 (D. Conn. 1996)...........................................28, 29, 30

Moore v. City of Wynnewood,
  57 F.3d 924 (10th Cir. 1995)........................................................31

Murphy v. Chicago Transit Authority,
  638 F. Supp. 464 (N.D. Ill. 1986)..................................................29

v

People Helpers, Inc. v. City of Richmond,
    789 F. Supp. 725 (E.D. Va. 1992) ....................................................................21, 22, 25

Pitchell v. Callan,
    13 F.3d 545 (2d Cir. 1994).............................................................................................28

Polk County v. Dodson,
    454 U.S. 312, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981).........................................29, 30

Reg'l. Econ. Cmty. Action v. City of Middletown,
    294 F.3d 35 (2d Cir. 2002).................................................................................19, 20, 22

Rogers v. Fuller,
    410 F. Supp. 187 (M.D.N.C. 1976) ..............................................................................29

Ruscoe v. Housing Auth. of New Britain,
    259 F. Supp. 2d 160 (D. Conn. 2003)......................................................................28, 30

San Pedro Hotel Co., Inc., v. City of Los Angeles,
    159 F.3d 470 (9th Cir. 1998) .........................................................................................27

Schermerhorn v. Mobil Chem. Co.,
    2001 U.S. Dist. LEXIS 519 (D. Conn. 2001) (Tab J)....................................................38

Smith v. Shoreline Care Ltd. Pshp.,
    1996 Conn. Super. LEXIS 1343 (Conn. Super. Ct. 1996) (Tab K) ..............................38

Smith v. UAW-GM Legal Servs. Plan,
    2002 U.S. App. LEXIS 26175 (2d Cir. 2002) (Tab L) ..................................................26

Starbala v. Packard Bioscience Co.,
    2001 Conn. Super. LEXIS 3799 (Conn. Super. Ct. 2001) (Tab M) ........................37, 39

Thibodeau v. Design Group One Architects, LLC,
    260 Conn. 691, 802 A.2d 731 (2002) ...........................................................................35

Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,
    234 Conn. 1, 662 A.2d 89 (1995) ..................................................................................37

Van Zant v. KLM Royal Dutch Airlines,
    80 F.3d 708 (2d Cir. 1996)............................................................................................26

Vercher v. Harrisburg Housing Authority,
    454 F. Supp. 423 (M.D. Pa. 1978)...........................................................................21, 23

vi

Walker v. City of Lakewood,
    272 F.3d 1114 (9th Cir. 2001) ..................................................................22

Weinstock v. Columbia Univ.,
    224 F.3d 33 (2d Cir. 2000)........................................................................16

West v. Atkins,
    487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1997)...............................28

## STATUTES

28 U.S.C. § 1441...........................................................................................15

42 U.S.C. § 1437.............................................................................................2

42 U.S.C. § 1983...........................................................................1, 2, 15, 27

42 U.S.C. § 3601.............................................................................................2

42 U.S.C. § 3617...............................................................................1, 15, 17, 36

24 C.F.R. § 100.400(c)...................................................................................22

24 CFR Part 903...............................................................................................8

Conn. Gen. Stat. § 31-51q.........................................................................1, 15

Fed. R. Civ. P. 56(c) ......................................................................................16

## PRELIMINARY STATEMENT

Plaintiff John Hughes, brought this action against his former employer, the Milford

Housing Authority ("MHA"), MHA's Executive Director, Anthony Vasiliou ("Vasiliou"),

and the five MHA Commissioners, Richard Andersen, Hilary Holowink, John Amenta,

Edward Canelli and Jack Tucciarone (collectively, the "Commissioners"), asserting claims

arising from the separation of his employment in March 2002. Only six of the eight counts

contained in Plaintiff's Second Amended Complaint remain pending.[2]  As detailed below,

there are no disputed issues of material fact, and all of Plaintiff's remaining claims fail as a

matter of law.

In the First Count, Plaintiff claims that his termination in March 2002 was unlawful

retaliation in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3617. This claim clearly

fails because MHA decided to eliminate Plaintiff's position for budgetary and operational

reasons well before Plaintiff engaged in any alleged protected activity. This claim also fails

because Plaintiff's comments to an MHA contractor did not aid or encourage others in the

exercise of their Fair Housing rights. Finally, the First Count also fails because the undisputed

facts establish that Plaintiff was separated for a legitimate, nondiscriminatory reason.

In the Seventh Count, Plaintiff's second FHA retaliation claim, based on Vasiliou's filing

of a lawsuit against Plaintiff after he attended a meeting with the U.S. Department of Housing

and Urban Development ("HUD"), likewise fails because Defendants were not even aware of

that meeting; thus, there can be no inference of retaliatory intent. This claim also fails because

---

[2]/ Plaintiff's original Complaint and Amended Complaint both contained claims alleging violations of 42 U.S.C. § 1983 and Conn. Gen. Stat. § 31-51q. Plaintiff represented in his Motion of Third Party Witness to Quash, dated December 8, 2003, that "plaintiff does not intend to pursue those claims based upon information obtained through the discovery process." Plaintiff's Counsel confirmed Plaintiff's intent to withdraw these claims during a conference on January 20, 2004, and again during Plaintiff's continued deposition on May 11, 2004. (Pl. Cont. Dep., p. 8). Defendants therefore request that the Court dismiss the Third and Fourth Counts of the Second Amended Complaint, with prejudice.

1

during his meeting with HUD, Plaintiff did not oppose any unlawful practice or policy. In fact, Plaintiff told HUD that he was <u>not aware</u> of any unlawful conduct by MHA or Vasiliou.

