interview," but there is no evidence that Smith passed that information to Defendants. (Pl. Cont. Dep., p. 29). In fact, Defendants did not know that Plaintiff met with HUD on February 19, 2004, until after they received the Second Amended Complaint. (Vasiliou Aff., ¶ 9; Canelli Aff., ¶ 8; Amenta Aff., ¶ 4; Holowink Aff., ¶ 4; Tucciarone Aff., ¶ 4; D'Iorio Aff., ¶ 4).

Absent credible and specific evidence to demonstrate that Defendants were aware of Plaintiff's meeting with HUD, Plaintiff cannot demonstrate that the alleged adverse action, Vasiliou's lawsuit, was *because of* his routine meeting with HUD personnel. James, 2000 U.S. App. LEXIS 8805 at *3. Accordingly, Summary Judgment must be granted in favor of Defendants on Plaintiff's FHA retaliation claim in the Seventh Count.

3.   **The Retaliation Claims In The First And Seventh Counts Fail Because Plaintiff Did Not "Aid Or Encourage" Other Persons In The Exercise Or Enjoyment Of Their Fair Housing Rights.**

a.   **To "Aid" Or "Encourage" Requires More Than Friendship Or Sympathy To Rights Protected Under The FHA.**

Plaintiff must produce evidence that he "*actually aided or encouraged* the protected individual or group in the exercise or enjoyment of rights under" the FHA. People Helpers, Inc. v. City of Richmond, 789 F. Supp. 725, 732 (E.D. Va. 1992) (emphasis added); see also Meadows, 432 F. Supp. at 335 ("the plaintiff bears the burden of proof by a preponderance of the evidence on each issue including that they actually aided or encouraged the individual or group in the exercise or enjoyment of [Fair Housing] rights"). Plaintiff must show that "he was attempting in some way to enforce any right protected by the housing act." Vercher v. Harrisburg Housing Authority, 454 F. Supp. 423, 424 (M.D. Pa. 1978). HUD regulations provide the following examples of actions violating § 3617:

> "Threatening... or taking... adverse employment action [against an employee], for any *effort to assist a person seeking access to the sale or rental of a dwelling or seeking access to any residential real estate-related transaction,* because of" unlawful discrimination;

21

> "intimidating or threatening any person *because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons* to exercise, rights granted or protected by this part;" and

> "retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act."

See 24 C.F.R. § 100.400(c)(3), (4), (5) (emphasis added).

As the regulations make clear, Plaintiff must have actually aided or encouraged others in the exercise of their Fair Housing rights. See e.g. People Helpers, Inc., 789 F. Supp. at 732 (attempting to purchase and develop housing for the disabled); City of Middletown, 294 F.3d at 43 (attempting to create housing for the homeless and later complaining to HUD regarding defendant's obstruction of that plan); Walker v. City of Lakewood, 272 F.3d 1114, 1128 (9th Cir. 2001) (plaintiff "aided or encouraged" by investigating complaints, issuing press releases, conducting press conferences, providing legal assistance, providing Fair Housing information, referring an attorney and attempting to join a lawsuit on behalf of others); Hall v. Lowder Realty Co. Inc., 160 F. Supp. 2d 1299, 1323 (M.D. Ala. 2001) (complaining to company management about discriminatory practices as potential violations of FHA).

In Walker v. City of Lakewood, the plaintiffs, who operated a Fair Housing program for the city, assisted several tenants to combat discriminatory practices allegedly being committed by the owner and management company of their apartments. The plaintiffs advised the tenants as to their legal rights and referred them to a private attorney. The plaintiffs later conducted a press conference and issued a release describing the subsequent lawsuit filed by the tenants. Finally, the plaintiffs attempted to join that lawsuit. The Court concluded that based on these activities, the plaintiff had "shown that it participated in a protected activity," by "aiding or encouraging" the tenants in the exercise of their Fair Housing rights. Walker, 272 F.3d at 1128.

22

By contrast, simply offering friendship or sympathy does not qualify as "aid or encouragement." See Meadows v. Edgewood Mgmt. Co., supra, 432 F. Supp. at 335. In Meadows, the plaintiffs, former employees of a property management company, alleged that they had been unlawfully terminated because they were friendly toward a minority tenant. The plaintiffs relied on four incidents of alleged race discrimination by the management company. However, the evidence showed that the plaintiffs took no action on the tenant's behalf during their employment. The Court was not persuaded by the fact that the plaintiffs witnessed a racially derogatory statement. Id., at 337. Thus, despite claims that they were friendly to a minority tenant and that the management company discriminated against the tenant, Summary Judgment was granted because the record failed to show that the plaintiffs aided or encouraged the tenant in the exercise or enjoyment of her FHA rights. Id.

