UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN HUGHES,<br>　　　Plaintiff, | CIVIL NO. 302CV1917 (MRK) |
| v. | |
| MILFORD HOUSING AUTHORITY,<br>ANTHONY VASILIOU, RICHARD<br>ANDERSEN, HILARY HOLOWINK, JOHN<br>AMENTA, EDWARD CANELLI AND JACK<br>TUCCIARONE,<br>　　　Defendants. | JUNE 14, 2004 |

**DEFENDANTS' LOCAL RULE 56(a)**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56(a), Defendants submit the following Statement of Undisputed Facts in support of Defendants' Motion for Summary Judgment.

1.　Milford Housing Authority ("MHA") administers a publicly subsidized housing program and disperses housing assistance payments under Section 8 of the Fair Housing Act on behalf of the U.S. Department of Housing and Urban Development ("HUD"). (Vasiliou Dep., p. 22).

2.　MHA also receives federal funds for the purpose of developing, owning, operating and maintaining low-income or affordable public housing. (Vasiliou Dep., p. 20).

3.　MHA operates under the direction of a five member Board of Commissioners, responsible for creating and establishing policy for the overall operations of MHA. (Exhibit 3: *By Laws*). The Commissioners consider, vote on and approve the annual budgets and long term strategic plans for guiding MHA's operations. (Vasiliou Dep., pp. 149-50).

4. The day-to-day operations of MHA are overseen and managed by an Executive Director, Anthony Vasiliou, who was appointed by the Commissioners, in 1997. (Vasiliou Dep., pp. 8-11). All MHA personnel report to Vasiliou. (Exhibit 3).

5. Vasiliou oversees MHA's public housing projects, and his responsibilities include MHA's implementation of the terms of a Settlement Agreement with the DOJ and several individuals. (Vasiliou Aff., ¶ 5; Exhibit 5: *Settlement Agreement*).

6. In October 1998, the U.S. Department of Justice ("DOJ") and several individual plaintiffs resolved a consolidated lawsuit and entered into a Settlement Agreement (the "HUD Agreement"). (Exhibit 5).

7. The purpose of the HUD Agreement was to:

> provide quality affordable, rental housing in Milford to low-income families in need of such housing. To that end, the MHA will utilize the funds HUD has allocated under [certain projects] to acquire, acquire and rehabilitate, and/or develop twenty-eight subsidized housing units for families, or, if these funds prove insufficient to permit acquisition and/or development of the full complement of twenty-eight units, the maximum number of units that can be acquired, acquired and rehabilitated, and/or developed with these funds.

(Exhibit 5).

8. Pursuant to the HUD Agreement, HUD provided approximately 3.5 million dollars with which MHA was to "promptly pursue and make every reasonable effort to bring to fruition at the earliest possible time, the opportunities for acquisition, acquisition and rehabilitation, and/or development" of up to 28 units of Scattered-Site housing. (Exhibit 5).

9. Vasiliou understood that the HUD Agreement required MHA to use the 3.5 million dollars to "build as many units as [it] could… but if MHA "could only build less because of the money… [MHA] would have [still] been in compliance." (Vasiliou Dep., p. 56).

10.  Vasiliou's "intention was to provide as much family housing as we could with the three and a half million dollars." (Vasiliou Dep., p. 169).

11.  MHA prepared and submitted a comprehensive implementation plan and budget, later approved by HUD, for acquiring, renovating and tenanting out the public housing units. (Exhibit 5; Vasiliou Dep., pp. 45, 63).

12.  MHA also prepared and submitted detailed budgets projecting the costs and expenses associated with various activities, including property selection, inspection, acquisition, renovation and tenanting. (Vasiliou Dep., p. 63).

13.  MHA's plan and budgets included, among other things, contracting with architects to inspect and assess each property. (Vasiliou Dep., pp. 63-67; Pl. Dep., pp. 225-226).

