UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------------------x
| | | |
|---|---|---|
| JOHN HUGHES, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:02CV1917(MRK) |
| vs. | : | |
| MILFORD HOUSING AUTHORITY, ET AL, | : | |
| Defendants. | : | August 12, 2004 |

-----------------------------------------------------------------x

## PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT

I.   PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT

_____The plaintiff, pursuant to Rule 56(a)2 of the Local Rules of Civil Procedure for the District of Connecticut, and Rule 56 of the Federal Rules of Civil Procedure hereby responds to the defendant's Rule 56(a)1 statement as follows:

1.   Admitted.

2.   Admitted.

3.   Admitted.

4.   Admitted.

5.   Admitted. Vasiliou shared responsibility oversight for oversight of the public housing projects, and implementation of the settlement agreement with others. See Deposition of Anthony Vasiliou ("Vasiliou Depo"), p. 55, attached as Exhibit 1.

6.   Admitted.

7.   Admitted in part.    The Mission of the Milford Housing Authority is: to assist low income families with safe, decent, and affordable housing opportunities as

they strive to achieve self-sufficiency and improve the quality of their lives.  The Housing Authority is committed to operating in a fiscally prudent, ethical and professional manner.  The Housing Authority will strive to provide a suitable living environment for the families it serves without discrimination.

Milford Housing Authority Five Year Plan, Years 2000 - 2004, p. 1 (MHA 5 Year Plan), attached as Exhibit 2.

It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.  42 U.S.C. §3601.

The Fair Housing Act, 42 U.S.C. §3604 states in pertinent part:

It shall be unlawful:

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.[1]

In 1995, the Milford Housing Authority cancelled the development of a federally funded scattered site housing program.  Two Fair Housing Act lawsuits were brought, one by the eight individual plaintiffs, and one brought by the United States Department of Justice.  The lawsuits alleged that the cancellation of the federal scattered site housing program violated the Fair Housing Act because a significant proportion of the persons anticipated to benefit from the program were African-American or Hispanic.  Milford Housing Authority Fair Housing Act Settlement Agreement, p. 2 ("Settlement Agreement"), attached as Exhibit 3.

In October 1998, the two consolidated lawsuits were resolved.  Under the Settlement Agreement, the Milford Housing Authority agreed to develop 28 units of low income housing

---

[1] The State of Connecticut has a similar Fair Housing Statute.  Conn. Gen. Stat. §46a-64c.

units. Settlement Agreement, pp. 1-2. The parties agreed that the settlement agreement "furthers the purpose of the federal Fair Housing Act, 42 U.S.C. sec. 3601 et seq and the Milford Housing authority's core mission." Settlement Agreement, p. 2.

The Settlement Agreement called for MHA to develop a plan within 90 days of the execution of the Settlement Agreement (the "Implementation Plan") that required the MHA develop and have ready for occupancy:

- a. seven (7) scattered site housing units within one year from the date on which Housing Urban Development approves the plan ("Date of Housing Urban Development approval")

- b. seven additional housing units within two years from the date of Housing Urban Development approval;

- c. fourteen additional housing units within three years of Housing Urban Development approval

Settlement Agreement, pp. 6-7. The plan would be submitted to the Department of Housing and Urban Development ("HUD") for approval. HUD was to provide $3.5 - 3.6 million in funds to develop the 28 units of housing. Settlement Agreement, p. 5, Vasiliou Deposition Vol. I, p. 44. The Settlement Agreement provided, however that "if these funds prove insufficient to permit acquisition and/or development of the full complement of twenty-eight such units, the maximum number of units that can be acquired, acquired and rehabilitated, and/or developed with these funds." Settlement Agreement, p. 5.

