## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-------------------------------------------------------------x

JOHN HUGHES,                        :        CIVIL ACTION NO.

            **Plaintiff,**         :        3:02CV1917(MRK)

vs.                                 :

MILFORD HOUSING AUTHORITY, ET AL,   :

            **Defendants.**        :        **August 12, 2004**

-------------------------------------------------------------x


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I.        PRELIMINARY STATEMENT**

The plaintiff, Jack Hughes, has brought claims for violation of the Fair Housing Act, 42 U.S.C. §3617, and for breach of contract, stemming from his discharge as an employee of the defendant Milford Housing Authority on or about March 8, 2002.[1]  He subsequently amended his complaint to include another claim under the Fair Housing Act and 42 U.S.C. §1983, stemming from the Executive Director's retaliatory filing of a lawsuit against Hughes.

On June 14, 2004, the defendants filed a Motion for Summary Judgment.  For the reasons outlined below, the defendants' Motion should be denied in its entirety, except as consented to herein.

---

[1]        Hughes is not pursuing the claims contained in Counts Two (Wrongful Discharge in Violation of Public Policy), Three (Retaliation for Exercise of First Amendment Rights, Conn. Gen. Stat. §31-51q -Wrongful Discharge), and Four (§1983 - Retaliation for Exercising First Amendment Rights - Wrongful Discharge)

## II.    COUNTERSTATEMENT OF FACTS

### A.    Background

The Defendant Milford Housing Authority ("MHA") is a municipal Housing Authority established pursuant to Conn. Gen. Stat. §8-40 and located in Milford, Connecticut.  It is a public housing authority  receiving federal funds for development and operation of public housing, pursuant to the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437 *et seq*. Defendant operates under the direction of a five member Board of Commissioners.  At the time of the termination of Hughes' employment, the defendants Richard Anderson, Hilary Holowink, John Amenth, Edward Canelli, and Jack Tucciarone (Collectively "the Commissioners") were commissioners of the defendant MHA.  The defendant Anthony Vasiliou was hired as the Executive Director of the Milford Housing Authority in 1996.  Deposition of Anthony Vasiliou, dated September 17, 2003, p. 8 ("Vasiliou Depo., Vol. I"), attached as Exhibit 1.

The Mission of the Milford Housing Authority is:

to assist low income families with safe, decent, and affordable housing opportunities as they strive to achieve self-sufficiency and improve the quality of their lives.  The Housing Authority is committed to operating in a fiscally prudent, ethical and professional manner. The Housing Authority will strive to provide a suitable living environment for the families it serves without discrimination.

Milford Housing Authority Five Year Plan, Years 2000 - 2004, p. 1 (MHA 5 Year Plan), attached as Exhibit 2.  Towards that end, the Milford Housing authority operates two programs: Public Housing that it owns and operates and management of federal Section 8  housing (federally subsidized private housing through a voucher system).  Vasiliou Depo. Vol. I,  p. 21.  In 2002, the Milford Housing Authority administered 402 units elderly/disabled housing and 45 units of family housing.  Vasiliou Depo. Vol. I p. 39 - 40.

**B.    The Fair Housing Act Litigation Against the MHA And Resulting Settlement Agreement**

It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.  42 U.S.C. §3601.

The Fair Housing Act, 42 U.S.C. §3604 states in pertinent part:

It shall be unlawful:

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.[2]

In 1995, the Milford Housing Authority cancelled the development of a federally funded scattered site housing program.  Two Fair Housing Act lawsuits were brought, one by eight individual plaintiffs, and one brought by the United States Department of Justice.  The lawsuits alleged that the cancellation of the federal scattered site housing program violated the Fair Housing Act because a significant proportion of the persons anticipated to benefit from the program were African-American or Hispanic.  Milford Housing Authority Fair Housing Act Settlement Agreement, p. 2 ("Settlement Agreement"), attached as Exhibit 3.

In 1998, the two consolidated lawsuits were settled and resolved.  Under the Settlement Agreement, the Milford Housing Authority agreed to develop 28 units of low income housing units.  Settlement Agreement, pp. 1-2.  The parties agreed that the settlement agreement "furthers the purpose of the federal Fair Housing Act, 42 U.S.C. sec. 3601 *et seq*. and the Milford Housing authority's core mission."  Settlement Agreement, p. 2.

---

[2]    The State of Connecticut has a similar Fair Housing Statute.  Conn. Gen. Stat. §46a-64c.

The Settlement Agreement called for MHA to develop a plan within 90 days of the execution of the Settlement Agreement (the "Implementation Plan") that required the MHA develop and have ready for occupancy:

   a.     seven (7) scattered site housing units within one year from the date on which Housing Urban Development approves the plan ("Date of Housing Urban Development approval")

   b.     seven additional housing units within two years from the date of Housing Urban Development approval;

   c.     fourteen additional housing units within three years of Housing Urban Development approval

Settlement Agreement, pp. 6-7.  The plan would be submitted to the Department of Housing and Urban Development ("HUD") for approval.  HUD was to provide $3.5 - 3.6 million in funds to develop the 28 units of housing.  Settlement Agreement, p. 5, Vasiliou Deposition Vol. I,  p. 44. The Settlement Agreement provided, however that  "if these funds prove insufficient to permit acquisition and/or development of the full complement of twenty-eight such units, the maximum number of units that can be acquired, acquired and rehabilitated, and/or developed with these funds."  Settlement Agreement, p. 5.

The language of the Settlement Agreement clearly and unequivocally obligated the Milford Housing Authority to act in good faith and utilize its best efforts to develop all 28 units within budget and on time.  The parties agreed that the Settlement Agreement was to be undertaken "to ensure that low-income and minority citizens gain the benefits of subsidized housing provided by the Milford Housing Authority as quickly as practicable."  Settlement Agreement, p.1.   The parties agreed that "their mutual interests, as well as the interests of low-income and minority citizens, will be served by working cooperatively to ensure that both

the letter and spirit of this Settlement Agreement are realized." Settlement Agreement p.2. The parties further agreed that the "purpose of this Settlement Agreement is to provide quality, affordable rental housing in Milford to low-income families in need of such housing." Settlement Agreement pp. 4-5. The parties agreed that after HUD approval, "the Milford Housing authority shall promptly pursue and make every reasonable effort to bring to fruition at the earliest possible time the opportunities for acquisition, acquisition and rehabilitation, and/or development of housing units set forth under the plan." Settlement Agreement p. 9.

The Settlement Agreement further provided:

(1) that MHA use open, competitive and appropriate procurement procedures in developing the 28 units; Settlement Agreement p. 9;

(2) MHA inform the plaintiffs if it seeks delay in the implementation schedule or to reformulate Settlement Agreement; pp. 9 - 11;

(3) Provide periodic reports to the Department of Justice to Monitor the progress; Settlement Agreement; Vasiliou Deposition Vol. I p. 57.

