UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                    \*   CIVIL ACTION NO.
JOHN HUGHES                         \*   3:02CV1917(SRU)
            PLAINTIFF               \*
                                    \*
VS.                                 \*
                                    \*
MILFORD HOUSING AUTHORITY,          \*
ET AL.                              \*
            DEFENDANTS              \*
                                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

COPY

-------------------------------------------------
            DEPOSITION OF:  JOHN HUGHES
-------------------------------------------------


     Taken before Irene A. Janazzo, Registered
Professional Reporter, Lic./Reg. No. 00085, and
Notary Public in and for the State of Connecticut,
pursuant to the Federal Rules of Civil Procedure,
at the offices of Robinson & Cole, LLP, 280 Trumbull
Street, Hartford, Connecticut, on September 12, 2003,
commencing at 10:46 a.m.


            BRANDON SMITH REPORTING SERVICE, LLC
                 44 Capitol Avenue
                 Hartford, CT  06106
                 Tel:  (860) 549-1850
                 Fax:  (860) 549-1537

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

9/12/2003                                                    John Hughes

Page 10

```
 1            down the road that I would have to be looking
 2            for another position.
 3    Q    What does "stable" mean?
 4                  MR. CHIMES:  Objection, form.
 5                  You can answer.
 6  BY MS. WALKER:
 7    Q    Strike that.  In the context of -- you used the
 8            word "stable" to describe -- let me finish.
 9            You used the word "stable" to describe what you
10            thought "permanent" meant as the term was used
11            by Mr. Vasiliou, right?
12    A    Um-hum.
13    Q    And in that context, how do you interpret
14            "stable?"
15                  MR. CHIMES:  Objection.
16                  You can answer the question.
17    A    "Stable" to me is permanent.  It's not a
18            contractual position that will last for 12
19            months, six months, five years or whatever.
20            It's the duration.
21  BY MS. WALKER:
22    Q    For how long?
23    A    Till the day that they carry me out or I'm no
24            longer here.
25    Q    So it was your understanding after that one
```

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Page 11

```
1         interview with Mr. Vasiliou that if you got
2         that job you would be employed for the rest of
3         your life?
4    A    Yes, yes.
5              MR. CHIMES:  Objection to the form.
6              You can answer.
7    A    Yes.
8    BY MS. WALKER:
9    Q    Was that based on anything other than the
10        statement that you would have permanent -- it
11        was a permanent position?
12   A    I took it as what I just said.  It was a
13        permanent position.  It wasn't a term position.
14   Q    What's a term position?
15             MR. CHIMES:  Objection to form.
16             You can answer.
17   A    A term position is what we just talked about,
18        whether it's six months, a year, whether the
19        job has a beginning and an end, and the dates
20        are set.
21   BY MS. WALKER:
22   Q    Had you ever had a permanent position with any
23        other employer?
24   A    In my lifetime?
25   Q    That would be the only thing that's feasible,
```

Hughes vs Milford Housing

9/12/2003                                                     John Hughes

Page 21

1    Q    So now you remember what he told you?

2    A    Vaguely, vaguely.

3    Q    He did not use the words, "This is a permanent

4         position" though, did he?

5    A    I don't recall the word "permanent" he used.    I

6         think I took it for granted that the job --

7         there was no beginning or end.    I was not told

8         when this work is done and finished then the

9         position is no longer there, no.

10   Q    Do you recall anything else that Mr. Dunn said

11        to you?

12   A    No, I don't.

13   Q    Other than meeting with Mr. Dunn or

14        Mr. Vasiliou, do you remember anyone else you

15        may have met with prior to starting your

16        employment?

17   A    No, I don't.

18             MR. CHIMES:   Objection to form.   He

19        already testified he met with the chairman.

20             MS. WALKER:   Well, he testifies that

21        he doesn't recall, and then he remembers

22        things so I'm making sure.

23   BY MS. WALKER:

24   Q    Did you ever discuss with anyone at the Housing

25        Authority about entering into an employment

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                          John Hughes