Plaintiff's final federal claim, the Eighth Count, also based on Vasiliou's lawsuit, alleges a violation of his First Amendment rights under 42 U.S.C. § 1983. As with the Seventh Count, because Defendants lacked knowledge of the HUD meeting, this claim fails as a matter of law. This claim is also deficient because Plaintiff did not speak to HUD on a matter of public concern and, therefore, his speech was not constitutionally protected. Finally, the Eighth Count fails because Vasiliou's filing of the lawsuit was not an official action under color of law, and Vasiliou and the five Commissioners are entitled to qualified immunity.

The Second Count, Plaintiff's common-law claim of wrongful discharge in violation of public policy, also fails as a matter of law because such claims are precluded where a statutory remedy exists, as is the case here under the FHA.

Plaintiff's additional state law breach of contract claims in the Fifth and Sixth Counts are also fatally flawed because Plaintiff's employment application and MHA's Personnel Policies Manual contained clear and conspicuous at-will statements and contract disclaimers. There is no evidence of any agreement or promise to the contrary, and therefore, Plaintiff's breach of contract and breach of the covenant of good faith and fair dealing claims must be dismissed.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Milford Housing Authority.

MHA is a municipal corporation. As a public housing authority receiving federal funds for the development and operation of public housing, MHA observes and complies with, among other laws, the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437 <u>et seq</u>. and the Fair Housing Act of 1968, as amended, 42 U.S.C. 3601 <u>et seq</u>.

2

MHA receives federal funds for two main purposes. First, MHA administers a publicly subsidized housing program and disperses housing assistance payments under Section 8 of the Fair Housing Act on behalf of HUD. (Vasiliou Dep., p. 22).[3] In addition, MHA receives federal funds for the purpose of developing, owning, operating and maintaining low-income or affordable public housing. (Vasiliou Dep., p. 20). As of 1999, MHA owned and operated approximately 402 units of public housing. (Vasiliou Dep., p. 39).

According to its public housing authority mission statement:

> The mission of [MHA] is to assist low-income families with safe, decent, and affordable housing opportunities as they strive to achieve self-sufficiency and improve the quality of their lives. [MHA] is committed to operating in a fiscally prudent, efficient, ethical, and professional manner. [MHA] will strive to provide a suitable living environment for the families we serve without discrimination.

(Exhibit 2: *5-Year Plan for 2002-2004*).[4]

MHA operates under the direction of a five member Board of Commissioners, each of whom is appointed to a five year term. (Exhibit 3: *By-Laws*). The Commissioners typically hold Board meetings once per month, or more often as needed. (Exhibit 3). The Commissioners are responsible for creating and establishing policy for the overall operations of MHA. (Exhibit 3). In addition, the Commissioners consider, vote on and approve the annual budgets and long-term strategic plans for guiding MHA's operations. (Vasiliou Dep., pp. 149-50; Exhibit 3).

The day-to-day operations of MHA are overseen and managed by an Executive Director, Anthony Vasiliou, who was appointed by the Commissioners in 1997. (Exhibit 3; Vasiliou Dep., pp. 8-11). All MHA personnel report to Vasiliou. (Exhibit 3). As Executive Director, Vasiliou

---

[3] Relevant pages from the deposition transcripts of Defendant, Anthony Vasiliou, are attached to the Affidavit of Anne N. Walker at Exhibit 1, and hereinafter referred to as "Vasiliou Dep., p. ___." Vasiliou's deposition was taken on September 17, 2003, and continued on November 25, 2003.

[4] Exhibits 2, 5 and 19 are attached as exhibits to the Affidavit of Anthony J. Vasiliou. All other exhibits are attached to the Affidavit of Anne N. Walker.

has the "authority to hire, supervise and direct, promote, transfer, discipline, demote, suspend (with or without pay) and dismiss employees." (Exhibit 4, p. 4: *1999 Handbook*).

As Executive Director, Vasiliou oversees MHA's public housing projects. He was hired in large part to assist in the resolution of lawsuits concerning MHA's public housing program, and to manage MHA's implementation of the terms of any proposed settlement agreement with the DOJ and other individual plaintiffs. (Vasiliou Aff., ¶ 5; Exhibit 5).

**B.    1998 Settlement Agreement Between The DOJ And MHA.**

As of August 1995, prior to Vasiliou's hire, MHA received federal funds from HUD for the acquisition of existing homes which would be rehabilitated or developed as part of a Scattered-Site public housing program. (Exhibit 5: *Settlement Agreement*). In approximately September 1995, MHA discontinued its participation in this program. (Exhibit 5). Thereafter, two lawsuits were filed against MHA alleging violation of the Fair Housing Act. One suit brought by the NAACP, New Haven branch, and several individuals was filed in June 1996, and a second, brought by the U.S. Department of Justice ("DOJ") was filed in April 1997. (Exhibit 5). Both lawsuits were consolidated in June 1997 under Docket No. 396 CV 01118 (AHN), and finally completely resolved in October 1998, when the parties entered into a Settlement Agreement (the "HUD Agreement"). (Exhibit 5).

The purpose of the HUD Agreement was to:

> provide quality affordable, rental housing in Milford to low-income families in need of such housing. To that end, the MHA will utilize the funds HUD has allocated under [certain projects] to acquire, acquire and rehabilitate, and/or develop twenty-eight subsidized housing units for families, or, *if these funds prove insufficient* to permit acquisition and/or development of the full complement of twenty-eight units, *the maximum number of units that can be acquired, acquired and rehabilitated, and/or developed with these funds.*

(Exhibit 5) (emphasis added).