Indeed, conduct which is only tangentially related to and has no direct impact on the housing rights of others does merit protection under § 3617. See Vercher v. Harrisburg Housing Authority, supra, 454 F. Supp. at 424. For example, in Vercher, the plaintiff alleged that he had been terminated after contacting the local Urban League in an effort to secure equal police protection for minority tenants. Vercher, 454 F. Supp. at 423. Granting summary judgment in favor of the housing authority, the Court held that although securing police protection could impact the use and enjoyment of housing, Plaintiff's actions had no "direct connection with the sale, rental or occupancy of housing." Id., at 424. Even though the plaintiff "was attempting to end a form of discrimination," summary judgment was appropriate because his actions were not an attempt "to enforce any right protected by the housing act." Id. Actions which have only "some impact" on housing do not warrant protection under the FHA. Id.

23

**b.    Plaintiff's Statements To Kuncas Were Not Made To Aid Or Encourage Others In The Exercise Of Their Fair Housing Rights.**

In the present case, Plaintiff alleges in the Second Amended Complaint that he made one comment to Kuncas expressing his dissatisfaction with a request for payment of fees submitted by Kuncas.  Based on the foregoing legal precedent, this act alone is wholly insufficient to establish that Plaintiff aided or encouraged others in the exercise of their Fair Housing rights.[25]

Plaintiff did not tell anyone that he opposed an MHA policy or practice or even that he believed an MHA policy or practice to be unlawful.  Plaintiff also testified that he never read the HUD Agreement and never met the plaintiffs who initiated the lawsuit which preceded the HUD Agreement.  (Pl. Dep., pp. 64-65).  In fact, Plaintiff did not identify any group of people whom he was aiding or encouraging in their Fair Housing rights.[26]  Plaintiff never brought any alleged concerns about the HUD Agreement to the Commissioners' attention, or to any other official at HUD, the DOJ or elsewhere during his employment. (Pl. Dep. pp. 120-22, 131-33; Pl. Cont. Dep., p. 19; White Dep., pp. 23-24).  Such conduct is hardly the hallmark of an individual aiding or encouraging others to exercise and enjoy their Fair Housing rights.

Plaintiff's comments to Kuncas that money was being spent on soft costs clearly had no "direct connection with the sale, rental or occupancy of housing" as required by law.  Vercher, 454 F. Supp. at 424.  Because the undisputed evidence shows that Plaintiff did not engage in any action to "aid or encourage" others in the exercise or enjoyment of Fair Housing rights, Summary Judgment must be granted as to the First Count. Meadows, 432 F. Supp. at 337.

---

[25]/ As Plaintiff's job duties included controlling vendor costs, this conversation appears to be little more than a negotiation regarding an architect's professional fees.  Plaintiff's comments referred specifically to "unit prices," "overall costs" and "increased costs."  (Pl. Dep., p. 62).
[26]/ When asked about whether he engaged in any protected activity, Plaintiff responded that he encouraged some MHA employees to join a union. (Pl. Dep., p. 86).

24

**c.    Plaintiff Did Not Aid Or Encourage The Fair Housing Rights Of Others By Attending A Meeting With HUD In February 2004.**

To sustain the Seventh Count, Plaintiff must likewise produce evidence that during the February 2004 meeting with HUD, he "*actually aided or encouraged* [a] protected individual or group in the exercise or enjoyment of rights under" the FHA. People Helpers, Inc., supra, 789 F. Supp. at 732 (emphasis added).[27]

The undisputed evidence shows, and Plaintiff admits, that Plaintiff was simply interviewed in February 2004 as part of a routine procurement audit conducted by HUD, and did not engage in any protected activity under the FHA. (Pl. Cont. Dep., p. 18). HUD invited Plaintiff to attend that interview in connection with their audit. (Pl. Cont. Dep., p. 18). This was Plaintiff's first and only contact with HUD since his termination two years prior. (Pl. Cont. Dep., p. 19). Plaintiff answered routine questions regarding his former job duties, the Maintenance Department and procurement of properties. (Pl. Cont. Dep., p. 22-28). During the HUD meeting, Plaintiff did not state that he opposed any MHA policy or practice, or even that he believed an MHA policy or practice to be unlawful. HUD did not inquire about, and Plaintiff did not provide any information regarding, MHA's compliance with the HUD Agreement. (Pl. Cont. Dep., pp. 22-28).

Accordingly, Defendants are entitled to Summary Judgment on the Seventh Count because Plaintiff cannot sustain a retaliation claim where, as here, the undisputed evidence shows that Plaintiff did not "aid or encourage" others in the exercise of their Fair Housing rights during his meeting with HUD. Meadows, 432 F. Supp. at 337.