14.  Throughout the acquisition and renovation process, HUD monitored MHA's activities for compliance with the HUD Agreement and MHA provided HUD with periodic progress reports. (Vasiliou Dep., pp. 56-57; White Dep., p. 24).

15.  By December 2001, MHA had purchased and begun development of 18 units of "Scattered-Site" public housing. (Vasiliou Dep., pp. 181-82).

16.  Because of the high cost of housing, however, the money spent purchasing 18 units exhausted the funds budgeted for property acquisition. (Vasiliou Dep., pp. 181-82; White Dep., pp. 33-34; Pl. Dep., p. 70). The remaining funds were allocated toward the costs of construction, renovation and administration. (Vasiliou Dep., p. 182; Pl. Dep., p. 216).

17.  In approximately December 2001, MHA notified HUD, the DOJ and White that the funds budgeted for property acquisition were exhausted after the purchase of the 18 units. (White Dep., pp. 25-27; Vasiliou Dep., pp. 181-82). The parties agreed that MHA would

renovate the 18 units already purchased, but that no additional units would be bought. (White Dep., pp. 26-27).

18.     At no time was MHA obligated to acquire and/or develop 28 units of public housing. (Exhibit 5; Vasiliou Dep., p. 56; White Dep., p. 47).

19.     Plaintiff commenced employment with MHA in January 1999. (Pl. Dep., p. 6).

20.     The Director of Facilities Maintenance and Operations was a new position, created because of the changing demands on MHA, which included implementation of the HUD Agreement. (Vasiliou Dep., pp. 23, 29-31).

21.     Plaintiff's duties and responsibilities were as follows:

- Direct architects, engineers, construction contract supervisors and staff to complete major construction projects within budget and schedule;
- Schedule, plan, organize and supervise staff throughout other construction projects;
- Inspect and evaluate workmanship for contract compliance;
- Recommend the approval and acceptance of completed projects;
- Perform site inspections at existing facilities, and prepare evaluation reports;
- Provide professional advice concerning costs, design and construction criteria;
- Serve as MHA's contact with various state and municipal agencies in the management of construction projects;
- Maintain project status information, financial and non-financial, and prepare reports for MHA use;
- Devise specifications, and solicit bids for work whenever conditions permit to assure best possible prices;
- Oversee Maintenance Department activities and workload;
- Respond to tenant complaints; and
- Prepare/review bid specifications for ongoing contract work or supplies.

(Exhibit 8: *job description*).

22.     At the time he was hired, Plaintiff's responsibilities included (1) "the ongoing maintenance of [MHA's] existing buildings," and (2) oversight of the "upcoming… renovation work" for the Scattered-Site project. (Pl. Dep. p., 92).

23.     Plaintiff never actually read the HUD Agreement. (Pl. Dep., p. 65).

24.     In approximately October 2001, Vasiliou began developing MHA's annual budget for the fiscal year beginning April 1, 2002. (Vasiliou Dep., pp. 112-14, 131-33).

25.     At the same time, Vasiliou began planning MHA's One-Year and Five-Year strategic Plans, as required by HUD regulations. (Vasiliou Dep., pp. 112-14, 131-33).

26.     Throughout the "planning process" Vasiliou held "working sessions" with the Commissioners, and also worked with David Dunn, MHA's Labor Consultant, and Teresa Ewald, MHA's accountant. (Vasiliou Dep., pp. 112-13, 131-33; Dunn. Dep., pp. 16, 40-41; Ewald Dep., pp. 21-22, 26).

27.     As MHA's budget and strategic plans were being prepared, Vasiliou began to consider a reorganization of the Maintenance Department. (Vasiliou Dep., pp. 119-20; Dunn Dep., pp. 28-29, 39-41). Vasiliou considered this decision in light of the overall health of the housing industry, the immediate and long term impact of the labor cost, and overhead costs. (Vasiliou Dep., p. 123).