The language of the Settlement Agreement clearly and unequivocally obligated the Milford Housing Authority to act in good faith and utilize its best efforts to develop all 28 units within budget and on time. The parties agreed that the Settlement Agreement was to be undertaken "to ensure that low-income and minority citizens gain the benefits of subsidized

housing provided by the Milford Housing authority as quickly as practicable." Settlement Agreement, p.1.  The parties agreed that "their mutual interests, as well as the interests of low-income and minority citizens, will be served by working cooperatively to ensure that both the letter and spirit of this Settlement Agreement are realized." Settlement Agreement p.2.  The parties further agreed that the "purpose of this Settlement Agreement is to provide quality, affordable rental housing in Milford to low-income families in need of such housing." Settlement Agreement p. 4-5.  The parties agreed that after HUD approval, "the Milford Housing authority shall promptly pursue and make every reasonable effort to bring to fruition at the earliest possible time the opportunities for acquisition, acquisition and rehabilitation, and/or development of housing units set forth under the plan." Settlement Agreement p. 9.

    The Settlement Agreement further provided:

    (1) that MHA use open, competitive and appropriate procurement procedures in developing the 28 units; Settlement Agreement p. 9;

    (2) MHA inform the plaintiffs if it seeks delay in the implementation schedule or to reformulate Settlement Agreement; pp. 9 - 11;

    (3) Provide periodic reports to the Department of Justice to Monitor the progress; Settlement Agreement; Vasiliou Deposition Vol. I p. 57.

8.     Admitted in part.  See plaintiff's response to ¶7.

9.     Denied.  Anthony Vasiliou, the Executive Director of the Housing Authority, stated on several occasions that he had no intention of building 28 units of housing, that he would spend the money on soft costs and the property, and that he would be a "hero" in Milford for not doing it.  See deposition of Jack Hughes, dated September 12, 2003 ("Hughes

Depo., Vol. I"), pp. 66- 76; Deposition of Karen DeVito, dated December 18, 2003 ("DeVito Depo."), p. 15, 37-38. Ms. DeVito, a former employee, Testified:

> Anthony told me that he was going to spend as much money as he could up front on soft costs[2] out of the $3.5 million so that he would not have to buy many units, and he would be a hero in the city of Milford.

Q: And when did Mr. Vasiliou make that statement?

A: It was right at the end of the – as the lawsuit was being settled, which would make it probably '98. I don't have a time line.

Q: And where were you when he made that statement?

A: In his office.

DeVito Depo., p. 15.

10. Denied. See plaintiff's response to ¶9.

11. Admitted to the extent that defendants submitted an implementation plan.

12. Admitted.

13. Admitted.

14. Denied. The Settlement Agreement called for periodic monitoring. See Settlement Agreement. Plaintiff's counsel and the Department of Justice had on ongoing obligation to monitor the settlement. Sometimes other commitments prevented counsel from monitoring the settlement agreement. See Deposition of Shelly White, pp. 53-55, attached as Exhibit 29.

15. MHA had acquired the 18 units of housing by December 2001. MHA did not commence rehabilitation of the units until after Hughes' discharge in March 2002. Vasiliou Depo. p.

---

[2] Soft costs are such costs as architects, engineers, attorneys, and project management. Hard costs include the cost of the proerty and actual construction.

          65. See Affidavit of Linda DeMatteis, dated August 11, 2004, attached as Exhibit 14.

16.      Admitted to the extent that the defendants exhausted their budgeted funds for the acquisition of property after they had only acquired 18 units.  Defendants exhausted the funds because they had no intention of building 28 units of housing as called for under the Settlement Agreement.  The remaining funds were spent on soft costs and rehabilitation of the 18 units by September 2003.   They were spent in full because the defendants had no intention of building 28 units of housing under the settlement agreement.  See deposition of Jack Hughes, dated September 12, 2003 ("Hughes Depo., Vol. I"), pp. 66- 76; Deposition of Karen DeVito, dated December 18, 2003 ("DeVito Depo."), p. 15, 37-38; See Exhibit 35.

17.      Denied.  White never testified that such an agreement had been reached.

18.      Denied.  The defendants were obligated to use their best efforts and act in good faith to acquire and develop 28 units of public housing. See Settlement Agreement.

19.      Admitted.

20.      Denied.  The Director of Operations was an open position.  See announcement Re: Hughes hiring, attached as Exhibit 34.