The MHA subsequently developed its Implementation Plan. It was approved by the MHA commissioners on March 29, 1999. The presentation to the Commissioners indicated that 28 units would be built over 3 years, and the total development cost would average $125,000 per unit. *See* Minutes of Milford Housing Authority Commissioners, dated 3/29/99 ("3/29/99 Minutes"), attached as Exhibit 4. HUD approved the MHA implementation plan in April - May, 1999, triggering the three year development plan laid out in the Settlement Agreement. Letter of Assistant Attorney General Je Jung to Attorney Christopher Cody, dated 4/11/02 ("AAG 4/11/02 Letter"), attached as Exhibit 5.

**C.      The 1999 MHA Reorganization**

In November 1998, the MHA retained a consultant, Goodwin & Associates, to provide

maintenance consulting services.  *See* Goodwin Maintenance Proposal, dated 11/12/98, attached

as Exhibit 6.  Goodwin submitted a "Maintenance Improvement Plan" in July 1999.  *See*

Maintenance Improvement Plan, dated July 1999, attached as Exhibit 7.

Under the Plan, the MHA would have a Director of Facilities Management and

Operations in Maintenance Organization reporting directly to the Executive Director.

Maintenance Improvement Program for the Milford Housing Authority p. 1-1, org. chart.  The

Director of Facilities Management and Operations would have a dual function: He would

supervise the ongoing maintenance (daily routine care for the facilities) of the Milford Housing

Authority, and he would supervise the MHA's ongoing modernization (capital projects) efforts.

*See* Maintenance Improvement Plan.

In the Plan, there would be a Work Center Supervisor reporting to the Director of

Facilities Management and Operations who would oversee the maintenance workers.

Approximately 50% of the foreman's work would be hands on work.  *See* Maintenance Plan, p.

1-1; org chart.

The Plan also called for a Modernization Inspector who would report directly to the

Director of Facilities Management and Operations.  He would provide the day-to-day oversight

of the modernization efforts.  Maintenance Improvement Program for the Milford Housing

Authority p. 1-1, org. chart.

**D.      Hiring of Jack Hughes**

Hughes was hired to the newly reconstituted position of Director of Facilities

-6-

Management and Operations against the backdrop of the Settlement Agreement and the commitment to build 28 new units of family housing over the next three years.

Hughes started his position on January 5, 1999. *See* MHA offer letter to Hughes, dated 1/4/99, attached as Exhibit 8. Hughes was supposed to supervise new construction and ongoing maintenance. *See* Job Description, Director of Facilities Management and Operations, dated 8/24/98 ("Job Description"), attached as Exhibit 9.

Hughes had over thirteen years of prior experience in maintenance supervision for the City of Norwalk, and overseeing construction for a non-profit housing corporation prior to taking the job at MHA. *See* Resume of John Hughes, attached as Exhibit 10.

Hughes was supposed to supervise subordinate supervisors in both the Maintenance and Construction departments. *See* Job Description, Maintenance Improvement Plan. The position of Work Center Supervisor was filled by Dion Smith in 2001. Vasiliou Depo., p. 31. The position of Modernization Coordinator was never filled by anyone but Hughes.

During Hughes' first two years on the job, most of his daily responsibilities involved overseeing maintenance. Vasiliou Deposition Vol. I p. 72

Hughes was supposed to help in procurement and acquisition and rehabilitation of the 28 properties under Settlement Agreement. Vasiliou Deposition Vol. I p. 64. Hughes' role in acquisition process was satisfactory to Vasiliou. Vasiliou Deposition Vol. I p. 66. Vasiliou had no doubt about Hughes' modernization ability. Vasiliou Deposition Vol. I, p.108-109.

In July 2000, the MHA sent Hughes to a National Association of Housing and Redevelopment Officials ("NAHRO") course in Procurement and Project Management. Hughes successfully completed the course. *See* Certificate of Completion, dated July 14, 2000, attached

as Exhibit 11.

Hughes never received a formal performance evaluation throughout his entire employment with the Milford Housing Authority.  Vasiliou Deposition Vol. I p. 102. Throughout his tenure, however, he consistently received commendations, performance awards, and merit raises.  Vasiliou Deposition Vol. I p. 95, 100; Commissioner Vlantes letter of commendation for Hughes, dated 01/11/00, attached as Exhibit 12, Anthony Vasiliou Letter of Commendation for Jack Hughes, dated 12/21/00, attached as Exhibit 13.

MHA had acquired eighteen units of housing by July 2001.  *See* Affidavit of Linda DeMatteis, dated August 11, 2004, attached as Exhibit 14.  None of the units were ready for occupancy, and construction on them had not yet begun.  Letter of Je Jung dated April 11, 2002.

In August 2001 Mr. Vasiliou "clarified" Hughes' increased responsibilities in the area of modernization.  Vasiliou Depo., p. 104.  *See* Letter and Memorandum re: Modernization ("Modernization Memo"), attached as Exhibit 15.  Mr. Vasiliou did not consider this "clarification" a negative reflection on Hughes' performance.  Vasiliou Depo. Pp. 106-107.  In fact, Vasiliou's Modernization Memo refers to the "Modernization Coordinator" responsibilities on numerous occasions.  *See* Modernization Memo.  In August 2001, Mr. Vasiliou was placing Hughes into the unfilled Modernization Coordinator position.  *See* Modernization Memo, Maintenance Improvement Plan.

On March 8, 2002, Hughes' employment was terminated.  Vasiliou indicated that his "position as Facilities Management and Operations Director has been eliminated as a result of budgetary considerations and a reorganization of the Milford Housing Authority."  Letter of Anthony Vasiliou to Jack Hughes, dated March 8, 2002, attached as Exhibit 16.

Hughes was never told of any performance issues, budgetary issues or potential reorganization prior to his discharge.  *See* Affidavit of Jack Hughes, dated August 12, 2004, attached as Exhibit 17.

The actual rehabilitation of the eighteen acquired properties did not start  until after Hughes' termination.  Vasiliou Deposition Vol. I p. 65.

**E.    The Defendants Violated the Fair Housing Act Settlement**

In 1998, as part of their settlement of the two Fair Housing Act claims, the defendants agreed to use their good faith and best efforts to build 28 units of affordable housing in a three year period.

**1.    Executive Director Vasiliou Had No Intention of Acting in Good Faith to Comply With the Settlement Agreement**

Defendants never had any intention of honoring this commitment.  Anthony Vasiliou, the Executive Director of the Housing Authority, stated on several occasions that he had no intention of building 28 units of housing, that he would spend the money on soft costs and the property, and that he would be a "hero" in Milford for not doing it.  *See* deposition of Jack Hughes, dated September 12, 2003 ("Hughes Depo., Vol. I"), pp. 66- 76, attached as Exhibit 37; Deposition of Karen Devito, dated December 18, 2003 ("DeVito Depo."), p. 15, 37-38, attached as Exhibit 35. Ms. Devito, a former employee,  Testified:

> Anthony told me that he was going to spend as much money as he could up front on soft costs[3] out of the $3.5 million so that he would not have to buy many units, and he would be a hero in the city of Milford.