Page 22

| 1  |   | agreement for a specific term? |
|----|---|--------------------------------|
| 2  | A | No. |
| 3  | Q | Never came up? |
| 4  | A | I don't recall it. |
| 5  | Q | Do you know -- from your perspective, do you |
| 6  |   | know why you didn't ask -- strike that. |
| 7  |   | Did you ever ask them how long your |
| 8  |   | job would go for? |
| 9  | A | I don't think there was that feeling or that |
| 10 |   | conversation. |
| 11 | Q | Why not? |
| 12 | A | I go back to again that it was a permanent |
| 13 |   | position. |
| 14 | Q | Did you fill out an employment application? |
| 15 | A | Yes, I did. |
| 16 | Q | Did you read the employment application? |
| 17 | A | I'm sure I did. |
| 18 | Q | And you filled it out accurately? |
| 19 | A | To the best of my knowledge. |
| 20 | Q | Did you understand it when you filled it out? |
| 21 | A | I'm sure I did. |
| 22 | Q | Is this a copy of the employment application? |
| 23 |   | MS. WALKER:  You can mark that as |
| 24 |   | Defendant's 2. |
| 25 |   | |

Brandon Smith Reporting Service

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                    John Hughes

Page 23

1                          (Defendant's Exhibit No. 2,

2                          employment application, marked

3                          for identification.)

4

5    A    That's my signature, yes.

6    BY MS. WALKER:

7    Q    That's your signature on the bottom of what's

8         been marked as Defendant's Exhibit 2?

9    A    Yes.

10   Q    Can you take a minute to read the bottom

11        paragraph on the second page.  When you read

12        that back in 1998, what was your understanding

13        of what "At will" meant as it's used in that

14        paragraph?

15              MR. CHIMES:  Where's the term?  I

16           don't see that.

17              MS. WALKER:  First sentence.

18   A    That I could be let go at any time for any

19        reason, if a theft was involved, if I was not

20        to do the position as I was required to do it.

21   BY MS. WALKER:

22   Q    It says for any reason you could be let go,

23        correct?

24   A    That's what it says.

25   Q    And you understood that when you read it?

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                      John Hughes

---

Page 24

```
 1    A    Yes.

 2    Q    As we sit here today, do you think that that

 3         statement is consistent with your belief that

 4         you would have permanent employment at the

 5         Milford Housing Authority?

 6              MR. CHIMES:  Objection to form.

 7    A    Yes, I do.

 8   BY MS. WALKER:

 9    Q    How is that consistent?

10    A    It's consistent in my mind, because if somebody

11         does something illegal or other than what the

12         rules and regulations state, they can be

13         terminated.

14    Q    What about if the Housing Authority needed to

15         reorganize?  Could that be a reason that they

16         could let you go?

17              MR. CHIMES:  Objection to form.

18              You can answer.

19    A    I would suppose so.

20   BY MS. WALKER:

21    Q    And what about if they were having financial

22         problems?  Would that be a reason they could

23         let you go?

24              MR. CHIMES:  Objection to form.

25              You can answer.
```

---

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                      John Hughes

Page 25

1    A    I would think so, but I think at my age I would

2         have been called in, and this would have been

3         laid out to me, and it would have been

4         explained to me, give me ample time to recover.

5    BY MS. WALKER:

6    Q    What does your age have to do with this,

7         Mr. Hughes?

8    A    Well, as you get older, it makes it more

9         difficult to find a position, to go out and

10        start a new position.

11   Q    Are you suggesting that your age had some

12        impact on the decision that the Milford Housing

13        Authority made with respect to terminating your

14        employment?

15   A    I'm saying ladies and gentlemen in being fair

16        and equal to me I should have been called, and

17        this should have been laid out to me.

18   Q    That wasn't my question.  I understand that,

19        and that's a fair position, but that wasn't my

20        question.  My question is:  Is it your position

21        that your age had something to do with the

22        decision that the Milford Housing Authority

23        made with respect to the termination of your

24        employment?

25             MR. CHIMES:  Objection to form.

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                    John Hughes

Page 29

1   Q   Did anyone else at the Housing Authority say

2       anything to you about Mr. Smith's age, Frank

3       Smith's age?

4   A   It was kind of a general humorous thing in the

5       fact that at his age he still works as hard as

6       he does and he still pursues his daily

7       activities.

8   Q   Who said things like that to you?

9   A   Oh, numerous people on the staff.  I don't

10      recall.

11  Q   Did Mr. Vasiliou say things like that?

12  A   Not that I recall.

13  Q   Did the commissioner say things like that?

14  A   I didn't have that much to do with the

15      commissioner, no.

16  Q   Who on the staff said things like that?

17  A   The maintenance mechanics per se.

18  Q   And how often did they make those statements?

19  A   Oh, gee, it would come up in general

20      conversation.  I don't know how often.

21  Q   And it was -- tell me if I'm wrong, but it was

22      basically a comment that he was still working

23      at his age?