4

Pursuant to the HUD Agreement, HUD provided approximately 3.5 million dollars with which MHA was to "promptly pursue and make every reasonable effort to bring to fruition at the earliest possible time, the opportunities for acquisition, acquisition and rehabilitation, and/or development" of up to 28 units of Scattered-Site housing. (Exhibit 5). Vasiliou understood that the HUD Agreement required MHA to use the 3.5 million dollars to "build as many units as [it] could," but if MHA "could only build less because of the money... [MHA] would have [still] been in compliance." (Vasiliou Dep., p. 56). Vasiliou's "intention was to provide as much family housing as [they] could with the three and a half million dollars." (Vasiliou Dep., p. 169).

As called for by the HUD Agreement, MHA prepared and submitted a comprehensive implementation plan and budget, later approved by HUD, for acquiring, renovating and tenanting out the public housing units. (Exhibit 5; Vasiliou Dep., pp. 45, 63). As part of the plan, MHA prepared and submitted detailed budgets projecting the costs and expenses associated with various activities, including property selection, inspection, acquisition, renovation and tenanting. (Vasiliou Dep., p. 63). MHA's plan and budgets included, among other things, contracting with architects and engineers to inspect and assess each property, renovation, construction and repairs, and other administrative costs. (Vasiliou Dep., pp. 63-67; Pl. Dep., pp. 225-226).[5] Throughout the acquisition and renovation process, HUD monitored MHA's activities for compliance with the HUD Agreement. (Vasiliou Dep., pp. 56-57; White Dep., p. 24).[6] MHA also provided HUD with periodic progress reports. (Vasiliou Dep., pp. 56-57).

By December 2001, MHA had purchased and begun development of 18 units of "Scattered-Site" public housing. (Vasiliou Dep. pp. 181-82). Because of the high cost of

---

[5]/ Relevant pages from the first two deposition transcripts of Plaintiff, John Hughes, are attached to the Affidavit of Anne N. Walker at Exhibit 6, and hereinafter referred to as "Pl. Dep., p. ___." Plaintiff's first two depositions were taken on September 12, 2003, and November 25, 2003.

[6]/ Relevant pages from the deposition transcript of Shelley White are attached to the Affidavit of Anne N. Walker at Exhibit 7, and hereinafter referred to as "White Dep., p. ___." White's deposition was taken on December 4, 2003.

5

housing, however, the money spent purchasing 18 units exhausted the funds budgeted for property acquisition. (Vasiliou Dep., pp. 181-82; White Dep., pp. 33-34; Pl. Dep., p. 70). The remaining funds were allocated toward the costs of construction, renovation and administration. (Vasiliou Dep., p. 182; Pl. Dep., p. 216).

HUD, the DOJ and Shelley White from New Haven Legal Assistance[7] were aware that MHA purchased only 18 units. (White Dep., pp. 25-27). Specifically, in approximately December 2001, MHA notified HUD, the DOJ and White that the funds budgeted for property acquisition were exhausted after the purchase of the 18 units. (White Dep., p. 25; Vasiliou Dep., pp. 181-82). The parties agreed that MHA would renovate the 18 units already purchased, but that no additional units would be bought. (White Dep., pp. 26-27). At no time was MHA obligated to acquire and/or develop 28 units of public housing. (Exhibit 5; Vasiliou Dep., p. 56; White Dep., p. 47).[8]

### C.    Plaintiff's Responsibilities As The Director Of Facilities Maintenance And Operations.

Plaintiff commenced employment with MHA on or about January 5, 1999. (Pl. Dep., p. 6). Plaintiff held the position of Director of Facilities Maintenance and Operations until his separation from employment in March 2002. (Pl. Dep., p. 38). This was a "newly created position, a position that was not previously part of the organization." (Vasiliou Dep., p. 23). The position was created because of the changing demands on MHA, which included implementation of the HUD Agreement.[9] (Vasiliou Dep., pp. 23, 29-31).

---

[7]/ White represented some of the individual plaintiffs in the lawsuit preceding the HUD Agreement. (White Dep., p. 10).

[8]/ Therefore, a statement that a full 28 units would not or could not be bought has no legal significance relative to compliance with the HUD Agreement and cannot be viewed as analogous to a stated intent not to comply with the HUD Agreement.

[9]/ Beginning in 1998, MHA reviewed the Maintenance Department to improve its functioning and efficiency. Certain positions were eliminated, and others, including Plaintiff's "reconstituted position," were created to be more consistent with MHA's ongoing and projected needs. (Vasiliou Dep., pp. 23, 28-31).

Plaintiff's primary responsibility was to "direct all maintenance and construction work on all properties owned and/or managed [by MHA] to assure that the best quality work [was] done and tenant needs [were] satisfied." (Exhibit 8: *job description*).  Plaintiff supervised other <u>newly created</u> maintenance positions, including a Work Center Supervisor and Work Center Coordinator.[10] (Vasiliou Dep., pp. 28-31).  Plaintiff's responsibilities were as follows:

- Direct architects, engineers, construction contract supervisors and staff to complete major construction projects within budget and schedule;
- Schedule, plan, organize and supervise staff throughout other construction projects;
- Inspect and evaluate workmanship for contract compliance;
- Recommend the approval and acceptance of completed projects;
- Perform site inspections at existing facilities, and prepare evaluation reports;
- Provide professional advice concerning costs, design and construction criteria;
- Serve as MHA's contact with various state and municipal agencies in the management of construction projects;
- Maintain project status information, financial and non-financial, and prepare reports for MHA use;
- Devise specifications, and solicit bids for work whenever conditions permit to assure best possible prices;
- Oversee Maintenance Department activities and workload;
- Respond to tenant complaints; and
- Prepare/review bid specifications for ongoing contract work or supplies.