---

[27]/ Prior to February 2004, the evidence shows that Plaintiff spoke to Shelley White from New Haven Legal Assistance in July 2002, spoke to White again with the DOJ in August 2002, and a newspaper reporter in October 2002. (Pl. Dep., pp. 122-23, 127-28, 157). Even if these actions could be considered "protected activity," they all occurred over 17 months before Vasiliou's defamation lawsuit, the alleged adverse action. A delay of 17 months "suggests, by itself, no causality at all." See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 274, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (Where "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" is relied upon "the temporal proximity must be 'very close.'").

25

4.    **The Retaliation Claim In The First Count Also Fails Because The Undisputed Facts Establish Plaintiff's Position Was Eliminated For Budgetary And Operational Reasons.**

To defeat Defendants' properly supported Motion for Summary Judgment, Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, [non-retaliatory] reasons proffered by the employer were false, and that more likely than not [retaliation] was the real reason for the discharge." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (internal quotes omitted). If Plaintiff cannot demonstrate that Defendant's proffered reason is false, much less that the real reason for Plaintiff's termination was unlawful retaliation, his retaliatory termination claim must be dismissed. Mayo v. Columbia Univ., 2003 U.S. Dist. LEXIS 5639 (S.D.N.Y. April 7, 2003) (plaintiff failed to present evidence disputing defendant's legitimate, non-discriminatory reason for the employee's termination); Smith v. UAW-GM Legal Servs. Plan, 2002 U.S. App. LEXIS 26175 (2d Cir. 2002) (plaintiff produced no evidence that lay-off pursuant to terms of a collective bargaining agreement was retaliatory).

The undisputed evidence shows that Plaintiff's position was eliminated during a departmental reorganization. Dunn and Ewald have corroborated Vasiliou's testimony that MHA began consideration of changes to the Maintenance Department in October 2001. (Vasiliou Dep., pp. 112-14, 133; Ewald Dep., pp. 21-22, 29-30; Dunn. Dep., pp. 16, 40-41). As part of the long-term planning and budgeting process, Vasiliou considered a number of factors, including the Maintenance Department's performance and efficiency, overhead costs and the long-term outlook of the housing industry. Because Plaintiff's position was "relatively expensive" compared with others in the Maintenance Department, and based on the functions his position served, Vasiliou determined that it would not be an efficient use of MHA's resources to retain that position. (Vasiliou Dep., pp. 123-24). MHA's accountant confirmed a significant

26

labor cost reduction both in the short and long-term as well as the timing of the reorganization. (Ewald Dep. pp. 21-22, 29-30).

Plaintiff has offered no evidence to dispute these legitimate reasons for Plaintiff's separation. To the contrary, when asked during his deposition why he believed his statements to Kuncas were the reason for his termination, Plaintiff stated merely that it was his "gut feeling... [he] just felt it within [him]self." (Pl. Dep., p. 91). Plaintiff cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." McCloskey v. Union Carbide Corp., 815 F. Supp. 78, 81 (D. Conn. 1993) ("gut feeling" is insufficient to withstand summary judgment); Chappell v. GTE Products Corp., 803 F.2d 261, 268 (2d Cir. 1986) ("Personal beliefs, conjecture and speculation are insufficient to support an inference" of retaliatory motive.). Because Plaintiff has produced no evidence to dispute the reasons for Plaintiff's separation from employment, his claim of retaliation in the First Count must be dismissed. McCloskey, 815 F. Supp. at 81.

**C.    Plaintiff's Claim Under 42 U.S.C. § 1983 Fails As A Matter Of Law.**

In the Eighth Count, Plaintiff claims deprivation of his Constitutional right to free speech in violation of 42 U.S.C. § 1983, based on Vasiliou's filing of a defamation lawsuit shortly after Plaintiff's meeting with HUD. This claim relies on the identical facts alleged in support of Plaintiff's FHA retaliation claim in the Seventh Count.

To sustain a claim under § 1983, Plaintiff must first show that "(1) the conduct alleged was committed by an individual acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." San Pedro Hotel Co., Inc., v. City of Los Angeles, 159 F.3d 470, 479 (9th Cir. 1998). In addition, Plaintiff must prove that: (1) his speech was constitutionally protected, (2) he suffered an adverse action, and (3) a causal connection exists between his speech and the adverse action, so that it can be said that his speech was a

27

motivating factor in the determination. <u>Ruscoe v. Housing Auth. of New Britain</u>, 259 F. Supp. 2d

160, 170 (D. Conn. 2003).