28.     Vasiliou ultimately decided to eliminate the Director of Facilities Maintenance and Operations position "for budgetary purposes and to improve efficiency" in the Maintenance Department. (Vasiliou Dep., p. 119).

29.     Vasiliou expected the elimination of this position to increase efficiency by improving the lines of communications throughout the organization. (Vasiliou Dep., p. 119).

30.     The elimination of Plaintiff's position also addressed MHA's long and short-term budgetary needs. (Vasiliou Dep., p. 120). In December 2001, Ewald confirmed that eliminating Plaintiff's position would result in reduced short-term labor costs and projected savings over the next five years. (Ewald Dep., pp. 21-22, 29-30; Vasiliou Dep., pp. 119-20).

31. To improve the efficiency of the maintenance function and reduce labor costs, Vasiliou decided to eliminate the Director of Facilities Maintenance and Operations position from the budget for the next fiscal year, beginning April 2002. (Vasiliou Dep., pp.119-23; Canelli Aff., ¶ 6).

32. The "final, final decision" to eliminate Plaintiff's position was made "in mid-January" 2002. (Dunn Dep., p. 16; Canelli Aff., ¶ 6; Vasiliou Aff., ¶ 6).

33. The annual 2002-2003 budget and the Five-Year Plan, including the proposed reorganization of the Maintenance Department, were voted on and approved by the Commissioners during a Board meeting held on January 15, 2002. (Vasiliou Dep., pp. 114-16, 130; Canelli Aff., ¶ 6-7).

34. This decision eliminated Plaintiff's position from the upcoming fiscal year's budget, beginning April 1, 2002. (Canelli Aff., ¶ 7).

35. During late January and up through February 26, 2002, Dunn assisted and advised Vasiliou on the preparation of a lay-off package. (Dunn. Dep., pp. 62-63).

36. On March 8, 2002, three weeks before the fiscal year ended, Vasiliou and Dunn informed Plaintiff of the decision to eliminate his position. (Pl. Dep., p. 53; Dunn Dep., p. 12).

37. Plaintiff prepared a statement, dated March 14, 2002, in which he wrote that Vasiliou telephoned him on March 8, 2002, and told him that he had been laid off "for budgetary reasons and reorganization reasons." (Exhibit 14: *3/14/02 statement*).

38. On February 28, 2002, prior to his separation, Plaintiff met with Alphonse Kuncas, to discuss a request for additional funds to cover cost overruns. (Pl. Dep., pp. 80-84).

39. At that meeting, Plaintiff complained to Kuncas about cost overruns. (Pl. Dep., pp. 62, 84).

40.     Plaintiff completed and signed an employment application. (Pl. Dep., p. 22). That application stated, in pertinent part:

> I understand that employment is "at-will", in that I or MHA may terminate my employment at any time, or for any reason consistent with the applicable state or federal law. I understand that this application is not a contract.

(Exhibit 15, *Employment Application*).

41.     Plaintiff understood this provision at the time he completed the application. (Pl. Dep., pp. 22-23).

42.     January 1999, Plaintiff received a copy of the MHA Personnel Policies manual. (Pl. Dep., pp. 36-37, 40, 44).

43.     Plaintiff signed a document entitled "Receipt and Acknowledgment of Personnel Policy Manual" confirming that he received a copy of the MHA Personnel Policies Manual on January 29, 1999. (Exhibit 16).

44.     The 1999 Manual included a document entitled, "DISCLAIMER," which stated:

> "This Personnel Policy Manual is distributed to [MHA] employees as a guide and summary of the current personnel policies, procedures and work rules of [MHA]. This Manual is not intended nor should it be construed, as a binding contract of employment – express or implied – between the [MHA] and any employee. Furthermore, this Manual is not intended as a guarantee of continued employment."

(Exhibit 4).

45.     In approximately July 2002, Plaintiff contacted Shelley White of New Haven Legal Assistance Association. (White Dep., pp. 12-13, 21; Pl. Dep., pp. 123, 127-28). During that meeting, Plaintiff discussed his termination and MHA's compliance with the HUD Agreement. (White Dep., p. 16).