21.      It is admitted that these items were listed in plaintiff's job description.

22.      Admitted that these were identified as plaintiff's responsibilities when he was hired.

23.      Admitted to the extent that Hughes has not read it verbatim.  Hughes Depo. p. 65.

24.      Admitted to the extent that is generally the time period when the budget process for the following fiscal year is commenced.

25. Admitted to the extent that is the time period when the one year and five year fiscal plans are developed.

26. Admitted to the extent that Mr. Vasiliou met with Mr. Dunn and Ms. Ewald.

27. Denied. In the defendants Maintenance Improvement Plan, in their Five Year Plan, and their Annual Plans for fiscal years beginning 4/1/2000, and 4//1/2001,[3] the defendants organizational charts indicating the position of modernization coordinator. See Maintenance Improvement Plan; See Exhibit 7; Milford Housing Authority Annual Plan 2001, attached as Exhibit 24. The modernization coordinator position remained unfilled, however, until Vasiliou made Hughes the modernization coordinator in August 2001. See Exhibit 15.

In July 2002, four months after Hughes was discharged, John Schukoske was hired as an independent contractor for the clerk of the works position. Vasiliou depo. Pp. 201 - 213.

Hughes' responsibilities during the construction phase of the implementation of the settlement agreement, as outlined in the modernization coordinator job description, were nearly identical to the job responsibilities assumed by John Schukoske as clerk of the works three months later. Compare Exhibit 15, which outlines Hughes' responsibilities as modernization coordinator, and the Request For Proposal Monitoring Services, attached as Exhibit 25, which outlines Schukoske's responsibilities; Vasiliou depo. p. 201 - 213; Hughes depo., p. 192. The defendants merely replaced Hughes with Schukoske in the modernization coordinator position under a different name.

---

[3] The Milford Housing authority Fiscal Year ends on March 31 of each year.

Defendants contention that Hughes' position was eliminated for budgetary reasons was pretextual. The financial savings within the maintenance department itself was minimal. In the same year that Hughes was terminated, at a salary of $51,000, the defendants budgeted and hired a work center coordinator, at a salary of $25,000, for a net decrease in the maintenance budget of $26,000. See Ewald Depo. pp. 27 - 28.

Hughes' replacement, John Schukoske, actually earned comparable compensation. Schukoske received over $20,000 from the Milford Housing Authority for less than six months work. See 2002 1099 for John Schukoske, attached as Exhibit 26. Under Schukoske's contract for 2003, he was earning $50 per hour for a forty hour week. See Clerk of the Works Contract, July 2003, attached as Exhibit 27. This would have resulted in substantially more compensation than Hughes would have earned in 2003. Thus, there were no budgetary savings. The cost was merely shifted from the maintenance budget to another budget.

28. Denied. See response to ¶27.

29. Denied. See response to ¶27.

30. Denied. See response to ¶27.

31. Denied. See response to ¶27

32. Plaintiff cannot further admit or deny this allegation because defendants' counsel refused to permit questioning on the information that was submitted to the Commissioners on the basis of attorney-client privilege.

33. Admitted to the extent that the Minutes of the January 15, 2002 Commissioner's meeting seem to indicate that the Annual and Five year plan for the fiscal year beginning 4/1/03 was approved. Plaintiff further admits that the defendants have provided an

organizational chart dated January 15, 2002 in discovery. Plaintiff cannot further admit ore deny this allegation because defendants' counsel refused to permit questioning on the information that was submitted to the Commissioners on the basis of attorney-client privilege.

34. Admitted to the extent that plaintiff was discharged on March 8, 2002, prior to the commencement of the upcoming fiscal year, and that nobody replaced him in his position as Director of Facilities Maintenance and Operations. Denied to the extent that he was replaced as modernization coordinator by John Schukoske. Compare Exhibit 15, which outlines Hughes' responsibilities as modernization coordinator, and the Request For Proposal Monitoring Services, attached as Exhibit 25, which outlines Schukoske's responsibilities; Vasiliou depo. p. 201 - 213; Hughes depo., p. 192.

35. Admitted to the extent that Hughes received a "letter" of termination at his home while he was out sick on March 8, 2002. Hughes Aff.