---

[3]    Soft costs are such costs as architects, engineers, attorneys, and project management.  Hard costs include the cost of the property and actual construction.

Q:      And when did Mr. Vasiliou make that statement?

A:      It was right at the end of the – as the lawsuit was being settled, which would make it probably '98.  I don't have a time line.

Q:      And where were you when he made that statement?

A:      In his office.

Devito Depo., p. 15.

When the Commissioners approved the Implementation Plan to the settlement agreement, on March 23, 1999, they were falsely told in the public hearing that 28 units were going to be fully developed within the $3.5 million budget at a total development cost of $125,000.  *See* 3/29/99 Minutes.

> **2.      The Cost of Contractors Hired To Implement the Settlement Agreement Was Billed Against the $3.5 Million HUD Development Fund**

The Milford Housing Authority contracted with numerous outside contractors to implement the settlement plan.  ABT Associates developed the Implementation Plan.  Vasiliou Depo. P. 69-70.  John D'Emilia & Associates was hired to be the Project Manager for the implementation of the Settlement Agreement in March 2000.  Vasiliou Depo. p. 86.  D'Emilia received $136,000 for its project management work  the HUD fund that was given to the MHA to implement the settlement agreement.  *See* Development Fund Summary ("Development Fund"), attached as Exhibit 18.  Alfred Kuncas was hired as the architect for the implementation of the settlement agreement.  Hughes depo. p. 77.  Kuncas received $114,073.26 for architectural and engineering services.  *See* Development Fund.  John Schukoske was hired after Hughes' discharge as a clerk of the works.  Vasiliou Depo., p. 75.  In 2002, Schukoske was paid over $20,000 from the HUD fund.  Vasiliou Depo.. Vol. II, p. 200.  "Soft costs" for the

-10-

implementation of the settlement agreement totaled approximately $577,723.07 of the $3.5 million total budget.  *See* Development Fund.

### 3. The Project Manager Reported Directly to Vasiliou Rather Than Hughes

Under Hughes' job description, John D'Emilia, the project manager, and Al Kuncas, the architect, should have reported to Hughes.  *See* Exhibits 7, 9.  In fact, neither D'Emilia nor the other contractors involved in the scattered site project ever reported directly to Hughes.  They reported directly to Vasiliou.  *See* Hughes Aff.

### 4. The Contractors All Had Prior Connections With Vasiliou and Each Other

Vasiliou knew D'Emilia before D'Emilia had contracted with the Milford Housing Authority.  Vasiliou knew D'Emilia before Vasiliou had been hired by the Milford Housing Authority.  Vasiliou Depo. p. 85.  D'Emilia also had an ongoing relationship with the architect, Kuncas, and lobbied for Kuncas' selection.  Hughes Depo. pp. 77- 79.  Schukoske, who was brought in as an independent contractor after Hughes' discharge, had known Vasiliou for over 20 years, called him "Donny," and had worked with Vasiliou's wife at Wesleyan College.  Vasiliou Depo., p. 79; Deposition of Dion Smith, p. 18, attached as Exhibit 19.

### 5. Vasiliou Directed Hughes Not to Question the Bills Submitted by John D'Emilia

Mr. Vasiliou instructed Jack Hughes not to question John D'Emilia's bills, just pay them. Hughes Aff.

### 6. Vasiliou Directed His Employees Not to Have Any Communication With the MHA Commissioners

Vasiliou instructed MHA employees not to have contact with commissioners.  Devito Depo., p. 35.

7.    **Hughes Had No Role in the Acquisition of Properties Under the Implementation Plan**

Under his job description, Hughes should have played a significant role in the property acquisition process in order to assess the rehabilitation needs and the potential cost and timetable of rehabilitation.  *See* Exhibits 7 and 9.  In actuality, Hughes was completely shut out from the acquisition process.  He did not accompany the architect and the project manager when they inspected potential properties.  He did not participate in the selection of the properties.  He did not review any appraisals.  Hughes Depo. Vol. II, p. 259.

8.    **MHA Failed to Meet the Timetable Set Forth in the Settlement Agreement**

Under the settlement agreement, MHA was supposed to have 7 units of scattered site housing ready for occupancy by May 2000.  MHA had not acquired a single unit of occupancy by May 2001.  *See* Exhibit 5.

Under the original settlement agreement, MHA should have had 14 units of housing available for occupancy by May 2001.  In fact, MHA had only acquired six units, and none of them were ready for occupancy.  *See* Exhibit 5.

In January 2001, the Department of Justice and the Milford Housing Authority agreed to extend the deadlines for phase I and II.  Six units were to be ready for occupancy by June 1, 2001, and all 14 units required under phase II were to ready for occupancy by August 1, 2001.  No units were ready for occupancy by August 1, 2001.  *See* Exhibit 5.

Under the original Phase III deadline, the Milford Housing Authority was supposed to have 28 units of housing available for occupancy by May 2002.  No units were available for occupancy by May 2002.  *See* Exhibit 5.

-12-

9.      **MHA Failed to Comply With the Procedures for Modifying the Agreement or Extending the Deadlines**

Under the Settlement Agreement, the Milford Housing Authority is to provide notice to the plaintiffs if it seeks to modify or reform the agreement. *See* Settlement Agreement. Despite its repeated delays and the fact that it has not built the 28 units, the Milford Housing authority has never provided notice or request for modification or reformation of the settlement agreement. *See* Exhibit 5.

10.     **The Hiring of John Schukoske to Take Over Hughes' Modernization Responsibilities Violated the Settlement Agreement**

Under paragraph 8 of the Settlement Agreement, the Milford Housing Authority is supposed to use competitive procurement procedures when it hires any new contractors to implement the Settlement Agreement. John Schukoske, the Clerk of the Works who replaced Hughes, was hired without a Request for Proposal. There were no other candidates considered when he replaced Hughes in June 2002. There was no competitive bidding. Vasiliou Depo., p. 210 -211.

In addition, the replacement of Hughes with Schukoske furthered Vasiliou's intended purpose of minimizing the number of units completed by depleting the HUD development funds. Schukoske was paid out of the HUD development funds. Vasiliou deposition, pp. 162 - 163. In contrast Hughes, an employee of the Housing Authority, was paid out of the Housing Authority operational budget. Deposition of Theresa Ewald, dated October 7, 2003 ("Ewald Depo"), p. 26 - 28, 41, attached as Exhibit 36. Work done by Hughes implementing the scattered site project was not a "soft cost" charged against the HUD development budget. Shifting the cost of the modernization work from Hughes to Schukoske shifted the cost to the HUD development

budget, and further increased "soft costs."