24  A   Correct.

25  Q   And was that good or bad that he was still

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                                    John Hughes

Page 30

```
 1            working at his age?

 2    A       They marveled at the fact of his agility at

 3            that age, both physical and mental.

 4    Q       Other than the comments of those coworkers

 5            about Mr. Smith's age, did anyone else ever

 6            make any comments that you heard about his age

 7            or that you know of?

 8    A       There was a receptionist that was friendly,

 9            Joyce Petrowski.  She used to kind of kid him.

10            Of course he brought the mail in to her and

11            different things, and Frank would join right in

12            with the conversation.

13    Q       And did anyone ever make any comments to you

14            about your age?

15    A       It was made occasionally -- I don't remember by

16            whom -- that, "Gee, you're close to Frank.

17            You're following Frank's footsteps."

18    Q       Did Mr. Vasiliou ever make any comment like

19            that?

20    A       I don't recall.

21    Q       You don't recall?

22    A       No.

23    Q       Did any of the commissioners ever make any

24            comments like that?

25    A       No.
```

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                           John Hughes

Page 47

```
 1    Q    Is it possible that you did?

 2    A    Quite possibly.  My signature is in two places,

 3         both basically one-day difference.

 4              MS. WALKER:  Mark this as Defendant's

 5           8.

 6

 7                        (Defendant's Exhibit No. 8,

 8                        personnel policies, revised

 9                        1/15/02, marked for

10                        identification.)

11

12    BY MS. WALKER:

13    Q    I'm going to show you what's been marked as

14         Plaintiff's Exhibit 8 -- Defendant's Exhibit 8.

15         What's that document?

16    A    Same as this only with a different date on it.

17              MR. CHIMES:  Objection.

18              MS. WALKER:  I understand.

19              MR. CHIMES:  He has not reviewed

20           Exhibit 8.

21    BY MS. WALKER:

22    Q    Those are -- that document says, "Milford

23         Housing Authority personnel policies," right?

24    A    Yes.

25    Q    And it's dated January 15th, 2002?
```

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                        John Hughes

Page 48

```
 1     A      Yes.

 2     Q      As you sit here today, do you recall getting

 3            another employee handbook in January of 2002?

 4     A      No, I don't.

 5     Q      No recollection whatsoever?

 6     A      No.  I don't see my initials, and I didn't fill

 7            in anything either.

 8     Q      Okay.  So to the best of your recollection, you

 9            got one in '99, and that's the only one you

10            got?

11                    MR. CHIMES:  Objection to form.  He's

12               got a signature on the 2001 one.

13     BY MS. WALKER:

14     Q      You can answer the question.

15     A      I must have received a second one, but, as I

16            stated before numerous times, I just worked out

17            of the '99 one.

18     Q      Okay.

19                    MR. CHIMES:  Does the Housing

20               Authority have a receipt for the 2002 one?

21                    MS. WALKER:  That's -- off the

22               record -- no.  You can stay on the record.

23               That's what I was looking for.  I can look

24               at it at lunchtime.

25                    MR. CHIMES:  I'm sure he did not.
```

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

9/12/2003                                                    John Hughes

Page 62

```
 1   BY MS. WALKER:

 2   Q    What do you believe about why you were

 3        terminated from the Milford Housing Authority?

 4   A    Personally believe?  That I was fired.

 5   Q    Why?

 6   A    Why?  An occurrence occurred with an architect

 7        a week earlier, and he came in looking for more

 8        money on soft costs for scattered site housing,

 9        and we had a conversation in my office with the

10        door closed, and at that point, I said to him,

11        "You know, this is more and more on soft costs.

12        There are unit prices.  There's overall costs,

13        and every time you're in here, it's increased

14        costs, and this is just more of the same stuff,

15        especially on the scattered site housing, that

16        when the Justice Department comes in that I

17        plan to show them."  And with that, the door

18        came flying open, and in comes Vasiliou on a

19        tirade just saying, "How dare you talk to an

20        outside person.  If you have anything to say,

21        come down and say it to me."

22   Q    What else did he say?

23   A    Oh, he went on and on.

24   Q    What did he say?

25   A    On and on about, "If you got anything to say,"
```

Hughes vs Milford Housing

Page 63

1           as I just said, "say it to me."

2      Q   How long did he talk to you?

3      A   In front of Kuncas probably a good six, seven

4           minutes.

5      Q   But you can only remember one phrase that he

6           said?

7      A   Yeah, he just went off and off.

8      Q   About what?

9      A   What I just said to you.

10     Q   Well, what you just said to me took about 35

11          seconds.

12     A   He kept repeating it.

13     Q   For seven minutes, he kept repeating that same

14          phrase?