(Exhibit 8).  At the time he was hired, Plaintiff's responsibilities thus included (1) "the ongoing maintenance of [MHA's] existing buildings," and (2) oversight of the "upcoming... renovation work" for the Scattered-Site project.[11] (Pl. Dep. p., 92).  Although Plaintiff had responsibilities directly relevant to MHA's compliance with the HUD Agreement, Plaintiff never actually read the HUD Agreement. (Pl. Dep., p. 65).

---

[10]/ MHA also hired Dion Smith in 2000 to fill the new position of Work Center Supervisor.  (Vasiliou Dep., p. 74). Smith became "responsible for the maintenance department, taking care of work orders, and training staff..." (Smith Dep., p. 14).  Thus, after Smith was hired, Plaintiff's role in the maintenance function diminished as his prior responsibilities shifted in part to the Work Center Supervisor. (Vasiliou Dep., pp. 74, 104).  Relevant pages from the deposition transcript of Dion Smith are attached to the Affidavit of Anne N. Walker at Exhibit 9, and hereinafter referred to as "Smith Dep., p. ___."  Smith's deposition was taken on February 26, 2004.

[11]/ In August 2001, Vasiliou provided Plaintiff with a memo and an updated job description to "provide some focus" and "clarification" as to Plaintiff's job duties in connection with "MHA's modernization, rehabilitation and economic development programs." (Vasiliou Dep., pp. 104-05; Exhibit: 10, *8/30/01 memo*).

**D.**   **Plaintiff's Position Was Eliminated Due To A Reorganization Of The Maintenance Department And As Part Of An Overall Effort To Improve MHA's Long-Term Fiscal Outlook.**

In the midst of implementing the Scattered-Site project, in approximately October 2001, Vasiliou also began developing MHA's annual budget for the fiscal year beginning April 1, 2002. (Vasiliou Dep., pp. 112-14, 131-33). At the same time, Vasiliou began planning MHA's One-Year and Five-Year strategic plans as required by HUD regulations.[12] (Vasiliou Dep., pp. 112-14, 131-33). Throughout the several month long budgeting and "planning process," Vasiliou met and held "working sessions" with the Commissioners. (Vasiliou Dep., pp. 112-13, 131-33). During that time, Vasiliou also worked closely with David Dunn, MHA's Labor Consultant, and Teresa Ewald, MHA's accountant. (Vasiliou Dep., p. 112; Dunn. Dep., pp. 16, 40-41; Ewald Dep., pp. 21-22, 26).[13]

As MHA's budget and strategic plans were prepared, Vasiliou began to consider, because of poor management and organizational inefficiency, a reorganization of the Maintenance Department. (Vasiliou Dep., pp. 119-20; Dunn Dep., pp. 28-29, 39-41). In doing so, Vasiliou assessed the overall health of the housing industry, the immediate and long-term impact of labor costs, and overhead costs. (Vasiliou Dep., p. 123). Vasiliou ultimately decided to eliminate the Director of Facilities Maintenance and Operations position "for budgetary purposes and to improve efficiency" in the Maintenance Department. (Vasiliou Dep., p. 119).

MHA believed the elimination of this position would improve the lines of communication both "vertically" and "laterally" throughout the organization. (Vasiliou Dep., p. 119). Rather

---

[12] As a public housing authority, MHA is required to submit a One-Year and Five-Year Plan to HUD for approval. See 24 CFR Part 903.

[13] Relevant pages from the deposition transcript of David Dunn are attached to the Affidavit of Anne N. Walker at Exhibit 11, and hereinafter referred to as "Dunn Dep., p. ___." Dunn's deposition was taken on November 13, 2003. Relevant pages from the deposition transcript of Teresa Ewald are attached to the Affidavit of Anne N. Walker at Exhibit 12, and hereinafter referred to as "Ewald Dep., p. ___." Ewald's deposition was taken on October 7, 2003.

than use Dion Smith and Plaintiff to handle a maintenance issue, one designated contact person for all maintenance activities was planned to improve efficiency. (Vasiliou Dep., pp.119-20). "Individuals across the organization would be able to go directly... [to] the Work Center Supervisor without always having to go to an intermediary," as was the case during Plaintiff's employment. (Vasiliou Dep., p. 122).

The elimination of Plaintiff's position would address not only organizational efficiency, but also MHA's long and short-term budgetary needs. (Vasiliou Dep., p. 120). At the time, the housing industry was "not [viewed as] being a healthy industry," MHA's "overhead [was] very high," and Plaintiff's position was considered "expensive." (Vasiliou Dep., p. 123). After weighing the projected costs associated with Plaintiff's relatively "high-salaried" position against the actual duties being performed by Plaintiff, and other problems in the department,[14] Vasiliou concluded Plaintiff's position was an "inefficient use of resources." (Vasiliou Dep., pp. 123, 24). In December 2001, Vasiliou discussed the budgetary impact of the reorganization with Ewald, who confirmed that eliminating Plaintiff's position would realize an immediate savings on short-term labor costs and projected savings over the next five years.[15] (Ewald Dep., pp. 21-22, 29-30; Vasiliou Dep., pp. 119-20). Because Vasiliou expected the position elimination to improve efficiency of the maintenance function and also reduce labor costs, MHA eliminated the Director of Facilities Maintenance and Operations position from the budget for the next fiscal year, beginning April 2002. (Vasiliou Dep., pp.119-23; Canelli Aff., ¶¶ 6-7).

---

[14]/ During the week of August 13, 2001, Vasiliou met with Plaintiff to discuss the focus of his job as the Scattered-Site project progressed. Vasiliou advised Plaintiff that his proper focus should be on the modernization functions related to the Scattered-Site project. (Vasiliou Dep., p. 104; Pl. Dep., pp. 98-100). Vasiliou followed up this conversation with a memo, dated August 30, 2001, to "help provide some focus" and "clarification" to Plaintiff regarding his job duties. (Vasiliou Dep., pp. 104-05; Exhibit 10).