1.    **Plaintiff's § 1983 Claim Fails Because Defendants Were Not Aware Of Plaintiff's Meeting With HUD, The Alleged Protected Activity.**

To demonstrate a causal connection between the alleged protected activity and the

adverse action, Plaintiff must demonstrate that Defendants were at least "aware of Plaintiff's

participation in the protected activity." See <u>James v. Newsweek, Inc.</u>, 2000 U.S. App. LEXIS

8805 at *3 (2d Cir. 2000). The undisputed evidence shows that Defendants were not aware of

Plaintiff's meeting with HUD prior to Vasiliou's lawsuit being filed. (Vasiliou Aff., ¶ 9; Canelli

Aff., ¶ 8). As discussed in Section III-B-2, because the undisputed evidence shows that

Defendants were not aware of Plaintiff's meeting with HUD, Plaintiff cannot demonstrate that

the alleged adverse action, Vasiliou's lawsuit, was *because of* his meeting with HUD personnel.

<u>Id.</u> Accordingly, Defendants are entitled to Summary Judgment on the Eighth Count.

2.    **Plaintiff's § 1983 Claim Must Be Dismissed Because Vasiliou's Private Lawsuit Does Not Constitute An Official Action Under Color Of Law.**

To sustain a claim under § 1983, Plaintiff "must demonstrate that a person acting under

the color of state law committed the conduct complained of, and that such conduct deprived the

plaintiff of a right secured by the Constitution or the laws of the United States." <u>Monsky v.

Moraghan</u>, 947 F. Supp. 53, 54 (D. Conn. 1996) (citing to <u>West v. Atkins</u>, 487 U.S. 42, 48, 108

S. Ct. 2250, 101 L. Ed. 2d 40 (1997)). "A person acts under the color of state law when his

actions are committed in the performance of any actual or pretended duty, and are not committed

in the ambit of his personal pursuits." <u>Monsky</u>, 947 F. Supp. at 54. "It is by now axiomatic that

under color of state law means pretense of law and the acts of officers in the ambit of their

personal pursuits are plainly excluded." <u>Pitchell v. Callan</u>, 13 F.3d 545, 547-48 (2d Cir. 1994).

For "conduct to relate to state authority, it must bear some similarity to the nature of the powers

28

and duties assigned to the defendant[].” <u>Dang Vang v. Vang Xiong Toyed</u>, 944 F.2d 476, 480 (9th Cir. 1991).

The mere fact that the actor is an employee of the state is not dispositive of whether his conduct was committed under the color of state law.” <u>Monsky</u>, 947 F. Supp. at 54; <u>see also</u> <u>Polk County v. Dodson</u>, 454 U.S. 312, 321, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981) (public defenders do not act under color of state law when lawyering, even though state employees, because state does not have authority over their actions); <u>Kern v. City of Rochester</u>, 93 F.3d 38, 43 (2d Cir. 1996).

For example, in <u>Murphy v. Chicago Transit Authority</u>, 638 F. Supp. 464, 468 (N.D. Ill. 1986), an attorney employed by the transit authority sued co-workers under § 1983 for sexual harassment. The court found that the harassing behavior “had nothing to do with, and bore no similarity to, the nature of the staff attorney job.” <u>Id.</u> Representing the transit authority in legal matters “did not and could not give the illusion that sexual harassment, albeit during working hours, somehow related to the nature of that job.” <u>Id.</u> Similarly, in <u>Delcambre v. Delcambre</u>, 635 F.2d 407 (5th Cir. 1981), the chief of police who assaulted his sister-in-law on the premises of the municipal police station while on duty was not liable under § 1983 because the conduct was a private matter. Likewise, in <u>Rogers v. Fuller</u>, 410 F. Supp. 187 (M.D.N.C. 1976), the act of stealing, even by a police officer on duty and in uniform, was held to be a personal, private pursuit and not committed under color of state law.

Here, the undisputed facts show that Vasiliou filed a lawsuit on his own behalf in Connecticut Superior Court. (Vasiliou Aff., ¶ 11; Exhibit 20). Vasiliou’s lawsuit seeks remedies for harm to his personal reputation and clearly does not involve MHA or the Commissioners, as they are not named parties in the action and no remedy is sought on their behalf. (Exhibit 20).

29

Neither the Commissioners nor MHA have assisted, encouraged, condoned or financed Vasiliou's lawsuit in any way. (Vasiliou Aff., ¶ 11; Canelli Aff., ¶ 9; Amenta Aff., ¶¶ 5-6; Holowink Aff., ¶¶ 5-6; Tucciarone Aff., ¶¶ 5-6; D'Iorio Aff., ¶¶ 5-6). Vasiliou did not propose, and the Commissioners did not approve on behalf of MHA or the Commissioners, Vasiliou's bringing of a lawsuit against Plaintiff. (Canelli Aff., ¶ 10; Amenta Aff., ¶ 7; Holowink Aff., ¶ 7; Tucciarone Aff., ¶ 7; D'Iorio Aff., ¶ 7).

The undisputed facts reflect that MHA and the Commissioners had no involvement in Vasiliou's lawsuit. The evidence further shows that Vasiliou's lawsuit is clearly a purely private matter having nothing to do with his official powers and duties. Such private conduct does not give rise to action taken under color of state law, and accordingly, Summary Judgment must be granted as to the Eighth Count. Monsky, 947 F. Supp. at 54; Polk County, 454 U.S. at 321.