46.     White contacted the DOJ, and in August 2002, a DOJ attorney requested that Plaintiff meet her at White's office to further discuss his employment, the circumstances of his

7

separation and MHA's compliance with the HUD Agreement. (Pl. Dep., p. 122-25; White Dep., pp, 15, 35-36; Pl. Cont. Dep., pp. 10-11).

47.     Following the August 2002 meeting, White and DOJ personnel reviewed MHA's files, but concluded there was "insufficient evidence" to initiate further action. (White Dep., pp. 36-41).

48.     White "did not believe [there] was a violation of the consent decree" or "evidence that... Mr. Vasiliou was noncompliant." (White Dep., pp. 38-42).

49.     In approximately May 2003, HUD commenced a procurement audit to "evaluate [MHA's] implementation and administration of the Capital Fund program and related procurement practices [and] to evaluate bond financing transactions. (Pl. Cont. Dep., p. 18; Exhibit 19: *5/03 audit letter*).

50.     On February 19, 2004, at HUD's request, Plaintiff met with HUD personnel and answered questions regarding his former job duties, the Maintenance Department, customer service, and property procurement. (Pl. Cont. Dep., pp. 22-24, 26).

51.     Plaintiff told HUD that he was not aware that Vasiliou had ever done anything unlawful. (Pl. Cont. Dep., pp. 22-23).

52.     This was the first contact between Plaintiff and HUD after his separation from employment with MHA. (Pl. Cont. Dep., p. 19).

53.     Plaintiff never notified the Commissioners or Vasiliou about his meeting with HUD in February 2004. (Pl. Cont. Dep., p. 30).

54.     The Commissioners and Vasiliou were unaware of Plaintiff's meeting with HUD until <u>after</u> receiving Plaintiff's Second Amended Complaint. (Vasiliou Aff., ¶ 9; Canelli Aff., ¶ 8; Amenta Aff., ¶ 4; Holowink Aff., ¶ 4; Tucciarone Aff., ¶ 4; D'Iorio Aff., ¶ 4).

55. On or about February 25, 2004, Vasiliou filed a private lawsuit on his own behalf in Connecticut Superior Court against Plaintiff. (Vasiliou Aff., ¶ 11; Exhibit 20: *Vasiliou Complaint*).

56. Vasiliou retained Attorney David Metzger, in late December 2003, and initiated his lawsuit before Plaintiff met with HUD in February 2004. (Vasiliou Aff., ¶ 10).

57. Neither MHA nor the Commissioners are financing, directing, advising or influencing Vasiliou with respect to his lawsuit. (Vasiliou Aff., ¶ 11; Canelli Aff., ¶ 9; Amenta Aff., ¶¶ 6-7; Holowink Aff., ¶¶ 6-7; Tucciarone Aff., ¶¶ 6-7; D'Iorio Aff., ¶¶ 6-7).

58. Vasiliou's lawsuit was not presented to or approved by the Board of Commissioners. (Canelli Aff., ¶ 10; Amenta Aff., ¶ 7; Holowink Aff., ¶ 7; Tucciarone Aff., ¶ 7; D'Iorio Aff., ¶ 7).

DEFENDANTS,
MILFORD HOUSING AUTHORITY, ANTHONY VASILIOU, RICHARD ANDERSEN, HILARY HOLOWINK, JOHN AMENTA, EDWARD CANELLI, JACK TUCCIARONE,

By: /s/
Richard F. Vitarelli (ct 15145)
Anne Noble Walker (ct 11637)
Michael G. Petrie (ct 22789)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299
Email: awalker@rc.com

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, certified mail, return receipt requested, on this 14th day of June, 2004 to:

Lewis H. Chimes, Esq.
Garrison, Levin-Epstein, Chimes & Richardson, P.C.
405 Orange Street
New Haven, CT 06511

                                              Anne Noble Walker