36. Admitted that they told him that his position was eliminated due to a reorganization and for budgetary considerations.

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted.

41. Denied. Plaintiff testified this provision only permitted the MHA to discharge him if he committed theft or something similar. Hughes Depo. pp. 22-25.

42. Plaintiff cannot admit or deny this allegation, since he has no specific recollection as to whether he received the 1999 personnel manual. Hughes Depo. pp. 242 - 244.[4]

43. Admitted to the extent that Hughes signed the acknowledgment. Hughes cannot admit or deny whether he received the 1999 personnel manual because he has no recollection of having received it.

44. Admitted to the extent that on the date of Hughes deposition, after defendants had previously disclosed completely different excerpts from a different personnel policy as part of their initial disclosures, they disclosed a 1999 personnel policy that contained that a "Disclaimer" containing those words. The disclaimer page, unlike every other page in the manual, contained no page numbering, and was typed in different type from the rest of the manual.

45. Admitted.

46. Admitted.

47. Denied. Attorney White testified that they could not determine whether excessive funds had been spent on soft costs. They considered doing an audit, but decided that it would not be cost effective because the HUD development funds had already been spent and they would not be able to get the Housing Authority to acquire more units.

48. Denied. White believed that Vasiliou and all of the Commissioners did not intend to comply with the settlement agreement. White Depo. P. 25. White did not find sufficient evidence to warrant an enforcement action. White Depo. p. 42-43.

---

[4] The deposition testimony that defendant cites is erroneous. Hughes was confusing the 1999 personnel manual, which he does not remember receiving, with the 2001 personnel manual, which he actually received and retained.

49. Unable to admit or deny, Exhibit 20, cited in defendants' 56(a)(1) statement, was not attached to the exhibits provided to plaintiff's counsel and had not previously been provided in discovery. Plaintiff admits that HUD was conducting an investigation of the Milford Housing Authority beginning in 2003, based on a number of serious allegations made against MHA, and that HUD's report is due next month.

50. Admitted. The HUD personnel also questioned Mr. Hughes about whether he had observed Mr. Vasiliou engaged in any criminal activity. Hughes Depo., Vol. 3, p. 18.

51. Denied. Mr. Hughes told the HUD investigators that he had not personally observed Mr. Vasiliou engaged in any criminal activity.

52. Admitted.

53. Admitted.

54. Plaintiff is unable to admit or deny this allegation, since no discovery on this issue took place.

55. Admits that Mr. Hughes was served a lawsuit brought by Mr. Vasiliou. Mr. Vasiliou was aided and assisted in that lawsuit by counsel for all defendants, Attorney Walker, acting with full authority of all of the defendants acting in their official capacity. Attorney Walker, acting on behalf of all of the defendants, used discovery in the Hughes v. Milford Housing Authority case to aid, abet, and assist Anthony Vasiliou to bring a counterclaim against Mr. Hughes for the events that are the subject of Hughes' case. During the deposition of Mr. Hughes, Attorney Walker, acting on behalf of all of the defendants, questioned Hughes extensively about what he said to others about Mr. Vasiliou, and tried to pin him into admitting making statements about Mr. Vasiliou that were potentially

defamatory. Hughes identified the Department of Justice, Attorney Shelly White, and three former co-workers – Dion Smith, Mary Margaret Mandel, and Karen DeVito as persons who he may have talked to about Mr. Vasiliou. Hughes depo. pp. 66-77, 94-98, 120-129, 131-140, 152-173, 191-198, 232-236. Attorney Walker, acting on behalf of all of the defendants, aided, abetted, and assisted Mr. Vasiliou in bringing his own lawsuit by deposing all of the persons identified by Mr. Hughes, with the exception of the Department of Justice attorney. In each case Attorney Walker questioned the witness extensively about statements made by Mr. Hughes about Mr. Vasiliou. See Smith Depo, pp. 28, 32-33, 38, attached as Exhibit 19; DeVito Depo, pp. 20, 73, attached as Exhibit 35; White Depo. pp. 17, 28, 32, 47, attached as Exhibit 29. The defendants also paid for the expenses for Ms. DeVito to travel to Connecticut from Triangle, Virginia for her deposition in order to allow Mr. Vasiliou to attend Ms. DeVito's deposition. See Letter from Deborah French to Ann Walker, dated January 5, 2004, attached as Exhibit 32. Mr. Vasiliou attended all of the depositions and was compensated for his time by the Milford Housing Authority.