**F.     Hughes Spoke Out Regarding Excessive Spending Under the Implementation Plan**

Hughes believed that the Milford Housing Authority should have used its best efforts to develop 28 units of affordable housing.  He believed that this was consistent with the Settlement Agreement and the core mission of the Housing Authority.  Hughes Aff.

At various times during the implementation of the settlement agreement, Hughes questioned the wisdom of certain spending that depleted the HUD development fund.

Under D'Emilia's contract with the Housing Authority, D'Emilia received a consistent monthly consultation fee from the HUD development budget.  Etta Lopez, MHA's Director of Finance, administered the HUD development budget.  Vasiliou Deposition Vol. I p. 52.  Early in the process of implementing the settlement agreement, Hughes questioned whether payments should be made to D'Emilia during periods of inactivity.  Hughes Aff.

Hughes also felt that the cost for some of the acquired properties was excessive, if the goal was to build 28 units of housing.  He discussed this with Mr. Vasiliou, Ms. Lopez, and Mr. Anderson, the Chairman of the Commission.  Hughes Depo. p. 259 - 260.

On February 28, 2002, Al Kuncas, the architect, met with Hughes in the MHA offices. Kuncas was asking for more money than called for under his contract.  Hughes did not believe that Kuncas deserved any additional funds.  Frustrated by the escalating costs of the project, Hughes stated that "if the Department of Justice came in, I would tell them that Anthony Vasiliou has no intention of building 28 units of scattered site housing."  Mr. Vasiliou immediately burst into the room and yelled at Hughes for making that sort of statement to a contractor.  Hughes Aff.

Hughes' employment was terminated eight days later.  *See* Exhibit 16.

-14-

G.    **Hughes' Employment Handbook**

The Milford Housing Authority distributed two personnel policy manuals during Hughes'

tenure with the Housing Authority.  MHA records indicate that Hughes received a personnel

policy manual on January 29, 1999.  *See* Acknowledgment of receipt of Hughes' personnel

policy manual, dated January 29, 1999, attached as Exhibit 20.  Hughes received an updated

personnel manual on March 28, 2001.  *See* Acknowledgment of receipt of Hughes' personnel

manual, dated March 28, 2001, attached as Exhibit 21.

Both manuals contained similar substantive language.

Paragraph 7.7 of MHA's personnel policies clearly and unambiguously states that an

employee can only be terminated for cause, and outlines the grounds.

Paragraph 7.8 of MHA's personnel policies clearly and unambiguously states:

Prior to the dismissal of a regular employee, the Executive director shall notify the
employee and the Chairman of the Commission of the charges against him/her in writing
and conduct a hearing where the employee has an opportunity, with his representative
present, to answer or explain the charges and demonstrate why he should not be
dismissed.

Paragraph 7.9 of MHA's personnel policies states in pertinent part:

Reduction in Force.  If it is necessary to reduce personnel, the selection of employees to
be retained shall be based primarily on their relative efficiency and the operating and
budgetary needs of the MHA as determined by the Executive Director.  Other things
being equal, length of service shall be given consideration.

Hughes retained and relied upon a copy of the 2001 Personnel Manual.  He does not

recall having a copy of the 1999 personnel manual. Hughes Depo. pp. 244 - 246.  The 2001

personnel manual **did not** have any disclaimer attached to it.  *See* 2001 Hughes' Personnel

Manual, attached as Exhibit 22; Affidavit of Karen DeVito, and attachments, attached as Exhibit

-15-

23.

**H.    The Defendants' Claim that Hughes' Position Was Eliminated as a Result of a Reorganization Is Pretextual; Hughes Was Replaced by Vasiliou's Acquaintance, John Schukoske**

In the defendants Maintenance Improvement Plan, in their Five Year Plan, and their Annual Plans for fiscal years beginning 4/1/2000, and 4//1/2001,[4] the defendants organizational charts indicating the position of modernization coordinator.  *See* Maintenance Improvement Plan; *See* Exhibit 7; Milford Housing Authority Annual Plan 2001, attached as Exhibit 24.  The modernization coordinator position remained unfilled, however, until Vasiliou made Hughes the modernization coordinator in August 2001.  *See* Exhibit 15.

In July 2002, four months after Hughes was discharged, John Schukoske was hired as an independent contractor for the clerk of the works position.  Vasilou depo., pp. 201 - 213.

Hughes' responsibilities during the construction phase of the implementation of the settlement agreement, as outlined in the modernization coordinator job description, were nearly identical to the job responsibilities assumed by John Schukoske as clerk of the works three months later.  *Compare* Exhibit 15, which outlines Hughes' responsibilities as modernization coordinator, *with* the Request For Proposal Monitoring Services, attached as Exhibit 25, which outlines Schukoske's responsibilities; Vasiliou depo. p. 201 - 213; Hughes depo., p. 192.  The defendants merely replaced Hughes with Schukoske in the modernization coordinator position under a different name.

---

[4]    The Milford Housing authority Fiscal Year ends on March 31 of each year.

**I.    Defendants' Claim that Hughes' Position Was Eliminated for Budgetary Reasons is Pretextual**

Defendants contention that Hughes' position was eliminated for budgetary reasons is pretextual.  The financial savings within the maintenance department itself was minimal.  In the same year that Hughes was terminated, at a salary of $51,000,  the defendants budgeted and hired a work center coordinator, at a salary of $25,000, for a net decrease in the maintenance budget of $26,000.  *See* Ewald Depo. pp. 27 - 28.

Hughes' replacement, John Schukoske, actually earned comparable compensation. Schukoske received over $20,000 from the Milford Housing Authority for less than six months work.  *See* 2002 1099 for John Schukoske, attached as Exhibit 26.  Under Schukoske's contract for 2003, he was earning $50 per hour for a forty hour week.  *See* Clerk of the Works Contract, July 2003, attached as Exhibit 27.  This would result in substantially more compensation than Hughes would have earned in 2003.  Thus, there were no budgetary savings.  The cost was merely shifted from the maintenance budget to another budget.

**J.    Defendants Retaliated Against Hughes For Having Spoken Out and Filed a Fair Housing Act Complaint**

After Hughes was discharged from the Milford Housing Authority, he met with plaintiff's counsel and a Department of Justice Attorney.  In July and August, 2002, Hughes spoke with Shelly White, counsel for the individual plaintiffs, concerning the statements that Mr. Vasiliou had made about his intention not to build the 28 units of housing.  *See* Memo of Shelly White to Attorney Tegeler and Assistant Attorney General Jung, attached as Exhibit 28.