15     A   I don't remember what the whole rest of it was,

16          but he was out listening at the door.

17     Q   And was Mr. Kuncas there the whole time?

18     A   Yes, he was.

19     Q   And why was the door shut?

20     A   It was quieter.

21     Q   Do you shut your door all the time?

22     A   A lot of time, yeah, when I have somebody come

23          in, yeah.

24     Q   If you can turn to paragraph 9, can you just

25          read that for a minute?

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                    John Hughes

Page 86

| 1 | Q | Can you turn to the next page.  Can you read |
| 2 | | paragraph 23.  What did you do to aid or |
| 3 | | encourage other persons in exercise of their |
| 4 | | rights granted by the Fair Housing Act? |
| 5 | | MR. CHIMES:  Objection to the form |
| 6 | | since that's a legal term. |
| 7 | | You can answer the question. |
| 8 | A | I've encouraged them to seek a union. |
| 9 | BY MS. WALKER: |
| 10 | Q | Who's that? |
| 11 | A | Members of the department that were in the |
| 12 | | classification that I was in. |
| 13 | Q | What else? |
| 14 | A | Pretty much that's it. |
| 15 | | MR. VASILIOU:  Which paragraph is |
| 16 | | that?  I'm sorry. |
| 17 | | MS. WALKER:  Paragraph 23. |
| 18 | BY MS. WALKER: |
| 19 | Q | Paragraph 25 indicates that you suffered mental |
| 20 | | anguish and emotional distress.  Following the |
| 21 | | separation of your employment, have you visited |
| 22 | | a doctor regarding mental anguish or emotional |
| 23 | | distress? |
| 24 | A | No, I haven't. |
| 25 | Q | Any sort of mental health care with respect to |

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                                John Hughes

Page 91

 1

 2                              (Luncheon  recess.)

 3

 4    BY MS.  WALKER:

 5      Q     Mr. Hughes, correct me if I'm wrong, but I

 6            believe you testified that you felt that you

 7            were terminated from the Housing Authority

 8            because of the statements that you made to the

 9            architect; is that correct?

10      A     That's correct.

11      Q     What's the basis for your belief that that was

12            the reason for your termination?

13      A     My gut feeling.

14      Q     Your gut feeling.  Anything else?

15      A     No.

16      Q     Do you know what's giving you that gut feeling?

17      A     Well, it was initially with me at the time, and

18            it stayed with me even though I looked at other

19            documents and talked with other people, but

20            it's just first impressions.

21      Q     Were any statements made to you that led you to

22            have that impression or that gut feeling?

23      A     Just felt it within myself.

24      Q     That's all.  That's it.  Nothing else?

25      A     Um-hum.

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                                      John Hughes

Page 118

| | | |
|---|---|---|
| 1 | | this and typed it up and given it to |
| 2 | | Mr. Vasiliou? |
| 3 | A | Or given him a clear -- clean, clear, concise |
| 4 | | without all the -- yeah. |
| 5 | Q | Do you recall the circumstances under which you |
| 6 | | wrote this, who asked you to write it, why you |
| 7 | | wrote it? |
| 8 | A | No.  I think this again goes back to the |
| 9 | | meeting I had that day with Al Kuncas, and that |
| 10 | | was about his contract, the moneys he had been |
| 11 | | paid and what his contract was for. |
| 12 | Q | Was it your position that he had been paid |
| 13 | | sufficient money, and he didn't need to be paid |
| 14 | | anymore? |
| 15 | A | At that time, yeah.  My feeling was that he had |
| 16 | | done his obligation, and this extra money was |
| 17 | | like, come on, Al, we all do extra work, yeah. |
| 18 | Q | Was that the position of your colleagues at the |
| 19 | | Housing Authority as well? |
| 20 | A | I don't think I discussed that at the time. |
| 21 | Q | So you didn't know when you had this meeting |
| 22 | | with Mr. Kuncas regarding the cost overruns |
| 23 | | what Mr. Vasiliou's position was on the cost |
| 24 | | overruns or what anyone else's position at the |
| 25 | | Authority was? |