[15]/ The elimination of Plaintiff's position resulted in a drop in administrative salaries from $313,676 to $254,645. (Ewald Dep., pp. 29-30).

9

Being part of MHA's strategic Five-Year Plan, the proposed reorganization of the Maintenance Department required the Commissioners' approval. Hence, the "final, final decision" to eliminate Plaintiff's position was made "in mid-January" 2002. (Dunn Dep., p. 16; Canelli Aff., ¶ 6; Vasiliou Aff., ¶ 6). In particular, the annual 2002-2003 budget and the Five-Year Plan, including the proposed reorganization of the Maintenance Department, was voted on and approved by the Commissioners during a Board meeting held on January 15, 2002. (Vasiliou Dep., pp. 114-16, 130; Canelli Aff., ¶ 6-7). This decision eliminated Plaintiff's position from the upcoming fiscal year's budget, beginning April 1, 2002. (Canelli Aff., ¶ 7). Hence, notice to Plaintiff was delayed from January until March 8, 2002 to prepare for the lay-off.

During late January and up through February 26, 2002, Dunn assisted and advised Vasiliou on the preparation of a lay-off package. (Dunn. Dep., pp. 62-63). The goal was to have Plaintiff complete several outstanding projects and also give him a reasonable severance pay, three weeks, which was to be allocated to the 2001-2002 fiscal year. (Vasiliou Aff., ¶ 7).

Accordingly, on March 8, 2002, three weeks before the fiscal year ended, Vasiliou and Dunn told Plaintiff of the decision to eliminate his position.[16] (Pl. Dep., p. 53; Dunn Dep., p. 12). Because Plaintiff was out sick, the separation decision had to be communicated by telephone.[17] Plaintiff later prepared a statement, dated March 14, 2002, in which he wrote that Vasiliou telephoned him on March 8, 2002, and told him that he had been laid off "for budgetary reasons and reorganization reasons." (Exhibit 14: *3/14/02 statement*).

---

[16] Plaintiff called in sick that day. (Pl. Dep., p. 53).
[17] Vasiliou also sent Plaintiff a letter, dated March 8, 2002, which confirmed that Plaintiff's position was eliminated "as a result of budgetary considerations and a reorganization" of MHA. (Exhibit 13: *3/8/02 letter*). This letter was hand delivered.

10

### E.    Plaintiff's Conversation With Alphonse Kuncas On February 28, 2002.

On February 28, 2002, prior to his separation, Plaintiff met with Alphonse Kuncas, an architect contracted by MHA to work on the Scattered-Site project.  (See Sec. Am. Compl., ¶ 18).  Plaintiff met with Kuncas to discuss a request for additional funds to cover cost overruns.  (Pl. Dep., pp. 80-84).  Resolving cost overruns was among Plaintiff's responsibilities.  (Pl. Dep., pp. 83-84; Exhibit 8).  Plaintiff believed that Kuncas "had done his obligation," and was adequately compensated, and that he was not entitled to "extra money" because "we all do extra work." (Pl. Dep., p. 118).

At the meeting, Plaintiff allegedly complained to Kuncas, "You know this is more and more on soft costs [for Scattered-Site housing].  There are unit prices.  There's overall costs, and every time you're in here, it's increased costs, and this is just more of the same stuff, especially on the [Scattered-Site] housing." (Pl. Dep., p. 62).   Plaintiff went on to say that, "when the Justice Department comes in… this is more information that I'm prepared to show them of escalating costs beyond belief." (Pl. Dep., pp. 62, 84).  In the Second Amended Complaint, Plaintiff alleges that he also said, "if the Justice Department came in here, I would tell them that Anthony Vasiliou has no intention of building 28 units of [Scattered-Site] housing."[18]  (See Sec. Am. Compl., ¶ 19).[19]

Vasiliou overheard these statements, came into the room, and according to Plaintiff, "chastised" him.  (See Sec. Am. Compl. ¶ 19).  Specifically, Plaintiff claims that Vasiliou said "How dare you talk to an outside person.  If you have anything to say, come down and say it to

---

[18]/ MHA was not obligated to build or develop 28 units. (Exhibit 5; White Dep., p. 47).

[19]/ In the Second Amended Complaint, Plaintiff claims that Vasiliou stated that he (Vasiliou) "had no intention of complying with the [HUD] Agreement," and that Vasiliou would avoid compliance by "spending the money on 'soft' costs, such as architects." (See Sec. Am. Compl., ¶¶ 16-17).  When Plaintiff was asked during his deposition, however, if Vasiliou ever actually said that "he had no intention of complying with the [HUD] Agreement," Plaintiff admitted, "Not the way you're saying it, no… Not those words." (Pl. Dep., pp. 66-67).  When asked again if Vasiliou actually said he "would avoid compliance with the [HUD Agreement] by spending money on soft costs," Plaintiff again admitted, "Not specifically, no." (Pl. Dep., p. 74).

me." (Pl. Dep., p. 62). When asked during his deposition whether he believed he was later

terminated because of his statements to Kuncas, Plaintiff said yes, but gave no reason other than

his "gut feeling... [he] just felt it within [him]self." (Pl. Dep., p. 91).

**F.    Plaintiff Received At-Will And Contract Disclaimers In His Employment Application And The Personnel Policies Manual.**

Prior to being hired, Plaintiff completed and signed an employment application. (Pl.

Dep., p. 22). That application clearly stated that Plaintiff's employment would be "at-will."