### 3.    Plaintiff Did Not Make Statements To HUD On Matters Of Public Concern.

To establish his claim under the First Amendment, Plaintiff must demonstrate that "his speech was constitutionally protected." Ruscoe, 259 F. Supp. 2d at 170. "The question of whether certain speech enjoys a protected status under the First Amendment is one of law, not fact." Connick v. Myers, 461 U.S. 138, 148 n.7, 103 S. Ct. 1684, 75 L. Ed 2d 708 (1983). Central to this inquiry is whether the statement may "be fairly characterized as constituting speech on a matter of public concern." Id., at 146. Whether speech addresses a matter of public concern "must be determined by the content, form and context of a given statement, as revealed by the whole record." Id., at 148. Speech is considered a "matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" Id., at 146; Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d 98, 105 (2d Cir. 2001). If speech is focused

30

merely "on matters personal to the employee, it cannot be classified as being on a matter of public concern." Id.

To be entitled to Constitutional protection, the speech "must not merely relate generally to a subject matter that is of public interest, but must 'sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government.'" Moore v. City of Wynnewood, 57 F.3d 924, 932 (10th Cir. 1995) (internal quotations omitted). It is not enough to simply identify a subject of public concern, courts must "look beyond the general topic of the speech to evaluate more specifically what was said on the topic." Id.

Here, Plaintiff's meeting with HUD did not result in any speech that could be construed or interpreted as informing the public on a matter of public concern. Plaintiff did not initiate contact with HUD to report new or important information regarding MHA's operations. Instead, Plaintiff merely accepted an invitation to speak with HUD. (Pl. Cont. Dep., pp. 18-19). This is particularly unremarkable given that Plaintiff understood this meeting was just a routine part of HUD's audit and HUD apparently interviewed many employees and individuals involved with MHA. (Pl. Cont. Dep., pp. 18-19). Plaintiff stated he had "no idea what [the meeting] was about" but did not believe that it was connected to his separation from employment or MHA's compliance with the HUD Agreement. (Pl. Cont. Dep., p. 20). Plaintiff's recitation of the information he discussed during the meeting clearly shows that he did not complain about any of MHA's practices or policies and did not criticize any action taken by Vasiliou during the meeting. To the contrary, Plaintiff confirmed that he was not aware that Vasiliou had ever done anything unlawful. (Pl. Cont. Dep., pp. 27-28).

Not "every remark… and certainly not every criticism directed at a public official" constitutes speech on a matter of public concern. Connick, 461 U.S. at 149 (emphasis added).

31

General commentary regarding the management practices of a public entity and even criticism about spending practices or internal budgetary allocations, do not rise to the level of public concern. See Gardetto v. Mason, 100 F.3d 803, 814 (10th Cir. 1996) ("Management practices or decisions allocating management responsibility to particular individuals" and "details of internal budgetary allocations" do not involve matters of public concern"); Bunger v. Univ. of Okla. Bd. of Regents, 95 F.3d 987, 992 (10th Cir. 1996) (internal grievances regarding organization and composition of public university's governing counsel were not an issue of social importance or heightened public interest).

Taken as a whole, the information Plaintiff provided to HUD, "cannot be fairly characterized as constituting speech on a matter of public concern." Connick, 461 U.S. at 146. Accordingly, Defendants are entitled to Summary Judgment on the Eighth Count.

4. **Vasiliou And The Commissioners Are Shielded From Personal Liability By Qualified Immunity And Should Be Dismissed From The Lawsuit.**

Even if Plaintiff could somehow show that Vasiliou's lawsuit was taken under color of law, rather than being brought as a private citizen, Vasiliou and the Commissioners are entitled to qualified immunity and as such are shielded from personal liability. The qualified immunity defense applies because the act of filing an objectively meritorious lawsuit does not violate a clearly established federal statutory or Constitutional right.

The qualified immunity doctrine "balances the need to protect the rights of citizens through damage remedies, with the opposing need 'to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" Danahy v. Buscaglia, 134 F.3d 1185, 1189 (2d Cir. 1998). "Qualified immunity protects government officials from liability for civil damages if the challenged action 'does not violate clearly established statutory or constitutional rights of which a reasonable

32

person would have known.'" Id., at 1190 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent." McEvoy v. Spencer, 124 F.3d 92, 96 (2d Cir. 1997) (internal quotations omitted).