56. Plaintiff is unable to admit or deny this allegation, as no discovery has taken place on this issue.

57. Denied. See plaintiff's response to ¶55.

58. Plaintiff is unable to admit or deny this allegation, as no discovery has taken place on this issue.

II. **DISPUTED ISSUES OF MATERIAL FACT**

1. Did the defendants intentionally avoid building 28 units of public housing?

2. Did defendants violate the Fair Housing Act Settlement Agreement?

3.  Prior to his discharge, did John Hughes engage in conduct that"aided" or "encouraged" persons in the enjoyment of rights protected by the Fair Housing Act?

4.  Was there a causal connection between John Hughes' discharge and the protected conduct addressed in issue #3?

5.  Did John Hughes' 2001 personnel manual, which contained an unambiguous discharge for cause provision, and did not contain a disclaimer, create a binding agreement between Hughes and the Milford Housing Authority?

6.  Was the alleged reorganization that resulted in the elimination of John Hughes' position pretextual?

7.  Were John Hughes' functions taken over by John Schukoske?

8.  Was the budgetary justification for the elimination of John Hughes' position pretextual?

9.  Did the discharge of John Hughes breach the implied contract created by the 2001 personnel manual?

10. Did the defendants discharge of Hughes breach the covenant of fair dealing implicit in their employment contract with him?

11. Were Hughes' discussions with Shelly White, the individual plaintiffs' counsel for the Fair Housing Act litigation, the Department of Justice, the media and HUD protected activities under the Fair Housing Act?

12.  Did Hughes file his Fair Housing Act lawsuit in good faith?

13. Was Hughes' filing of a Fair Housing Act lawsuit a protected activity under the anti-retaliation provisions of the Fair Housing Act?

14. Was their a causal connection between Mr. Vasiliou's lawsuit and Hughes' protected activity under the Fair Housing Act?

15. Were Hughes discussions with Shelly White, the individual plaintiffs' counsel for the Fair Housing Act litigation, the Department of Justice, the media and HUD protected activities under the First Amendment of the United States Constitution?

16. Was Hughes' filing of a Fair Housing Act lawsuit a protected activity under the First Amendment of the United States constitution?

17. Was their a causal connection between Vasiliou's lawsuit and Hughes' constitutionally protected activities?

18. Was Vasiliou's lawsuit frivolous?

19. Did the other defendants, through their authorized representative, Attorney Walker, aid and assist Vasiliou in the filing of his lawsuit?

20. Did Vasiliou intend to retaliate against Hughes by filing his lawsuit?

21. What economic damages has Hughes suffered as a result of the termination of his employment?

22. What compensatory damages has Hughes suffered as a result of the termination of his employment?

23. Is Hughes entitled to punitive damages as a result of the discharge of his employment?

24. What economic damages is Hughes entitled to for Vasiliou's filing of a retaliatory lawsuit?

25. What compensatory damages is Hughes entitled to as a result of Vasiliou's filing of a retaliatory lawsuit?

26. Is Hughes entitled to punitive damages as a result of Vasiliou's filing of a retaliatory lawsuit?

                                **RESPECTFULLY SUBMITTED,**
                                **THE PLAINTIFF, JOHN HUGHES**

**By:**_____
        Lewis H. Chimes
        *Fed. Bar No.: ct07023*
        GARRISON, LEVIN-EPSTEIN, CHIMES
          & RICHARDSON, P.C.
        405 Orange Street
        New Haven, CT  06511
        Ph:  (203) 777-4425
        Fax: (203) 776-3965
        lchimes@garrisonlaw.com

## **CERTIFICATION**

     I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. mail, postage prepaid, this 12<u>th</u> day of August 2004 to:

Ann Noble Walker, Esquire
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103-3597


_____
Lewis Chimes