In  August, 2002, Hughes met with Assistant Attorney General Je Jung, who had represented the Department of Justice in the Fair Housing lawsuit against MHA, and discussed

Mr. Vasiliou's statements and efforts to build the 28 units of housing.  *See* deposition of Shelly White ("White Depo."), pp. 34-36, attached as Exhibit 29.

In October 2002, Hughes, through counsel, filed the instant complaint against the defendants, alleging violations of the Fair Housing Act, 42 U.S.C. §3617, in connection with his discharge, in the State of Connecticut Superior Court for the Judicial District of Ansonia/Milford.  The defendants removed the case to U.S. District Court on October 30, 2002.

Hughes also spoke to the Frank Juliano, a reporter for the Connecticut Post on several occasions in connection with the allegations against the Milford Housing Authority.  *See* Articles from Connecticut Post, dated October 22, 2002, and October 26, 2002, attached as Exhibit 30.

All of the defendants retained Attorney Ann Walker and the law firm of Robinson & Cole to be their agent and representative in the instant litigation.  *See* appearance of Ann Walker, attached as Exhibit 31.

Attorney Walker, acting on behalf of all of the defendants, used discovery in the <u>Hughes v. Milford Housing Authority</u> case to aid, abet, and assist Anthony Vasiliou in bringing a counterclaim against Hughes for the events that are the subject of Hughes' case.

During Hughes' deposition, Attorney Walker, acting on behalf of all of the defendants, questioned Hughes extensively about what he said to others about Mr. Vasiliou, and tried to pin him into admitting making statements about Mr. Vasiliou that were potentially defamatory. Hughes identified the Department of Justice, Attorney Shelly White, and three former co-workers – Dion Smith, Mary Margaret Mandel, and Karen DeVito as persons who he may have talked to about Mr. Vasiliou.  Hughes depo., pp. 66-77, 94-98, 120-129, 131-140, 152-173, 191-198, 232-236.  Attorney Walker, acting on behalf of all of the defendants, aided, abetted, and assisted Mr.

Vasiliou in bringing his own lawsuit by deposing all of the persons identified by Hughes, with the exception of the Department of Justice attorney.  In each case Attorney Walker questioned the witness about statements made by Hughes about Mr. Vasiliou.  *See* Smith Depo, pp. 28, 32-33, 38, attached as Exhibit 19; Devito Depo, pp. 20, 73, attached as Exhibit 35; White Depo. pp. 17, 28, 32, 47, attached as Exhibit 29.  The defendants also paid for the expenses for  Ms. Devito to travel to Connecticut from Triangle, Virginia for her deposition in order to allow Mr. Vasiliou to attend Ms. DeVito's deposition.  *See* Letter from Deborah French to Ann Walker, dated January 5, 2004, attached as Exhibit 32.  Mr. Vasiliou attended all of the depositions and was compensated for his time by the Milford Housing Authority.

Commencing in 2003, the U.S. Department of Housing and Urban Development ("HUD"), Office of Inspector General commenced an audit of the Milford Housing Authority operations.   On February 19, 2004, Hughes was interviewed by HUD investigators in connection with that audit.  They asked about whether he had observed Vasiliou do anything illegal, and generally about how the MHA functioned.  Hughes depo., Vol. III, pp. 16  - 27.

On February 25, 2004, six days later, Hughes was served with a lawsuit by Anthony Vasiliou.  The lawsuit was brought in the Superior Court for the Judicial District of Middlesex County and alleged defamation.  A copy of the lawsuit is attached as Exhibit 33.

At the time that Mr. Vasiliou brought the lawsuit, Hughes was 66 years old and unemployed.  Hughes Aff.

## III.  DISCUSSION

### A.  Standard of Review

The standard governing the appropriateness of summary judgment is well-defined.

Federal Rule of Civil Procedure 56©) provides that summary judgment shall only be rendered

when a review of the entire record demonstrates "that there is no genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986);

Donahue v. Windsor Locks Bd. of Fire Comm., 834 F.2d 54, 57 (2d Cir. 1987); Cronin v. Aetna

Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995).  The movant must satisfy a burden of showing the

absence of a genuine issue as to any material fact.  Celotex, 477 U.S. at 323-25, 106 S.Ct. at

2553-54; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142

(1970); LaFond v. General Physics Services Corp., 50 F.3d 165, 171 (2d Cir.1995); Cronin, 46

F.3d at 202; Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir.1994).

In determining whether there is a genuine issue of material fact, the court must resolve all

ambiguities and draw all factual inferences in favor of the party against whom summary

judgment is sought.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513,

91 L.Ed.2d 202 (1986); LaFond, 50 F.3d at 171; Cronin, 46 F.3d at 202; Gallo, 22 F.3d at 1223;

Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 57 (2d Cir.1987).  The

inferences to be drawn from the underlying facts revealed in materials such as affidavits,

exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the

party opposing the motion.  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir.1994);

see also Cronin, 46 F.3d at 202; LaFond, 50 F.3d at 171.

If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. Cronin, 46 F.3d at 203; *See also* LaFond, 50 F.3d at 171.

**B.      Count One - Fair Housing Act 42 U.S.C. §3617 - Discharge**

42 U.S.C. §3617 of the Fair Housing Act states in pertinent part:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, **or on account of his having aided or encouraged any person in the exercise or enjoyment of**, any right granted or protected by section 3603, 3604, 3605, or 3606 of this Title. (Emphasis added).

An employee who is discharged in retaliation for acting on behalf of the rights of individuals protected by the Fair Housing Act has standing to bring a claim under §3617. Gonzalez v. Lee County Housing Authority, 161 F.3d 1290 (11th Cir. 1998); Smith v. Stechel, 510 F.2d 1162 (9th Cir. 1975); Wilkey v. Pyramid Const. Co., 619 F.Supp. 1453 (D.Conn.1985); Berlickij v. Town of Castleton  2003 WL 831863 (D.Vt.,2003); Vercher v. Harrisburg Housing Auth., 454 F.Supp. 423, 424 (M.D.Pa.1978); Tokaji v. Toth, 1 Eq. Opp. Hsing Rptr. (PH) ¶ 13,679 (N.D.Ohio 1974).

A Section 3617 retaliation claim utilizes the same analysis as Title VII and other discrimination cases.  Regional Economic Community Action Program, Inc. v. City of Middletown, 281 F.3d 333 (2nd Cir. 2002); Harris v. Itzhaki, 183 F.3d 1043 (9th Cir. 1999).

A Fair Housing Act violation is shown if Hughes demonstrates that his involvement in a protected activity, (to wit, aiding or encouraging others in the enjoyment of activities protected by the Fair Housing Act), was a motivating factor for his discharge, even if it was not the only

factor that motivated the discharge.  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133,

120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); <u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d 196, 203 (2d Cir.

1995).

When analyzing a Fair Housing Act claim, courts use the analytical framework set forth

by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 1973) and refined in <u>Reeves</u>.