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

Hughes vs Milford Housing

9/12/2003                                    John Hughes

Page 119

```
 1    A    No.

 2    Q    You never had a discussion with them about

 3         that?

 4    A    No.

 5    Q    And you don't recall the circumstances under

 6         which you wrote this memo or why you wrote it?

 7    A    No, and I wouldn't submit this like this.  I

 8         mean, this is -- what I do is an initial thing

 9         for the most part.  It's a rough draft.

10    Q    Okay.

11    A    Then I go back and say, "Gee" --

12    Q    On the second page, you'll see it says, "See

13         attached I fee summary by Kuncas Associates.

14         See attached II MHA ledger April 1st, 2002, to

15         February 24th, 2002."  What are those

16         documents?

17              MR. CHIMES:  Again, for the record,

18         this is a document that's being produced by

19         MHA.

20              MS. WALKER:  If he knows.

21              MR. CHIMES:  Your obligation would be

22         to have produced them rather than do a

23         memory test of what it is.

24              But you can answer the question.

25    BY MS. WALKER:
```

Brandon Smith Reporting Service

eb298653-e4e2-42dd-b6ca-61bf335eb3b0

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3

4

- - - - - - - - - - - - - - - - - - - - - - - -x  VOLUME II

5

JOHN HUGHES,                          :

6

            Plaintiff,                :

7                                         Civil No.
    -versus-                          : 302CV1917 (SRU)

8

MILFORD HOUSING AUTHORITY;            :

9  ANTHONY VASILIOU; RICHARD
   ANDERSEN; HILARY HOLOWINK;         :

10 JOHN AMENTA; EDWARD CANELLI;
   and JACK TUCCIARONE,               :

11
            Defendants.               :

12
- - - - - - - - - - - - - - - - - - - - - - - -x

13

14

15              Deposition of JOHN H. HUGHES,

16      taken pursuant to the Federal Rules of

17      Civil Procedure, at the law offices of

18      Garrison, Levin-Epstein, Chimes &

19      Richardson, P.C., 405 Orange Street,

20      Connecticut, before Gerald Gale, L.S.R.

21      00027, Registered Merit Reporter and a

22      Notary Public in and for the State of

23      Connecticut, on November 25, 2003,

24      at 10:05 a.m.

25

1    start.  You should start the first day the

2    contractor begins the project.

3        Q.   Have you ever in your capacity as a

4    professional retained a clerk of the works?

5        A.   Yes, I have.

6        Q.   When have you retained a clerk of the

7    works?

8        A.   When I worked in Norwalk, there was a

9    clerk of the works for the city hall project

10   there.  There has been a clerk of the works on a

11   number of construction jobs, Bridgeport.

12       Q.   Did you hire one for the Milford

13   Housing Authority?

14       A.   No.

15       Q.   Did you anticipate that the Milford

16   Housing Authority would need a clerk of the

17   works for any of their outstanding construction

18   projects or Harrison Avenue or --

19       A.   I assume that would be a

20   responsibility as well, but, no, that had not

21   been --

22       Q.   You assumed it would be your

23   responsibility to hire a clerk of the works?

24       A.   Yes.

25       Q.   You didn't expect to perform the job

1    of clerk of the works, did you?

2                    MR. CHIMES:  Objection to form.

3                    You can answer.

4         A.    I didn't know how that was going to

5    work out.

6         Q.    Why would you think that you would

7    have done the clerk of the works job?

8         A.    It's prudent to hire a clerk of the

9    works.

10        Q.    Your role was not clerk of the works?

11        A.    No.

12        Q.    How was your job different than what a

13   clerk of the works would do?

14        A.    The clerk of the works would report to

15   me.  As I mentioned before, he would be there

16   every day from the start of the job to the

17   completion of that day, where I wouldn't have

18   the time to do that.

19        Q.    Did you discuss with anyone, while you

20   were employed by the Milford Housing Authority,

21   hiring a clerk of the works?

22        A.    I believe I had a discussion with Dion

23   Smith about it.

24        Q.    When was that?

25        A.    Prior to my leaving the housing

1    authority.

2         Q.    Can you give me a month?

3         A.    Probably -- I left in March.    That

4    probably would have been January or February.

5         Q.    What did you say to Mr. Smith?

6         A.    That a clerk of the works should be in

7    place for construction projects.

8         Q.    Do you recall where this conversation

9    occurred?

10        A.    Gee, I don't know.

11        Q.    Was it within the Milford Housing

12   Authority?

13        A.    It could well have been.

14        Q.    What did Mr. Smith say about that?

15        A.    He more or less agreed with me.

16        Q.    Did you discuss the need to hire a

17   clerk of the works with your superior?

18        A.    We had not talked about that.

19        Q.    Why not?

20        A.    Just didn't come up in conversation.

21        Q.    Had the construction phase for any --

22   had the construction phase begun for the

23   scattered site project or for Harrison Avenue

24   during your tenure?

25        A.    Yes, it had.

1    Q.    Why wasn't a clerk of the works put in

2    place?