(Exhibit 15, *Employment Application*). The application states, in pertinent part:

> I understand that employment is "at-will," in that I or MHA may terminate
> my employment *at any time, or for any reason* consistent with the
> applicable state or federal law. I understand that this application is not a
> contract.

(Exhibit 15) (emphasis added). Plaintiff understood this provision at the time he completed the

application. (Pl. Dep., pp. 22-24).

On the "first day [he] started" his employment in January 1999, Plaintiff received a copy

of MHA's Personnel Policies Manual. (Pl. Dep., pp. 36-37). Plaintiff signed a "Receipt and

Acknowledgment of Personnel Policy Manual," confirming that he received the Manual on

January 29, 1999. (Exhibit 16: *Receipt*). Plaintiff "put [his] name on that manual in '99, and

that's the one... [he] always carried... in [his] attaché case."[20]  (Pl. Dep., pp. 40, 44).

The 1999 Manual included a document entitled, "DISCLAIMER," which stated:

> "This Personnel Policy Manual is distributed to [MHA] employees as a
> guide and summary of the current personnel policies, procedures and work
> rules of [MHA]. **This Manual is not intended nor should it be
> construed, as a binding contract of employment – express or implied –
> between [MHA] and any employee. Furthermore, this Manual is not
> intended as a guarantee of continued employment**."

(Exhibit 4) (emphasis added).

---

[20]/ Plaintiff received a revised Personnel Policies Manual in 2001. (Pl. Dep., pp. 45-46; Exhibit 17: *2001 Handbook*). The policies remained essentially the same as those contained in 1999 version. (Exhibit 4; Exhibit 17).

### G.    Plaintiff's Post-Termination Contact With The DOJ And HUD.

Plaintiff <u>never</u> spoke with the DOJ or HUD regarding compliance with the HUD

Agreement during his employment. (Pl. Dep., pp. 120-22, 131-33; Pl. Cont. Dep., p. 19).[21]  In

approximately July 2002, four months after Plaintiff's termination, Plaintiff contacted Shelley

White of New Haven Legal Assistance Association. (White Dep., pp. 12-13, 21; Pl. Dep., pp.

123, 127-28).  During that meeting, Plaintiff discussed his termination and MHA's compliance

with the HUD Agreement.[22]  (White Dep., p. 16).  Following that meeting, White called DOJ

personnel, who in turn scheduled a second meeting with Plaintiff in early August 2002.  (White

Dep., p. 15; Pl. Dep., pp. 122-23).

In August 2002, a DOJ attorney requested that Plaintiff meet her at White's office to

further discuss his employment, the circumstances of his separation and MHA's compliance with

the HUD Agreement. (Pl. Dep., p. 123-25; White Dep., pp, 35-36; Pl. Cont. Dep., pp. 10-11).

Following the August 2002 meeting with Plaintiff, White and DOJ personnel reviewed

MHA's files, but concluded there was "insufficient evidence" to initiate further action with

respect to compliance with the HUD Agreement. (White Dep., pp. 36-41).  White "did not

believe [there] was a violation of the consent decree" or "evidence that... Mr. Vasiliou was

noncompliant." (White Dep., pp. 38-42).  In essence, there was no evidence to substantiate non-

compliance, or that Vasiliou intended to avoid compliance, with the HUD Agreement.

Much later, in approximately May 2003, HUD commenced a routine procurement audit

of MHA. (Pl. Cont. Dep., p. 18; Exhibit 19: *HUD audit letter*).  The purpose of the audit was to

"evaluate [MHA's] implementation and administration of the Capital Fund program and related

---

[21]/ Since August 2002, Plaintiff has had no further contact with White or the DOJ. (Pl. Cont. Dep., pp. 10-11).
Relevant pages from Plaintiff's third deposition transcript are attached to the Affidavit of Anne N. Walker at Exhibit
18, and hereinafter referred to as "Pl. Cont. Dep., p. ___."  Plaintiff's third deposition was taken on May 11, 2004.
[22]/ White informed Plaintiff that she could not help him with his termination. (White Dep., pp. 23, 32).

13

procurement practices, [and] to evaluate bond financing transactions. (Exhibit 19). Specifically, HUD wanted to ensure that MHA was adhering to its Five-Year and One-Year Plans, complying with HUD procurement requirements, expending funds consistent with HUD guidelines, and completing modernization work efficiently and economically. (Exhibit 19).

On February 19, 2004, at HUD's request, Plaintiff met with HUD personnel and answered questions regarding routine matters, such as his former job duties, the Maintenance Department, customer service, and property procurement.[23] (Pl. Cont. Dep., pp. 22-24, 26). HUD also asked Plaintiff whether he ever witnessed Vasiliou do anything unlawful, to which Plaintiff responded that he was not aware of and had never witnessed Vasiliou do anything illegal.[24] (Pl. Cont. Dep., pp. 22-23) (emphasis added). This was Plaintiff's first and only contact with HUD after his separation from employment with MHA. (Pl. Cont. Dep., p. 19).

Plaintiff never notified the Commissioners or Vasiliou about his meeting with HUD in February 2004. (Pl. Cont. Dep., p. 30). In fact, the Commissioners and Vasiliou were unaware of Plaintiff's meeting with HUD until after receiving Plaintiff's Second Amended Complaint. (Vasiliou Aff., ¶ 9; Canelli Aff., ¶ 8; Amenta Aff., ¶ 4; Holowink Aff., ¶ 4; Tucciarone Aff., ¶ 4; D'Iorio Aff., ¶ 4). Plaintiff had "no idea" whether Vasiliou or the Commissioners were aware of the HUD meeting, or how they would have learned of the meeting. (Pl. Cont. Dep., pp. 30, 32). Plaintiff also had "no idea" how Vasiliou could have retaliated against him for attending the HUD meeting if he was not aware of it. (Pl. Cont. Dep., p. 37).