Vasiliou and the Commissioners can establish that they are entitled to qualified immunity by showing any of the following: (1) that it was not clear at the time of the official acts that the interest asserted by Plaintiff was protected by a federal statute or the Constitution; or (2) that it was not clear at the time of the acts at issue that an exception did not permit those acts; or (3) that it was objectively reasonable for the officer to believe that his acts did not violate Plaintiff's rights. See Krause v. Bennett, 887 F.2d 362, 368 (2d Cir. 1989) (explaining qualified immunity standard). Here, the act in question, the filing of a lawsuit by Vasiliou against Plaintiff, clearly satisfies both the second and third avenues for establishing the qualified immunity defense.

The First Amendment guarantees the "right to petition" the government for redress of grievances, a right which "is the most precious of liberties safeguarded by the Bill of Rights." BE&K Constr. Co. v. NLRB, 536 U.S. 516, 524, 122 S. Ct. 2390, 153 L. Ed 2d 499 (2002). "The right of access to the courts is... but one aspect of the right of petition." Id. The U.S. Supreme Court has advised that courts "should be sensitive to these First Amendment values" even where the filing of a lawsuit in certain contexts could be viewed as retaliatory or otherwise result in a statutory or common law violation. Bill Johnson's Rests. v. NLRB, 461 U.S. 731, 741, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983).

For example, in the labor relations context, the filing of a lawsuit to enjoin certain employee conduct could be viewed as an unfair labor practice to the extent it is initiated to

33

retaliate against concerted activity protected by the National Labor Relations Act. Nevertheless, the Court has observed that "going to a judicial body for redress of alleged wrongs... stands apart from other forms of action directed at the alleged wrongdoer. The right of access to a court is too important to be called an unfair labor practice solely on the ground that what is sought in the court is to enjoin employees from exercising a protected right." Bill Johnson's Rests, 461 U.S. at 741 (internal quotations omitted). Because of the importance of preserving access to the Courts, "the filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act." Id.

Here, Vasiliou filed a lawsuit alleging that Plaintiff made numerous defamatory statements. (Exhibit 20). Specifically, Vasiliou alleged that Plaintiff published statements that "Vasiliou had no intention of complying with the [HUD Agreement]" and that Vasiliou "was intentionally avoiding compliance with the agreement." (Exhibit 20, ¶ 7). During discovery in this matter, Plaintiff testified that Vasiliou in fact did "not [use] those words." (Pl. Dep., pp. 66-67). Given Plaintiff's admissions regarding the truthfulness and accuracy of his prior statements regarding Vasiliou's intent, it is "objectively reasonable" for Vasiliou, or any of the Commissioners to the extent that they were aware of the suit, to conclude that the filing Vasiliou's lawsuit did not violate Plaintiff's rights. Krause, 887 F.2d at 368. In addition, given the importance of one's Constitutional right to petition, it was reasonable to believe that Vasiliou's First Amendment rights created an exception which permitted him to proceed. BE&K Constr. Co., 536 U.S. at 524. Thus, Defendants are entitled to qualified immunity.

34

**D.    Plaintiff's Common-Law Claim For Wrongful Discharge Is Precluded
         Because Plaintiff Has A Statutory Remedy Available.**

In the Second Count, Plaintiff claims that he was wrongfully discharged in violation of an

important public policy, namely those represented in Connecticut and federal statutes in favor of

equal access to affordable housing. (See Sec. Am. Compl., ¶¶ 27-29). Plaintiff claims that he

was discharged because he allegedly threatened to inform the DOJ that Vasiliou intended not to

comply with the HUD Agreement. (See Sec. Am. Compl., ¶ 31).

The law in Connecticut is well-settled "that a common law wrongful discharge cannot be

predicated on a statute that already provides a plaintiff with a specific, private right of action."

Martin-Glave v. Aventis Pharms., 2003 U.S. Dist. LEXIS 23956, at * 6-7 (D. Conn. 2003); see

also Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 159-62, 745 A.2d 178 (2000) (action for

wrongful discharge not available to at-will employee if a statutory remedy exists under federal or

state law); Thibodeau v. Design Group One Architects, LLC, 260 Conn. 691, 710-11, 802 A.2d

731 (2002) (dismissing wrongful discharge claim because the Connecticut legislature provided

for specific administrative remedies); Dallaire v. Litchfield Cty. Ass'n. for Retarded Citizens,

Inc., 2001 U.S. Dist. LEXIS 2389 (D. Conn. 2001) (wrongful discharge claim cannot be

maintained where remedies were available under the ADA and CFEPA).

An action for wrongful discharge is "unavailable to an at-will employee if there exists a

statutory remedy under either federal or state law to redress the violation of public policy

manifested by the employer's" alleged misconduct. See Armstead v. Stop & Shop Cos., 2003

U.S. Dist. LEXIS 4107 at *9 (D. Conn. 2003) (quoting Burnham, 252 Conn. at 159-62). The

existence of a statutory remedy "bars the wrongful termination action whether or not a plaintiff

has taken advantage of the existing statutory remedy." Id. This rule also applies if the remedies

provided by the statute are lesser or narrower than the remedies potentially available in the tort or

35

contract action. Id. Thus, "a common law wrongful discharge (tort or contract) claim by an at-will employee asserting violation of public policy against discrimination or retaliation will be dismissed or stricken upon a showing of the existence of statutory redress for the alleged discriminatory discharge under federal or state law." Id.