First, the plaintiff must establish a prima facie case of discrimination.  <u>McDonnell</u>

<u>Douglas</u>, 411 U.S. at 142.   In order to establish a prima facie case, Hughes must prove that: (1)

he was aiding or encourgaing others in activities protected by the Fair Housing Act; (2) he

suffered an adverse employment action; and (4) that there was a causal connection between the

adverse action and the protected activity.  <u>Walker v. City of Lakewood</u>, 272 F. 3d 1114 (9th Cir.

2001); <i>See</i> Reeves, 530 U.S. at 142.

Once the plaintiff establishes a prima facie case, the employer then must produce

legitimate, nondiscriminatory reasons for its adverse employment action.  <u>Reeves</u>, 530 U.S. at

142.  This burden is one of production, not persuasion; it can involve no credibility assessment.

Once the employer produces legitimate, nondiscriminatory reasons for its adverse

employment action, the plaintiff then must prove, by a preponderance of the evidence, that the

protected activity was a motivating factor.  <u>Reeves</u>, 530 U.S. at 143.  There must be sufficient

evidence on the record that the protected activity played a role in the decision-making process

and actually motivated the employer's decision.

It is permissible for the trier of fact to infer the ultimate fact of discrimination from the

falsity of the employer's explanation.  Disbelief of the reasons put forward by the employer may,

together with the elements of the prima facie case, suffice to show retaliation for engaging in a

protected activity. Reeves, 530 U.S. at 147. In appropriate circumstances, the trier of fact can

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a

retaliatory purpose. Reeves, 530 U.S. 147.

Defendants contend that the First Count Fails because (1) Hughes was not "aiding or

encouraging" anyone in their right to Fair Housing under the statute; (2) the protected activity

took place after the decision was made to terminate Hughes; and (3) there is no material factual

dispute about the defendants' legitimate reasons for discharging Hughes. Defendants contentions

indicate a misunderstanding of the nature of the claim, the facts underlying the claim, and the

law.

1.    Hughes was Aiding and Encouraging Others in the Exercise of Activities Protected by the
      Fair Housing Act

The language of the Fair Housing Act should be interpreted in a broad and inclusive

manner. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209, 93 S. Ct. 364, 34 L. Ed. 2d

415 (1972).

Relevant to the instant case, there were two FHA lawsuits filed against the Milford

Housing Authority in 1995. The two Fair Housing Act lawsuits were initially brought against the

Milford Housing Authority after the MHA cancelled its scattered site housing project, because

the subsequent loss of low income housing in Milford had a disparate impact on African-

Americans and Hispanics. To the extent that Mr. Vasiliou and the defendants sought to

undermine the Settlement Agreement and minimize the number of low income housing units that

were built, it violated the FHA.

Hughes, as an employee of the Milford Housing Authority with a number of years in non-profit housing, believed in the mission of the Milford Housing Authority to make as much affordable housing available as it could.  He believed that the MHA was obligated to make its best efforts to build the 28 units of housing called for by the settlement agreement.  Throughout his employment, he questioned excessive spending on soft costs, and over-payment for properties during the acquisition process that would diminish the amount of funds that would be available to acquire and develop housing.

There is an issue of fact as to whether Hughes conducted  "aided and encouraged" others in the exercise of rights under the Fair Housing Act, thereby making summary judgment inappropriate.

2.     Hughes' Conduct Preceded the Decision to Terminate His Employment

In Hughes' original complaint, the initial focus of the alleged protected activity was the February 28, 2002 conversation that he had with Al Kuncas.  At the time that he filed his complaint, Hughes had a good faith basis to believe that this specific conversation was a factor in his discharge because he was discharged eight days later without prior notice of any performance deficiencies, budgetary concerns, or any pending reorganization.

During discovery, the defendants disclosed documents and there was testimony that indicated that the issue of Hughes discharge had been addressed in December 2001-January 2002.

As outlined above, Hughes had been involved in protected conduct prior to December, 2001.  He had questioned payments to D'Emilia during periods when D'Emilia was inactive, and he questioned the cost of some of the property acquisitions.  These activities all preceded the

-24-

decision to discharge him.  Thus, contrary to defendant's assertion, it is not an undisputed fact that Hughes failed to engage in protected conduct before the termination decision was made.  In fact, Hughes had engaged in protected activity before the termination decision.

There is an issue of fact as to whether these earlier protected activities were causally connected to his discharge.

3.    Defendant's Justification of Hughes' Discharge as a Reorganization for Budgetary Reasons is Pretextual

The defendants justify Hughes' discharge as a reorganization of the maintenance department.  However, in August 2001, Mr. Vasiliou had already indicated that Hughes' primary focus was to be on modernization, rather than maintenance.  By March 2002, Hughes was the modernization coordinator, and with construction about to commence on the scattered site projects, he could have remained fully employed and focused all of his efforts.

As outlined above, Hughes was replaced as modernization coordinator by Mr. Vasiliou's friend, John Schukoske.  There was no reorganization.

In addition, there were no budgetary savings.   In 2002, Schukoske made nearly as much money as Hughes would have made.  In 2003, Schukoske made more than Hughes would have made.

The replacement of Hughes with Schukoske merely shifted the cost from one budget to another.  Schukoske was paid out of the HUD development budget, and further drained moneys available to pay for the scattered site housing.  Hughes had been paid out of MHA's operational budget.

There is a genuine issue of fact as to whether the budgetary and reorganization rationale used to justify Hughes' discharge were pretextual, thereby making summary judgment inappropriate.

## C.    Count Five (Breach of Contract)

The defendant contends that its 1999 Personnel manual cannot give rise to an implied contract as a matter of law because it contains a disclaimer.  Defendant ignores the fact that, in 2001, the defendant Milford Housing Authority issued a superseding personnel manual to its employees that had no disclaimer and also included an unambiguous provision requiring cause for termination of employment.

Statements in an employer's personnel manual may give rise to an express or implied contract between employer and employee.  In the absence of express language disclaiming an intent to create a contract, the determination of what the parties intended to encompass in their contractual language is a question of the intention of the parties, and an inference of fact.  The determination of the intent of the parties is within the province of the jury.  Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 532-33, 733 A. 2d 197 (1999).

Hughes and the other Milford Housing Authority employees were issued a personnel handbook in 1999 which contained a disclaimer.  The personnel handbook that was issued to Hughes and other employees in 2001 did not contain a disclaimer.  The 2001 handbook unambiguously sets forth a just cause requirement.  2001 Personnel Handbook, ¶7.7.

The Connecticut Supreme Court directly addressed the situation of a superseding employment manual in Torosyan v. Boehringer Ingelheim Pharmaceuticals, 234 Conn. 1, 662 A. 2d 89 (1995):

> When an employer issues an employment manual that confers on an employee greater rights than he or she previously had, the employee's continued work for the new employer thereafter ordinarily demonstrates that the employee has accepted that offer of new rights.