3    A.    There was a gentleman, Mark Bakstis,

4    who worked for John D'Amelia, and he more or

5    less was assuming that position.

6    Q.    Mark Bakstis was performing the job of

7    clerk of the works?

8    A.    More or less, yes.

9    Q.    What is the basis for your belief that

10   he was performing the job of clerk of the works?

11   A.    What he was doing when, on a daily

12   basis.  When I met with him, that is.

13   Q.    Did you tell him that you thought he

14   was doing the job of clerk of the works?

15   A.    No.

16   Q.    Did you discuss that with him?

17   A.    I don't recall.

18   Q.    You don't recall having any discussion

19   with Mark about clerk of the works?

20   A.    No.

21   Q.    Do you know if Mark was on the job

22   site every day?

23   A.    No, he was on different job sites.  It

24   was again scattered site housing.

25   Q.    Have you ever met John Schukoske?

1      A.    No, I have not.

2      Q.    Do you know anything about the hiring

3  of John Schukoske or Connecticut Home

4  Inspection?

5      A.    No, I don't.

6      Q.    Have you ever had a conversation with

7  Dion Smith about that?

8      A.    No.

9      Q.    How did you learn that the Milford

10  Housing Authority had hired a clerk of the

11  works?

12            MR. CHIMES:  Objection to form.

13            MS. WALKER:  Strike that.

14      Q.    Did you know that the Milford Housing

15  Authority had hired a clerk of the works?

16      A.    Yes.

17      Q.    How did you find out that the Milford

18  Housing Authority had hired a clerk of the

19  works?

20            MR. CHIMES:  Just identify the

21  source.

22      A.    I believe Dion Smith told me.

23      Q.    What did Dion Smith tell you?

24      A.    That they had hired a clerk of the

25  works for the construction.

1           MR. CHIMES:  Objection to form.

2      A.    It was a lot of money for what was

3 being done, I thought.

4      Q.    Other than D'Amelia & Associates --

5 Strike that.

6           A basis for your belief --  Did

7 you have a belief that too much money was being

8 spent on soft costs?

9           MR. CHIMES:  Objection to form.

10     A.    Yes.

11     Q.    The basis for that belief was you

12 thought John D'Amelia was getting paid too much

13 money?

14     A.    Yes.  I thought he was getting paid a

15 lot of money for what he did.

16     Q.    Do you know how much money he was

17 being paid?

18     A.    No.

19     Q.    Did you know at the time?

20     A.    I did at the time.

21     Q.    Could you identify where it would be

22 in this budget?

23           MR. CHIMES:  Objection.

24           Don't guess.

25     A.    No.

1   Q. Other than Mr. D'Amelia, is there

2 another basis for your belief that too much

3 money was being spent on soft costs?

4   A. One of the architect's fees were

5 services, and costs were growing.

6   Q. Did you know if --  Which architect

7 was that?

8   A. Alfonso Kuncas.

9   Q. You testified previously, I believe,

10 that you participated in the selection process

11 for Mr. Kuncas, correct?

12   A. Yes.

13   Q. Did you know how much money Mr. Kuncas

14 was supposed to be paid?

15   A. I did at the time, yes.

16   Q. Do you know -- did you know at the

17 time if the housing authority was within budget

18 on architectural engineering fees?

19       MR. CHIMES:  Objection to form.

20       You can answer.

21   A. What they had allocated, yes.

22   Q. You knew whether they were within

23 budgets or not --

24   A. For the budget that was presented,

25 yes.

230

1        Q.    What other budget would be relevant?

2        A.    You asked me about the budget to hire

3   the architects.   Their fee that they proposed

4   that was accepted was within the budget.

5        Q.    This document suggests that as of

6   December 2001, the housing authority was within

7   budget on architectural and engineering fees,

8   doesn't it?

9                    MR. CHIMES:   Objection.

10                   You can answer.

11                   Objection to form.

12       A.    Yes.

13       Q.    It suggests they were within budget on

14   consultant's fees, correct?

15       A.    For what they had allocated in the

16   budget, yes.

17       Q.    Did you have a problem with what was

18   allocated in the budget?

19                   MR. CHIMES:   Objection to form.

20       A.    No.

21       Q.    Other than --   I am trying to

22   understand, Mr. Hughes, your -- the reason why

23   you felt so strongly that all the money was

24   being spent on soft costs.

25                   MR. CHIMES:   Objection to form.

1   He never testified to that --

2       Q.    Did you believe that money was being

3   spent on soft costs so that 28 units would not

4   have to be purchased?