On or about February 25, 2004, Vasiliou filed a private lawsuit on his own behalf in Connecticut Superior Court against Plaintiff, alleging claims of defamation, false light,

---

[23]/ The audit was not focused on, nor did Plaintiff recall providing any information regarding, MHA's compliance with the HUD Agreement. (Pl. Cont. Dep., p. 24).

[24]/ This attestation stands in stark contrast to Plaintiff's incredible allegation in his Complaint that Vasiliou said he did not intend to comply with the HUD Agreement. In fact, Plaintiff's retraction of this allegation in his deposition is consistent with his statement to HUD in February 2004, that he had not observed unlawful behavior.

14

intentional and negligent infliction of emotional distress, based on purportedly untrue statements made by Plaintiff about Vasiliou's expressed intent not to comply with the HUD Agreement. (Vasiliou Aff., ¶ 11; Exhibit 20: *Vasiliou Complaint*).  Vasiliou retained Attorney David Metzger, in late December 2003, and thus initiated his lawsuit well before Plaintiff met with HUD in February 2004.  (Vasiliou Aff., ¶ 10).  Notably, neither MHA nor the Commissioners are providing, or have provided, any assistance by financing, directing, advising or influencing Vasiliou with respect to his lawsuit. (Vasiliou Aff., ¶  11; Canelli Aff., ¶ 9; Amenta Aff., ¶¶ 6-7; Holowink Aff., ¶¶ 6-7; Tucciarone Aff., ¶¶ 6-7; D'Iorio Aff., ¶¶ 6-7).  Vasiliou's lawsuit was not presented to, or approved by, the Board of Commissioners.  (Canelli Aff., ¶ 10; Amenta Aff., ¶ 7; Holowink Aff., ¶ 7; Tucciarone Aff., ¶ 7; D'Iorio Aff., ¶ 7).

## II.     **PROCEDURAL HISTORY**

Plaintiff commenced this action in Connecticut Superior Court with the service of a four count Complaint on or about September 25, 2002.  Defendants removed the case to United States District Court on October 29, 2002 pursuant to 28 U.S.C. § 1441.  Defendants filed their Answer on December 5, 2002.  Plaintiff filed an Amended Complaint on July 16, 2003, adding two new counts alleging breach of contract and breach of the covenant of good faith and fair dealing. Defendants filed their Answer to the Amended Complaint on September 17, 2003.

On March 23, 2004, again over Defendants' objection, Plaintiff filed a Second Amended Complaint containing the following claims:

| | |
|---|---|
| First Count: | Violation of FHA, 42 U.S.C. § 3617; |
| Second Count: | Wrongful Discharge; |
| Third Count: | Violation of 42 U.S.C. § 1983; |
| Fourth Count: | Violation of Conn. Gen. Stat. § 31-51q; |
| Fifth Count: | Breach of Contract; |
| Sixth Count: | Breach of the Covenant of Good Faith and Fair Dealing; |
| Seventh Count: | Violation of FHA, 42 U.S.C. § 3617; and |
| Eighth Count: | Violation of Plaintiff's rights under 42 U.S.C. § 1983. |

15

Defendants filed an Answer to the Second Amended Complaint on or about May 12, 2004. As mentioned above, Plaintiff is no longer pursuing the Third and Fourth Counts. (Pl. Cont. Dep., p. 8). Defendants therefore request that the Court dismiss those claims, with prejudice. As to the remaining six counts, Defendants now move for Summary Judgment.

## III.    LEGAL ANALYSIS

### A.    Standard for Granting Summary Judgment.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to Summary Judgment if "there is no genuine issue as to any material fact and... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether Summary Judgment should be granted, the United States Supreme Court has explained that:

> there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party... . If the evidence is merely colorable... or is not significantly probative... summary judgment may be granted.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citations omitted). In essence, the inquiry is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999).

The Second Circuit has encouraged the use of Summary Judgment "to streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). The "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citations omitted). This reasoning applies equally to the resolution of employment claims. See e.g., McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994) (summary judgment appropriate for employment discrimination cases); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), cert. denied, 474 U.S. 829, 106 S. Ct. 91 (1985) ("[T]he salutary purposes of summary judgment... apply no less to discrimination cases than to commercial or other areas of litigation.").

### B.     The First And Seventh Counts Alleging Retaliation Under The Federal Fair Housing Act Fail As A Matter Of Law.

In the First and Seventh Counts of the Second Amended Complaint, Plaintiff alleges that Defendants violated the federal Fair Housing Act, 42 U.S.C. § 3617, by terminating his employment in March 2002 (First Count), and by Vasiliou filing a lawsuit against Plaintiff in February 2004 (Seventh Count).

Section 3617 of the FHA provides that:

> It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of having *aided or encouraged any other person* in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the FHA].

42 U.S.C. § 3617 (emphasis added). The FHA "protects persons who aid or encourage others in securing rights to equal housing opportunities and conditions by making it unlawful to coerce, intimidate, threaten or interfere with them because of their aid or encouragement." Meadows v.

17

Edgewood Mgmt. Corp., 432 F. Supp. 334, 336 (W.D. Va. 1977); see also Frazier v. Rominger,

27 F.3d 828, 833 (2d Cir. 1994) (Section 3617 "protects third parties, not necessarily members of

the protected class, who aid or encourage protected class members in the exercise or enjoyment

of their Fair Housing Act rights.").