Here, Plaintiff's claim of wrongful discharge is predicated on the same facts and circumstances alleged in support of his FHA retaliation claim. In addition, the public policies referred to in Plaintiff's wrongful discharge claim are exactly those endorsed by the FHA and Connecticut's Fair Housing laws, namely equal housing opportunities. As Plaintiff has alleged a statutory cause of action under 42 U.S.C. § 3617, Plaintiff has at his disposal an adequate statutory remedy and his claim of wrongful discharge must therefore be dismissed. Armstead, 2003 U.S. Dist. LEXIS 4107 *9; Burnham, 252 Conn. at 159-62.

### E.    Plaintiff's Breach Of Contract Claim Must Be Dismissed Because Plaintiff Was An At-Will Employee, And There Was No Contract Or Agreement To The Contrary.

Plaintiff claims that MHA maintained personnel policies governing the terms and conditions of Plaintiff's employment which were mutually binding and constituted and enforceable contract. (See Am. Compl., ¶¶ 38-40). Based on these policies, Plaintiff claims that he could only be terminated "for cause," and after having "an opportunity to be heard." (See Am. Compl., ¶¶ 42-43).

To prevail on his breach of contract claim, Plaintiff "must demonstrate an actual agreement by the defendants to have an employment contract with [him]. A contract implied in fact, like an express contract, depends on actual agreement." Burnham v. Karl & Gelb, P.C., 50 Conn. App. 385, 388, 717 A.2d 811 (Conn. App. 1998); D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 211 n.2, 520 A.2d 217 (1987). For there to be contractual liability, Defendants' representations must be sufficiently definite to manifest a

36

"present intention... to undertake immediate contractual obligations to the plaintiff." Id. Thus, to

survive Summary Judgment, Plaintiff must present "evidence that [Defendants]... agreed to

some form of actual contract commitment." Id.

Under Connecticut law, "statements in an employee manual may form the basis of a

contract between an employer and an employee." Finley v. Aetna Life & Casualty Co., 202

Conn. 190, 198, 520 A.2d 208 (1987).  However, to establish that statements in an employee

publication created an implied contract, Plaintiff must produce evidence to show that:

> issuance of a handbook to the employee was an "offer" -- i.e., that it was a
> promise to the employee, that, if the employee worked for the company,
> his or her employment would thereafter be governed by those... written
> statements... [and further], if the... handbook constitute[d] an 'offer'...
> that the employee accepted that offer... .

Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 14-15, 662 A.2d 89, 96

(1995) (citations omitted).   The Connecticut Supreme Court has further held however, that

employers can protect themselves against employee contract claims based on statements made in

personnel manuals "by eschewing language that could reasonably be construed as a basis for a

contractual promise, *or by including appropriate disclaimers of the intention to contract*."

Finley, 202 Conn. at 199 n.5 (emphasis added).  Thus, where the "employee manual expressly

disclaims an intention to contract, it cannot rise to the level of an express contract of

employment." Starbala v. Packard Bioscience Co., 2001 Conn. Super. LEXIS 3799 at * 6

(Conn. Super. Ct. 2001).

In the present case, Plaintiff received a copy of MHA's Personnel Policies Manual when

he was first hired in 1999, which included a document prominently entitled, "DISCLAIMER."

(Pl. Dep., p. 44; Exhibit 4).  MHA's disclaimer provided, in relevant part, that:

> "The Personnel Policies Manual is distributed as a guide and summary of
> the current personnel policies, procedures and work rules of [MHA].**This**

37

> Manual is not intended nor should it be construed, as a **binding
> contract of employment – express or implied** – between [MHA] and any
> employee. Furthermore, **this Manual is not intended as a guarantee of
> continued employment.**"

(Exhibit 4) (emphasis). This statement clearly and concisely informed Plaintiff that the terms of

the Manual were for informational guidance, and did not form a contractual obligation. This

statement further confirms that employees have no expectation of continued employment for any

specific period of time.

Before Plaintiff was even hired, he read and signed an employment application, which

stated quite clearly that, if hired, Plaintiff's "employment [with MHA] is at-will." (Exhibit 15).

Plaintiff understood this statement at the time he was hired. (Pl. Dep., pp. 23-24).