234 Conn. at 18.  *See* Morris v. Tri-Town Teachers Federal Credit Union, 2000 WL 1058882 (Conn. Super. 2000).  Here, Hughes continued working for the defendant after the 2001 Manual was issued, thereby accepting the greater rights that were offered by the 2001 Manual.

Thus, there are sufficient facts to conclude that the 2001 Personnel Manual constitutes an enforceable implied contract, thereby making summary judgment inappropriate.

**D.    Count Six (Breach of the Covenant of Good Faith and Fair Dealing)**

Defendants contend that this Count must fail because the plaintiff has failed to allege a violation of a public policy.   Defendant's motion on this count should be denied, however, because the plaintiff is entitled to make a claim for violation of the covenant of good faith and fair dealing in the context of a claim for breach of contract.

An action for breach of the covenant of good faith and fair dealing requires proof of three essential elements, which the plaintiff must duly plead: first, that the plaintiff and the defendant were parties to a contact under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits it reasonably expected to receive under the contract, the defendant was acting in bad faith.  Share America, Inc. v. Ernst & Young, Superior Court, Judicial District of Waterbury, Docket No. 150132 (July 2, 1999, Sheldon, J.); Scirocco v. Liberty Travel, Inc., 2003 WL 22234860 (Conn.Super. 2003).

As outlined above (See III.c), there are genuine issues of fact as to all three elements of this claim.  There is an issue of fact as to whether Hughes had an employment contract and there is an issue of fact as to whether the defendants have acted in bad faith in discharging Hughes. With respect to the third element, it is undisputed that Hughes was injured by his discharge from employment.

**E.      Count Seven (Fair Housing Act 42 U.S.C. §3617 - Vasiliou Lawsuit)**

Hughes may properly bring a claim of unlawful retaliation under 42 U.S.C. §3617 based upon Vasiliou's retaliatory lawsuit against him.  Walker v. City of Lakewood, 272 F. 3d 1114 (9th Cir.) cert. denied 535 U.S. 1114, 122 S. Ct. 1607 (2002); Marks v. BLDG Management Co., Inc., 2002 WL 764473 (S.D.N.Y. 2002); Broome v. Biondi, 17 F. Supp. 2d 211, 218-219 (S.D.N.Y. 1997); Zhu v. Countrywide Realty Co., 165 F. Supp. 2d 1181 (D. Kan. 2001); U.S. v. Wagner, 940 F. Supp. 972, 978-80 (N.D. Tex. 1996).

In Walker the Ninth Circuit held that the filing of a retaliatory lawsuit against a fair housing services provider who had supported and provided assistance to tenants involved in a Fair Housing lawsuit stated a potential cause of action under the anti-retaliatory provisions of the Fair Housing Act, 42 U.S.C. §3617.  Mr. Vasiliou's lawsuit against Hughes is directly analogous to the plaintiff's lawsuit in Walker.

The defendants contend that this claim must fail as a matter of law because (1) Defendants were unaware that Hughes had met with HUD on February 19, prior to the filing of Mr. Vasiliou's lawsuit against Hughes, and (2) Hughes had not engaged in activity that "aided" or "encouraged" others in the exercise of their rights under the Fair Housing Act.

1.     Plaintiff Engaged in a Number of Protected Activities That Aided or Encouraged Others in the Exercise of Rights Under the Fair Housing Act

As outlined above, Hughes engaged in a number of activities after his discharge that aided or encouraged others in the exercise of their First Amendment rights:

1.     He reported potential Fair Housing Act violations by Vasiliou to the Department of Justice and the individual plaintiffs' counsel in July - August 2002.

2.     He spoke out to the press about potential violations of the Fair Housing Act in July and October 2002.

3.     He filed a lawsuit in good faith alleging violations of the Fair Housing Act in October 2002.[5]

4.     He cooperated with a HUD investigation of potential violations of the FHA on February 19, 2004.

Each of these clearly constitutes a protected activity which is intended to aid or encourage others in the exercise of their Fair Housing Act rights.

2.     There is a Causal Connection Between These Protected Activities and Vasiliou's Lawsuit

Defendant contends that the claim must fail because the undisputed evidence presented by them is that they were unaware that Hughes had met with HUD in February at the time that Mr. Vasiliou filed his complaint.[6]  Defendant relegates the other enumerated protected activities

_____

[5]     Hughes is entitled to protection under the anti-retaliation provisions of the Fair Housing Act for filing a Fair Housing Act lawsuit in good faith.  That is a protected activity itself; he need not demonstrate the lawsuit was undertaken to "aid" or "encourage" others.

[6]     Plaintiff is unable to respond to defendants' evidence because the court did not permit the plaintiff to conduct any discovery on this issue.  Under the circumstances, the matter is best left for trial and treated as an evidentiary issue as

to a footnote, and dismisses them as being too remote in time to be causally connected.

     a.     <u>There is an Issue of Fact as to Whether any of the Defendants were Aware That Hughes had Spoken to HUD Prior to the Filing of Vasiliou's Lawsuit</u>

Dion Smith was aware that Hughes had met with HUD. Hughes Depo. Vol. III, pp. 20-21. The HUD personnel were also obviously aware that Hughes had been interviewed. Additionally, there was a fair amount of press coverage surrounding Hughes' remarks. No discovery has been done on this issue. It remains a question of fact as to whether Mr. Vasiliou or any of the defendants were aware that Hughes had spoken to HUD prior to the filing of the lawsuit.

     b.     <u>There is no Legitimate Non-Retaliatory Reason For Mr. Vasiliou to File a Lawsuit Against Hughes</u>

Mr. Vasiliou has not asserted any legitimate reason for filing the lawsuit against Hughes, and indeed, it would be impossible to do so.

It would strain credibility to believe that Mr. Vasiliou filed the suit in order to obtain monetary compensation. The case is frivolous, there is no evidence of damage to Mr. Vasiliou's reputation, and Hughes has been unemployed for over two years and unlikely to be able to pay any judgment.

It is not credible that Mr. Vasiliou filed the case in order to restore his reputation. He filed it in Middletown, where he lives. *See* Exhibit 33. All the publicity surrounding the case was in the Bridgeport - Milford area. *See* Exhibit 30.

---

to whether the meeting with HUD will be admissible in order to prove retaliation.

      c.     <u>Mr. Vasiliou Waited to File His Complaint Until he Had Completed Discovery</u>

The defendants, through their counsel, used the discovery process in <u>Hughes v. Milford Housing Authority</u> to assist Vasiliou to obtain evidence for his lawsuit.  Discovery in <u>Hughes v. Milford</u> closed on February 26, 2004.  Vasiliou served his complaint on Hughes on February 25, 2004.

      d.     <u>The Complaint was Filed and Served With the Intention of Harassing and Vexing Hughes</u>

Although Vasiliou could have brought his claims as permissive counterclaims in <u>Hughes</u>' pending federal action, he elected to bring his claims separately in state court.[7]

Vasiliou elected to file his complaint in Middletown, a jurisdiction as far and inconvenient for Hughes as possible.