5               MR. CHIMES:   Objection to form.

6       A.    No.

7       Q.    What was your objection to the money

8   that was being spent on soft costs then?

9       A.    Well, how much money was spent for the

10  services, again, I go back to D'Amelia, but that

11  was within the budget, and the architect's costs

12  kept increasing.

13      Q.    You made the statement that the

14  housing authority was using up money on soft

15  costs so it wouldn't have to build 28 units,

16  right?

17              MR. CHIMES:   Objection to form.

18      A.    I never told the reporter that.

19      Q.    You never told the reporter that.  Did

20  Mr. Vasiliou tell you that?

21      A.    He made several statements that he had

22  no intention of ever purchasing 28 units of

23  housing.

24      Q.    How did you think he was going to get

25  around the acquisition of 28 units?

236

1      Q.   It wasn't one conversation that you

2 told her that?

3      A.   I believe.

4      Q.   It was that one conversation that you

5 told her that?

6      A.   I believe.

7      Q.   You dealt with cost overruns by

8 Mr. Kuncas, correct?

9      A.   Yes.

10     Q.   Were there other contractors that you

11 dealt with with respect to cost overruns?

12     A.   I don't recall.

13     Q.   Would that have been your job?

14     A.   Yes.

15     Q.   Did you hire Mr. Smith?

16     A.   Yes.

17     Q.   What was Dion Smith's job?

18     A.   Maintenance foreman.

19          MR. CHIMES:   Do you want five

20 minutes to wrap up?

21          MS. WALKER:   I want to confer

22 with my client.  We may be able to do this by

23 stipulation.

24          On the record, the last time we

25 had a dispute about who produced Exhibit 17.

Hughes vs Milford Housing

12/4/2003                                                      Shelley White

Page 1

```
 1
 2
                UNITED STATES DISTRICT COURT
 3
                 DISTRICT OF CONNECTICUT          COPY
 4
     - - - - - - - - - - - - - - - - - - x
 5   JOHN HUGHES,
                        Plaintiff,      |    Civil Action No.
 6                                           302CV1917 (MRK)
                     vs.                |
 7
     MILFORD HOUSING AUTHORITY,         |
 8   ANTHONY VISILIOUI, RICHARD ANDERSEN,
     HILARY HOLOWINK, JOHN AMENTA,      |
 9   EDWARD CANELLI AND JACK TUCCIARONE,
                                        |
10                   Defendants.
     - - - - - - - - - - - - - - - - - - x
11
12
13
14
15
             DEPOSITION OF:  SHELLEY A. WHITE
16           DATE:  DECEMBER 4, 2003
             HELD AT:   ROBINSON & COLE, LLP
17           280 TRUMBULL STREET
             HARTFORD, CT
18
19
20
21
22
23              Tiffany V. Pratt, LSR #00128
             BRANDON SMITH REPORTING SERVICE, LLC
24                   44 Capitol Avenue
               Hartford, Connecticut  06106
25                   (860) 549-1850
```

d324a02b-77da-4af1-80df-1fecd5f49dde

Hughes vs Milford Housing

12/4/2003                                                                    Shelley White

Page 38

1    what Mr. Hughes had been telling you in these previous

2    meetings; is that correct?

3              MR. FITZGERALD:  Objection to form.

4         A    Well, we weren't able to find evidence that would

5    lead us to feel that we had a sufficient basis for sending

6    the letter that was required under the consent decree to the

7    Housing Authority notifying them of a violation of the

8    consent decree.

9    BY MS. WALKER:

10        Q    Were you able to substantiate the allegations that

11   Mr. Hughes was making?

12        A    About money being spent?

13        Q    On soft costs or inappropriately on the purchase

14   price of homes.

15        A    The housing authority was -- which we already,

16   actually, knew this even before Mr. Hughes -- was that the

17   housing authority had made a decision when they acquired the

18   housing to -- not simply to spend money to bring the housing

19   up to what would be required by HUD to acquire the property,

20   but also to modernize houses and perhaps do more than what

21   would be the minimum that HUD would require in order to

22   approve the acquisition of the housing.  And that had been

23   of concern to us, because it had meant that there was less

24   money available for other housing, but whether it was a --

25   we did not believe it was a violation of the consent decree

d324a02b-77da-4af1-80df-1fecd5f49dde

Hughes vs Milford Housing

Page 39

1      as it had been negotiated.

2          Q     Did you tell Mr. Hughes that?

3          A     I have no recollection, but he wouldn't have known

4      the ins and outs.  He wasn't a lawyer.  He wouldn't have

5      known the consent decree.