      To prevail on a retaliation claim under § 3617, Plaintiff "bears the burden of proof by a

preponderance of the evidence on each issue including that (1) [he] *actually aided or encouraged*

[an] individual or group in the exercise or enjoyment of [FHA] rights" and (2) that he was

terminated or other adverse action was taken *because of* his protected activity. Meadows, 432 F.

Supp. at 336 (emphasis added).

      Plaintiff's retaliation claims fail and Summary Judgment must be granted because the

undisputed facts unequivocally show no causal connection between any alleged adverse action

and any alleged protected activity.  More specifically, the First Count fails because the decision

to eliminate Plaintiff's position, the alleged adverse action, was made long before the

conversation between Kuncas and Plaintiff, the alleged protected activity.  Similarly, the Seventh

Count fails because Defendants were wholly unaware of Plaintiff's meeting with HUD in

February 2004.  Given these undisputed facts, no causal connection can be established, and the

First and Seventh Counts must be dismissed.  Additionally, the undisputed facts show that

Plaintiff's comments to Kuncas in February 2002 and meeting with HUD in February 2004 did

not "aid or encourage" anyone in the exercise of their Fair Housing rights; thus, Plaintiff never

engaged in any protected activity.  Finally, the retaliation claims must also be dismissed on

Summary Judgment because Plaintiff's separation and Vasiliou's lawsuit arose from legitimate,

nondiscriminatory motives.

18

1.    **The First Count Fails Because The Decision To Eliminate Plaintiff's Position Was Made *Before* Any Of His Alleged Protected Activity.**

To survive Summary Judgment, Plaintiff must be able to demonstrate that a "causal connection exists between the protected activity and the adverse action, that is, a retaliatory motive played a part in the adverse employment action." Hill v. Citibank Corp., 2004 U.S. Dist LEXIS 5069 at * 33 (S.D.N.Y. 2004). "Causation may be shown either directly, through evidence of retaliatory animus by the person who initiated the adverse action against plaintiff, or indirectly, by showing that the retaliatory action was taken shortly *after* the protected activity" occurred. Id., at *36. The causal connection "can be established indirectly by showing that the protected activity was closely <u>followed</u> in time by the adverse action." Reg'l. Econ. Cmty. Action v. City of Middletown, 294 F.3d 35, 44-45 (2d Cir. 2002) (emphasis added).

Here, Plaintiff cannot dispute that the decision to eliminate his position occurred long <u>before</u> Plaintiff's conversation with Kuncas, his alleged protected activity. Vasiliou began planning reorganization of the Maintenance Department and the elimination of Plaintiff's position in October 2001. (Vasiliou Dep., p. 133; Dunn Dep., pp. 40-41; Ewald Dep., pp. 21-22, 45-46). The proposed reorganization was discussed with the Commissioners beginning in October 2001 when Vasiliou began to prepare the upcoming fiscal year budget and MHA's Five-Year Plan. (Vasiliou Dep., pp. 112-13, 133). Vasiliou conferred with Dunn, his Labor Consultant, on the elimination of Plaintiff's position beginning in October 2001 and throughout the budgeting and planning process. (Dunn. Dep., pp. 16, 28-29, 40-41). Vasiliou also discussed the financial impact of the departmental reorganization with MHA's accountant in December 2001. (Ewald Dep., pp. 21-22, 26). The final budget and Five-Year Plan, which included the elimination of Plaintiff's position, was presented to the Commissioners, voted on and approved on January 15, 2002. (Vasiliou Dep., pp. 114-16, 130; Dunn Dep., pp. 15-16; Canelli Aff., ¶ 6).

19

Plaintiff did not make his alleged statements to Kuncas until February 28, 2002, well *after* the decision to eliminate his position was finalized. (<u>See</u> Sec. Am. Compl. ¶¶ 18-19). Plaintiff has not, and cannot, produce evidence to dispute the timing of these events. Given that the decision to eliminate Plaintiff's position was made long <u>before</u> his statements to Kuncas, a critical fact verified by two nonparty witnesses, Ewald and Dunn, such statements could not possibly have contributed to his termination. <u>City of Middletown</u>, 294 F.3d at 44-45. Summary judgment must therefore be granted in favor of Defendants on the First Count.

### 2. The Seventh Count Fails Because Defendants Were Wholly Unaware Of Plaintiff's February 2004 Meeting With HUD.

To survive Summary Judgment on his FHA retaliation claim in the Seventh Count, Plaintiff must again present credible evidence to support a causal connection between the alleged protected activity, his February 2004 meeting with HUD, and the alleged adverse action, Vasiliou's lawsuit, filed several days later. <u>See Frazier</u>, 27 F.3d at 831 (setting forth burden of proof for an FHA retaliation claim). To demonstrate a causal connection between the alleged protected activity and the adverse action, Plaintiff must demonstrate that Defendants were "aware of Plaintiff's participation in the protected activity." <u>See James v. Newsweek, Inc.</u>, 2000 U.S. App. LEXIS 8805 at *3 (2d Cir. 2000). "Implicit in the requirement that [Defendants were] aware of the protected activity is the requirement that [they] understood, or could reasonably have understood, that Plaintiff's opposition was directed at conduct prohibited" by the FHA. <u>Id.</u>

Here, there is no evidence to show that Defendants were aware of Plaintiff's attendance at a meeting with HUD in February 2004. Plaintiff himself testified that he had "no idea" whether Defendants knew of this meeting, or how they could have learned of it. (Pl. Cont. Dep., pp. 32-33). Plaintiff did not tell anyone other than Dion Smith, a former co-worker and his family. (Pl. Cont. Dep., p. 29). Plaintiff merely recalled telling Smith that he "had the

20