Numerous Connecticut Courts "have held that contract claims based upon the terms of an

employee handbook must fail if the handbook contained an effective disclaimer." <u>Schermerhorn

v. Mobil Chem. Co.</u>, 2001 U.S. Dist. LEXIS 519 (D. Conn. 2001). Handbooks which include the

kind of clear and concise disclaimer language used by MHA have routinely been found not to be

contracts. <u>Smith v. Shoreline Care Ltd. Pshp.</u>, 1996 Conn. Super. LEXIS 1343, 12-13 (Conn.

Super. Ct. 1996) (contract claim dismissed because of clear disclaimer language).

In <u>Shoreline Care</u>, the Court found the following disclaimer language to be adequate:

> Evergreen Woods does not provide written or oral employment contracts
> to employees. This means that both Evergreen Woods and the employee
> retain the right to terminate the employment relationship at any time for
> any reason.
>
> This Handbook is a living changing document. It is neither a
> comprehensive treatment of personnel issues, nor is it an employment
> contract. It is not a guarantee of continued employment.

<u>Shoreline Care Ltd. Pshp.</u>, 1996 Conn. Super. LEXIS 1343 at * 14. This language, like MHA's

disclaimer, confirms that the handbook is not a contract, that employment is at-will, and there is

no guarantee of continued employment.

Connecticut Courts also have held that disclaimers, which state that a handbook is for informational purposes only and not intended to form a contract, again similar to the one used here by MHA, are sufficient to prevent an implied contract. See e.g. Markgraf v. Hospitality Equity Investors, Inc., 1993 Conn. Super. LEXIS 426 (Conn. Super. Ct. 1993) (statement that "the contents of the handbook are presented as a matter of information only, and are not meant to be a contract" was a sufficient disclaimer); Grieco v. Hartford Courant Co., 1993 Conn. Super. LEXIS 298 (Conn. Super. Ct. 1993) (statement that "the handbook and any of the statements made herein are not to be construed as nor is it a contract" found to be an appropriate disclaimer). Lombardi v. Marketing Corp. of America, 1994 Conn. Super. LEXIS 1383 (Conn. Super. Ct. 1994) (disclaimer containing "definitive contractual language that the provisions of the employee handbook are not contractual provisions," protected the defendant "from any claims of contract based on the employee handbook"). Because Plaintiff signed an at-will statement in his employment application and received a clear and concise disclaimer stating that the Personnel Policies Manual was not a contract, and the undisputed evidence reflects no agreement to the contrary, Plaintiff's breach of contract claim fails as a matter of law. Finley, 202 Conn. at 199; Starbala, 2001 Conn. Super. LEXIS 3799 at * 6.

F.    **Plaintiff's Breach Of The Implied Covenant Claim Fails As A Matter Of Law.**

"To establish a claim for breach of the implied covenant of good faith and fair dealing, [Plaintiff] must allege either that an enforceable employment contract exists, or that the employer's actions in discharging the employee violated a recognized public policy." Cowen v. Federal Express Corp., 25 F. Supp. 2d 33, 37 (D. Conn. 1998). As discussed above, Plaintiff cannot maintain a claim under the public policy theory because he has an adequate statutory remedy. See Dallaire, supra, 2001 U.S. Dist. LEXIS 2389 (breach of implied covenant claim

39

based on termination in violation of public policy cannot be maintained where statutory remedies are available). Plaintiff has not identified any other public policy on which to base such a claim, and thus, his breach of the implied covenant of good faith and fair dealing claim cannot be maintained under that theory. <u>Doherty v. Sullivan</u>, 29 Conn. App. 736, 743, 618 A.2d 56 (1992) (Absent a public policy violation, "there is no breach of the implied covenant of good faith and fair dealing").

In the absence of a valid claim of public policy violation, a breach of the covenant of good faith and fair dealing claim is dependent upon the existence of an implied contract. <u>Cowen</u>, 25 F. Supp. 2d at 37. Because the undisputed evidence above shows that Plaintiff failed to demonstrate the existence of an implied contract, his claim for breach of the implied covenant of good faith and fair dealing also fails as a matter of law.

## IV.    CONCLUSION

WHEREFORE, as there are no material issues of fact in dispute, and Defendants are entitled to judgment as a matter of law, Defendants respectfully request that the Court enter Summary Judgment in favor of Defendants on all counts of the Second Amended Complaint.

DEFENDANTS,
MILFORD HOUSING AUTHORITY, ANTHONY VASILIOU, RICHARD ANDERSEN, HILARY HOLOWINK, JOHN AMENTA, EDWARD CANELLI, JACK TUCCIARONE,

By: _____
Richard F. Vitarelli (ct 15145)
Anne Noble Walker (ct 11637)
Michael G. Petrie (ct 22789)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299
Email: awalker@rc.com

40

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, certified mail, return receipt requested, on this 14th day of June, 2004 to:

Lewis H. Chimes, Esq.
Garrison, Levin-Epstein, Chimes & Richardson, P.C.
405 Orange Street
New Haven, CT 06511

Anne Noble Walker

41