Although Hughes was represented by counsel, the complaint was served by a sheriff by hand, without prior notice to counsel or Hughes.

The evidence overwhelmingly suggests that Vasiliou filed his complaint with the intent to coerce, intimidate, threaten, or interfere with Hughes and others similarly situated who would aid or encourage others in the assertion of rights under the Fair Housing Act.

**F.** **Count Eight ((42 U.S.C. §1983 Free Speech Claim - Vasiliou -  Lawsuit)**

Hughes may also bring a claim under 42 U.S.C. §1983 for retaliation for his exercise of his free speech rights based upon Vasiliou's filing of the defamation claim.  <u>Smith v. Garretto</u>, 147 F.3d 91, 95 (2d Cir. 1998); <u>Greenwich Citizens Committee v. Counties of Warren and Washington Industrial Development Agency</u>, 77 F.3d 26, 31 & n. 5 (2d Cir. 1996).

---

[7]     Ironically, it was the defendants in <u>Hughes v. Milford Housing Authority</u> who had elected to remove Hughes' complaint from state court to federal court.

42 U.S.C. §1983 states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

In order to assert a claim for a retaliatory lawsuit, the Hughes must demonstrate: (1) his actions are protected by the First Amendment; (2) defendants' actions have the effect of chilling plaintiffs' First Amendment rights; and (3) defendants' actions are motivated by or substantially caused by plaintiffs' decision to exercise these rights; and (4) defendants' intent was to chill the exercise of Hughes' First Amendment rights. Greenwich Citizens Committee, 77 F. 3d at 31.

Defendant's conduct that the claim must fail as a matter of law because (1) there has been no state action involved in Vasiliou filing his lawsuit; (2) Defendants were unaware that Hughes had met with HUD on February 19, prior to the filing of Mr. Vasiliou's lawsuit; (3) Hughes' speech was not on matters of public concern; and (4) the defendants are entitled to qualified immunity. Defendants contentions are without merit.

1.    Vasiliou was Acting Under Color of Law When He Filed His Complaint Against Hughes

A public employee acts under color of state law for § 1983 purposes "while acting in his official capacity or while exercising his responsibilities pursuant to state law." West v. Atkins, 487 U.S. 42, 50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Additionally, "a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." West v. Atkins, 487 U.S. at 49-50; Cahill v. O'Donnell, 7 F.Supp.2d 341 (S.D.N.Y. 1998).

In Columbo v. O'Connell, 310 F.3d 115 (2d Cir. 2002), the Second Circuit held that a government employee who files a private defamation suit is not acting under color of law for §1983 purposes.  *See also* O'Bradovich v. Village of Tuckahoe, 2004 WL 1616588 (S.D.N.Y. 2004).

The instant case, however, is distinguishable from Columbo.  In this case, the defendants through their attorney, acting in their official capacity defending this lawsuit, used the discovery process to aid and assist Mr. Vasiliou in his prosecution of his lawsuit against Hughes.  There is an issue of fact as to whether Mr. Vasiliou was acting under color of law when he filed this lawsuit against Hughes.

2.    There is a Causal Connection Between Hughes' Protected Activities and Mr. Vasiliou's Lawsuit Against Hughes

For the same reasons outlined in Section III E 3, supra, there is a causal connection between Hughes' protected activities and Vasiliou's lawsuit.

3.    Hughes' Speech Touched on Matters of Public Concern

Speech touches upon matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community."  Connick v. Meyers, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690 75 L. Ed. 2d 708 (1983); Abraham v. Gonzalez, 949 F. 2d 1567, 1574, (11th Cir. 1992).

Hughes' speech to the Department of Justice, to plaintiff's counsel (Attorney White) for the original Fair Housing lawsuit brought against the Milford Housing Authority, to the media, and to HUD all dealt with potential Fair Housing Act violations by the defendants.  Hughes' right to sue is also protected by the First Amendment because it is the "right conservative of all other

rights [which] lies at the foundation of orderly government," <u>Baker v. F and F Inv.</u>, 470 F.2d 778, 784 (2d Cir. 1972).

There is no real dispute that Hughes' speech touched upon matters of public concern and protected by the First Amendment.

4.    <u>Defendants Are Not Entitled to Qualified Immunity</u>

In order to resolve the issue of the affirmative defense of qualified immunity, a court must ask, first, whether "the facts alleged show the officer's conduct violated a constitutional right"; if so, "the next, sequential step" is to resolve the qualified-immunity claim by asking "whether the right was clearly established." <u>Bunting v. Mellen</u>, __ U.S. __, 124 S.Ct. 1750, 158 L.Ed.2d 636 (2004); <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

In determining the issue of qualified immunity for purposes of summary judgment, the issue of whether the officer's conduct violated a constitutional right must be viewed in the light most favorable to the injured party. <u>Catletti ex rel. estate of Catletti v. Rampe</u>, 334 F.3d 225 (2d Cir. 2003). A constitutional right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); <u>Catletti</u>, 334 F.3d 225.

In the instant case, Vasiliou's filing of a lawsuit, as outlined above, violates a constitutional right.

Hughes' right to speak out on matters of public concern is a clearly established constitutional right. <u>Catletti</u>, 334 F.3d 225. Moreover, as a former employee, Hughes presents no danger of interfering with governmental function by speaking out on matters of public

concern.

The fact that Hughes is entitled to be free from a retaliatory lawsuit is also a clearly established constitutional right.  <u>Smith v. Garretto</u>, 147 F.3d 91, 95 (2d Cir. 1998); <u>Greenwich Citizens Committee v. Counties of Warren and Washington Industrial Development Agency</u>, 77 F.3d 26, 31 & n. 5 (2d Cir. 1996).

As a result of the foregoing, the defendants are not entitled to qualified immunity in this case.

**IV.    CONCLUSION**

For the reasons stated herein, the defendants' Motion for Summary Judgment should be denied in its entirety, except as consented to herein.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFF, JOHN HUGHES**


By:_____
        Lewis H. Chimes
        *Fed. Bar No.: ct07023*
        GARRISON, LEVIN-EPSTEIN, CHIMES
           & RICHARDSON, P.C.
        405 Orange Street
        New Haven, CT  06511
        Ph:  (203) 777-4425
        Fax: (203) 776-3965
        lchimes@garrisonlaw.com


## CERTIFICATION

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. mail, postage prepaid, this 12th day of August 2004 to:

Ann Noble Walker, Esquire
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103-3597


_____
Lewis Chimes

-36-