6          Q     Wasn't he supposed to get a copy of the consent

7      decree?  Weren't all employees supposed to get a copy of the

8      consent decree?

9          A     They were, but my recollection was that that came

10     much, much later.  We were discussing that several years

11     after the consent decree, as to whether the employees had

12     ever received a copy of it, and I don't believe that they

13     did much before 1999.

14         Q     Would it surprise you if Mr. Hughes had never seen

15     the consent decree?

16               MR. FITZGERALD:  Objection to form.

17         A     Would it surprise me, no.

18     BY MS. WALKER:

19         Q     Why not?

20         A     I don't know.  I didn't think the housing -- the

21     housing authority hadn't made it available at some point in

22     time when we were inquiring about this, which was after the

23     settlement agreement had been signed, and my recollection

24     was at that point they were going to make it available, but

25     I don't know if we ever followed up to make sure it had

d324a02b-77da-4af1-80df-1fecd5f49dde

Hughes vs Milford Housing

12/4/2003                                                        Shelley White

Page 40

1    been.

2        Q    Do you have any reason to believe they didn't make

3    it available to their employees?

4        A    I have no knowledge one way or the other.

5        Q    You said that, we went to audit the files.  What

6    do you mean by "we"?  What was your --

7        A    I didn't mean audit.  I meant to review the files.

8        Q    Under what authority did you go to review the

9    files?

10       A    Under the authority of our consent decree.

11       Q    You went with the Department of Justice?

12       A    Yes.

13       Q    So I come back to my question.  Is it fair to say

14   that you -- strike that.

15            Mr. Hughes was telling you that he thought money

16   was being spent inappropriately on soft costs, correct?

17       A    That's -- yes.

18       Q    And he also told you that he thought perhaps that

19   the purchase price of the homes was too high; is that

20   correct?

21       A    Yes.

22       Q    And is it fair to say that when you went to review

23   the files with the Department of Justice, you couldn't find

24   evidence of that; is that true?

25       A    Sufficient for us to bring a compliance proceeding

d324a02b-77da-4af1-80df-1fecd5f49dde

Hughes vs Milford Housing

12/4/2003                                                               Shelley White

Page 41

1    against the Milford Housing Authority.

2        Q    What evidence did you find of it?

3        A    I have no recollection at this point in time.    I

4    mean, I was looking to see if there was going to be some

5    reason for bringing some kind of enforcement action.    We

6    didn't find that, and so I would have turned my attention

7    elsewhere.

8        Q    So you didn't find any evidence of it?

9             MR. FITZGERALD:    Objection to form.

10       A    I did not find sufficient evidence to warrant

11   doing that.

12   BY MS. WALKER:

13       Q    Well, sufficient evidence implies that you found

14   some evidence, and I'm asking, if you found some evidence,

15   what was that?

16       A    I would have no memory at this point in time.

17       Q    Did you take notes during your review?

18       A    If I -- did I take notes during my review?    I

19   always take notes during my reviews.    Whether I still have

20   those notes, probably not.    I would have kept them if there

21   had been a compliance proceeding.    There was no compliance

22   proceeding.    I probably don't have those notes as we speak.

23       Q    So as we sit here today, in effect, you did not

24   find anything to support the charges that Mr. Hughes was

25   making?

d324a02b-77da-4af1-80df-1fecd5f49dde

Hughes vs Milford Housing

12/4/2003                                                    Shelley White

Page 42

1            MR. FITZGERALD:  Objection to the form.

2       A    I did not find evidence at that point in time that

3   would justify going in to court against the housing

4   authority.

5   BY MS. WALKER:

6       Q    Did you find evidence that supported

7   Mr. Hughes' allegations?

8       A    There was -- as I said, we already knew that the

9   housing authority was spending perhaps more on these units

10  than they might have been required by HUD to have spent, but

11  we didn't feel that that was a violation of the consent

12  decree.

13      Q    Did you find any evidence that Mr. Visiliou did

14  not have any intent to comply with the terms of the

15  settlement agreement?

16      A    Can you repeat the question?

17      Q    Did you find any evidence that Mr. Visiliou did

18  not have any intent to comply with the terms of the

19  settlement agreement?

20      A    We didn't find any evidence that he was -- that

21  Mr. Visiliou was noncompliant.

22      Q    To your knowledge, has Mr. Hughes met with the

23  Department of Justice about this matter beyond the meetings

24  that you've described to me?

25      A    No.

Brandon Smith Reporting Service